1                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA
2

3     UNITED STATES OF AMERICA,          )
                                         ) Case No.:
4     vs.                                ) 2:20-cr-00254-AB-1
                                         )
5     NICHOLAS HOVAN,                     ) Philadelphia, PA
                                         ) June 29, 2021
6          Defendant.                     )

7                     TRANSCRIPT OF PROCEEDING
                  (EVIDENTIARY SUPPRESSION HEARING)
8              BEFORE THE HONORABLE ANITA BRODY
             SENIOR UNITED STATES DISTRICT COURT JUDGE
9

10    APPEARANCES:

11    For the Government:        PATRICK J. MURRAY, ESQ.
                                 KATHRYN E.DEAL, ESQ.
12                               JENNIFER A. WILLIAMS, ESQ.
                                 U.S. ATTORNEY'S OFFICE
13                               615 Chestnut Street
                                 Suite 1250
14                               Philadelphia, PA 19106

15    For the Defendant:         RYAN P. FAYHEE, ESQ.
                                 TYLER D. GROVE, ESQ.
16                               HUGHES HUBBARD & REED LLP
                                 1775 I Street NW
17                               Washington, DC 20006

18    ESR Operator:              Ames F.G. Scheidt

19

20

21

22

23

24                          HUNT REPORTING COMPANY
                          12 Crain Highway, NW
25                          Glen Burnie, Maryland 21061

1                          I N D E X

2              O P E N I N G   S T A T E M E N T S

3    PARTY                                              PAGE

4    BY THE GOVERNMENT                                    7

5    BY THE DEFENDANT                                    19

6                      E X H I B I T S

7    NO.       DESCRIPTION                    ID.    EVID.

8    All government exhibits received without        19
     objection
9

10   FOR THE DEFENSE:

11   5         302 of 2/10/20 Interview        158     ---

12   6         302 by Special Agents Jackson   175     ---
               and Fear
13

14   7         302 by John Christopher Vacanti 183     ---

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                THE COURT:  Move back to the back.
 3                MR. MURRAY:  And, Your Honor, there's
 4    two government agents.  I have not checked with them
 5    whether they're vaccinated.  I know one plans on
 6    wearing a mask when he testifies.
 7                THE COURT:  Well, but I have to wear a
 8    mask if he's going to be --
 9                MR. MURRAY:  Okay.
10                THE COURT:  There's not much --
11                MR. MURRAY:  Okay.  And I can check
12    with him now if the Court would like, you know, or I
13    can have the agent check --
14                THE COURT:  That's fine.  When he's
15    called.
16                MR. MURRAY:  Yes.
17                THE COURT:  Then you can let me know
18    and I'll have to wear my mask.
19                MR. MURRAY:  Thank you very much.
20                THE COURT:  I mean, I'm vaccinated but
21    that isn't the issue.
22                MR. MURRAY:  I understand.  For safety.
23                THE COURT:  Yeah.
24                MR. MURRAY:  We'll check right now.
25    Thank you, Your Honor.
```

```
 1                    THE COURT:  Okay.  All right.  You can
 2    -- if you're ready, prepare -- the person who isn't
 3    vaccinated has to keep their mask on.  Do you
 4    understand that?  Okay.
 5                    All right.  We're here in the matter of
 6    the United States v. Nicholas Hovan at criminal action
 7    number 2020-254-1.  And I recognize the presence of
 8    Jennifer Williams.  Good morning, Ms. Williams.
 9                    MS. WILLIAMS:  Good morning, Your
10    Honor.
11                    THE COURT:  Mr. Murray?
12                    MR. MURRAY:  Yes, Your Honor.  Good
13    morning.
14                    THE COURT:  And Ms. Deal?
15                    MS. DEAL:  Yes.  Good morning, Your
16    Honor.
17                    THE COURT:  And there's a case agent?
18    Mr. Torno, is that correct?
19                    MR. PICANTE:  I'm Agent Vacanti (ph).
20    And Mr. Torno's behind me.
21                    THE COURT:  Okay.  All right.
22    That's -- you're -- it's okay.  Thank you.
23                    Okay.  And for defense, Ryan Fayhee, I
24    think it would be.
25                    MR. FAYHEE:  Good morning, Your Honor.
```

```
 1                    THE COURT:  And with you?

 2                    MR. FAYHEE:  My colleague, Tyler Grove.

 3                    MR. GROVE:  Tyler Grove.

 4                    THE COURT:  Okay.  And then --

 5                    MR. FAYHEE:  And we're joined by Mr.

 6     Hovan --

 7                    THE COURT:  Okay.

 8                    MR. FAYHEE:  -- to my right.

 9                    THE COURT:  All right.  Thank you.

10                    All right.  It's --

11                    MR. MURRAY:  The report is both the

12     agents are vaccinated.  The agent, for personal

13     reasons, would like to keep a mask on regardless.

14                    THE COURT:  Oh, they can certainly --

15     they certainly can do that.  And I'll decide whether

16     I'm going to or not.

17                    MR. MURRAY:  Great.  Thank you.

18                    THE COURT:  Okay.  But if you'd like --

19     it's very hard to dress accordingly if you have masks

20     on.  And I've asked the one person -- is everyone else

21     in the courtroom vaccinated?  You're not.  Okay.  And

22     you're way in the back, too.  And you're the agent?

23                    MR. TORNO:  Yes, ma'am.

24                    THE COURT:  Okay.  And are you

25     vaccinated, too?  No.  I'm talking -- and the two in
```

1    the back?  And you're you vaccinated?

2                    MR. PICANTE:  Yes, Your Honor.

3                    THE COURT:  Okay.  I'm taking your word

4    for it.  I mean, it's not a matter of me.  It's a

5    matter of you.

6                    Okay.  The government has the burden.

7    They can begin.

8                    MR. MURRAY:  And just -- Ms. Deal's

9    going to speak here.  Does that mean, Your Honor, that

10   it's permissible for us to take our masks off, Your

11   Honor?

12                   THE COURT:  Yes.

13                   MR. MURRAY:  Thank you.  I just wanted

14   to confirm that.

15                   THE COURT:  Yeah.  Sure.  If you're

16   willing to, of course.

17                   MR. MURRAY:  Thank you.

18                   THE COURT:  That's -- you now know --

19   you now know what's here.  Okay?

20                   MS. DEAL:  Good morning, Your Honor.

21   Kate Deal on behalf of the government.

22                   THE COURT:  Who -- I wasn't introduced

23   to you.

24                   MS. DEAL:  Kate Deal.

25                   THE COURT:  Okay.

```
 1                      MS. DEAL:  Is it okay with Your Honor

 2     if I approach the podium?

 3                      THE COURT:  Of course.

 4                      MS. DEAL:  Good morning.

 5                      THE COURT:  You're not -- you haven't

 6     made an appearance.

 7                      THE CLERK:  No.  She has, Your Honor.

 8     (indiscernible).

 9                      MS. DEAL:  Katherine.  Katherine Deal,

10     D-E-A-L.

11                      THE COURT:  No.  Oh, sorry.  Okay.  My

12     apologies.

13                      MS. DEAL:  Thank you.

14                      THE COURT:  Okay.  All right, Ms. Deal.

15                      MS. DEAL:  Thank you, Your Honor.

16                      As Your Honor well knows, we're here

17     today for a hearing on whether Defendant Nicholas

18     Hovan voluntarily consented to the search of his two

19     cell phones, a Samsung phone and an iPhone, both of

20     which were in his possession at the time of his arrest

21     in this case on February 10th, 2020 here in

22     Philadelphia.

23                      THE COURT:  Okay.

24                      MS. DEAL:  As Your Honor may recall,

25     that arrest occurred just a couple of blocks from here
```

1   at the Hotel Monaco.  During a meeting in which

2   Defendant Hovan and several of his co-conspirators

3   were finalizing and implementing their plan to engage

4   in a legal transaction in sanctioned Iranian oil.

5                    Now today, for purposes of this

6   hearing, Your Honor, the government intends to present

7   a variety of evidence to demonstrate Defendant Hovan's

8   voluntary consent.

9                    THE COURT:  Okay.  I have heard the

10  tape.

11                   MS. DEAL:  Great.

12                   THE COURT:  I listened to it over the

13  weekend.

14                   MS. DEAL:  Wonderful, Your Honor.  We

15  have a full copy of that recording in our exhibit

16  binder.  We also have a full copy of the transcript of

17  that post-arrest interview --

18                   THE COURT:  I'm not in my own courtroom

19  sometimes.

20                   MR. MURRAY:  May I approach, Your

21  Honor?

22                   THE COURT:  Yeah, of course.

23                   THE COURT:  Okay.

24                   MS. DEAL:  Great.  So as Your Honor

25  will see, in our exhibits today, we plan to present

1    the audio recording.  Relevant excerpts of that

2    recording will be played.  We have the full transcript

3    of that post-arrest interview in which Defendant Hovan

4    repeatedly gave his consent to the search of his cell

5    phones.  We also have some documentary evidence for

6    Your Honor including a copy of Defendant Hovan's

7    signed written consent form.  That's a form which

8    Defendant Hovan signed during this interview in which

9    he acknowledged expressly that he was given voluntary

10   consent to the search of these two phones.

11              From the government's perspective, Your

12   Honor, we think that those two pieces of evidence are

13   sufficient to carry our burden, in and of itself, but

14   we're also prepared today to present the testimony of

15   the two interviewing agents.  It's Special Agent

16   Jessica Fear and Special Agent Christopher Jackson of

17   the FBI who participated in that post-arrest interview

18   and who we intend to present to provide consistent

19   testimony today.

20              THE COURT:  Okay.

21              MS. DEAL:  Now before we jump into the

22   evidence, Your Honor, if the Court will permit the

23   indulgence, I'd like to take just a couple of minutes

24   to provide some legal and factual framework for

25   today's inquiry.

 1                      THE COURT:  Yes.  What's the problem?
 2                      MR. FAYHEE:  Your Honor, just for the
 3   record, it would be great if we took evidence before
 4   getting into argument unless they give me the
 5   opportunity to respond to their arguments before
 6   taking evidence.
 7                      THE COURT:  Yeah.  You want an opening
 8   statement?  Is that what you want?
 9                      MS. DEAL:  Yes, Your Honor.
10                      THE COURT:  Okay.  You can have a
11   chance to do --
12                      MR. FAYHEE:  Sure.
13                      THE COURT:  -- an opening statement.
14   So sure.
15                      MS. DEAL:  So, Your Honor, just to put
16   everyone in the right frame of mind in terms of the
17   legal framework, as Your Honor well knows, the Fourth
18   Amendment permits consent searches.  If the validity
19   of that consent is challenged, the government has the
20   burden by a preponderance of the evidence to show that
21   the consent is freely and voluntarily given.  The
22   question of whether consent to search is voluntary as
23   opposed to the results of undue duress or coercion is
24   a question of fact.  And as the Court knows, it's
25   measured by the totality of the circumstances.

1              In turn, that totality is measured by a

2    variety of factors.  The Court can consider the

3    defendant's demeanor, the length of the defendant's

4    encounter with law enforcement, the atmosphere of any

5    questioning, whether the officers and agents involved

6    in the interview displayed any show of force.  It also

7    may be relevant to consider the defendant's age, the

8    defendant's education and intelligence and whether the

9    defendant had been advised of his constitutional

10   rights.

11             I'd also like to note for Your Honor

12   that disclosure of the defendant's right to refuse

13   consent is relevant but it's not necessary to

14   establish valid consent.  And here, as Your Honor will

15   hear and see today from the evidence, Defendant Hovan

16   received written disclosure of his right to refuse

17   consent to the search and he then signed a written

18   acknowledgment that he had received that notification.

19             When evaluating the validity of consent

20   under this totality of the circumstances test, no

21   single factor is dispositive.

22             Now, Your Honor, with that basic legal

23   framework in mind, I submit to you that you will hear

24   overwhelming and irrefutable evidence that Defendant

25   Hovan repeatedly gave voluntary consent to the search

1    of his two cell phones.

2                    And, Your Honor, it's not just that he

3    gave voluntary consent, but he did it repeatedly in

4    recorded oral statements and in writing during the

5    course of, again, a fully recorded, fully Mirandized

6    post-arrest interview that in its entirety lasted less

7    than one hour in length.  In fact, one of the things

8    that's remarkable about this case is that Defendant

9    Hovan repeated volunteered the consent.  And what I

10   mean by that is he invited the agent to look at

11   evidence on his phone before they even asked about his

12   phone.  For example, Your Honor will hear in the

13   recording and will see in the transcript that in

14   response to an open-ended question about whether the

15   defendant had anything further he'd like to share,

16   Defendant Hovan volunteered that he would point the

17   agents to every single conversation he's ever had.

18   That statement came after Defendant Hovan had already

19   invited the agent to both take and look at his chat

20   with co-conspirators.  That statement also followed

21   his prior invitation to the agents to "have at his

22   WhatsApp conversation and things like that" because

23   using Defendant Hovan's own words, those were fair

24   game for law enforcement.

25                    As everyone in this courtroom is well

1    aware, things like chat, things like a WhatsApp

2    conversation, other similar kinds of conservation,

3    they appear on cell phones.

4                Now given all of these unprompted open

5    invitations from Defendant Hovan to have the agent

6    look at evidence on his phone, what did these agents

7    do?  They did what good agents are supposed to do.

8    They confirmed.  They asked Defendant Hovan to confirm

9    his consent in writing if he was okay with the agents

10   looking through his phone.  And surprisingly, as you

11   will hear, given the tenor of the entire conversation,

12   how did Defendant Hovan respond?  He confirmed that,

13   yeah, he was okay with that.  And then he further

14   confirmed that consent in writing by reviewing and

15   signing a straightforward one-page standard written

16   consent form.

17               Now, Your Honor, you'll see that form.

18   It is in the binder today.  That consent form

19   specifically identifies Defendant Hovan's two cell

20   phones as the property to be searched.  And by signing

21   that form, Defendant Hovan acknowledged expressly in

22   writing that he was giving the consent voluntarily and

23   further that he had the right to refuse consent.

24               Remarkably, Your Honor, as you will

25   hear, Defendant Hovan's offering of consent didn't end

1    there.  They continued.  After providing written

2    consent to the search of his phones, he continued to

3    make oral statements offering up those devices to the

4    agents.  He told the agents "They should feel free to

5    look at everything in the phone" and that he would

6    point the FBI to the most --

7                    MR. FAYHEE:  Your Honor, I'm sorry to

8    interrupt the argument.  I think the issue today is

9    about consent.  So there's a whole -- I mean, if we

10   want to open it up and have a mini trial about whether

11   or not the client's guilty or not, but going beyond

12   consent, if the issue is for consent, I think the

13   government ought to limit themselves.  Happy to

14   examine everything leading up to the moment of his

15   arrest, the moment of the consent form.  But if we're

16   going to get into then what he said following consent,

17   I think that goes well beyond the scope of what Your

18   Honor is allowed for today.

19                   MS. DEAL:  Your Honor, this is an

20   example of one of the many instances in which consent

21   was given all of which, I understand, are being

22   challenged.

23                   THE COURT:  No.  I think -- that wasn't

24   my understanding.  But if you believe it's your

25   understanding, I'll let you certainly argue it.  Would

```
 1   you get closer to the microphone?

 2                 MS. DEAL:  Sorry.  Can you hear me --

 3                 THE COURT:  Or move the mic -- yeah.

 4   I'm not sure.  Is the microphone -- one second.  I'm

 5   not quite used to this --

 6                 MS. DEAL:  No worries.  Oh, there we

 7   go.

 8                 THE COURT:  Okay.  Yeah.

 9                 MS. DEAL:  Is that better?

10                 THE COURT:  Much better.

11                 MS. DEAL:  Thank you.

12                 So, Your Honor, as I was just saying,

13   not only did Defendant Hovan provide written signed

14   consent, he also continued to offer his oral consent.

15                 THE COURT:  Afterwards.

16                 MS. DEAL:  Afterwards.

17                 THE COURT:  At the --

18                 MS. DEAL:  At the same one hour -- less

19   than one hour recorded interview.

20                 THE COURT:  All right.

21                 MS. DEAL:  He is challenging consent

22   even though he told the agents they should feel free

23   to look through everything on his phone.  He offered

24   to point them to the most important conversation.

25   With respect to his personal cell phone, he directed
```

1    the agents to "go in here and see everyone that's in

2    the chat".

3                    Now, Your Honor, as you will also hear

4    from the evidence today, Defendant Hovan made all of

5    these statements of voluntary consent after receiving

6    and waiving his Miranda rights, both orally and in

7    writing at the outset of the conversation.

8                    You'll also hear, Your Honor, that for

9    their part, throughout this recorded interview, the

10   agents never showed force.  The agents never mentioned

11   any search warrant.  In fact, the words "search

12   warrant" were never uttered by anyone during the

13   entire course of the interview.  The agents never

14   mentioned any other  legal process or other means by

15   which they might obtain information that was on

16   Defendant Hovan's phones if he didn't consent.  They

17   surely never said or even suggested that Defendant

18   Hovan was required to consent.  There is simply no

19   evidence of coercion on this record.  There were no

20   misrepresentations by these agents.  And there's

21   simply no doubt that Defendant Hovan gave valid

22   consent multiple times in multiple ways orally and in

23   writing prior to the search of his two phones.

24                    Your Honor, you'll also hear, on the

25   recording and through the witnesses, that during the

1   course of this interview, Defendant Hovan was

2   perfectly lucid.  He appeared eager to cooperate.  And

3   he was relaxed enough to joke and laugh with the

4   agents at times which you'll hear.

5               The agents will also explain for Your

6   Honor the physical circumstances in which this

7   interview occurred.  You'll hear that Defendant Hovan

8   was sitting across a round table from the agents in a

9   small quiet interview room.  It was well lit.  It was

10  maintained at a comfortable temperature and the

11  interview occurred in the middle of the day.

12              At no point during that conversation

13  will you hear Defendant Hovan express any reservation

14  about his repeated offerings of consent.  He didn't

15  ask any questions about whether to consent.  He didn't

16  mention a search warrant.  He didn't ask about a

17  search warrant.  And he didn't rescind or even attempt

18  to rescind the consent that he repeatedly and

19  consistently gave.

20              Your Honor, what you'll hear is that

21  upon receiving his constitutional rights, he made the

22  tactical decision to appear cooperative and

23  forthcoming.  From start to finish in this

24  conversation, Your Honor will hear he told the agents

25  that he determined the best thing for him to do at

1   that point in time, having been caught out by the FBI,

2   was to tell the agents what he knew or to at least

3   appear as if that was what he was doing in this

4   interview.

5            In addition, Your Honor will learn

6   today a little bit about Defendant Hovan's educational

7   and professional background.  At the time of his post-

8   arrest interview, Defendant Hovan was in his thirties.

9   He had attended a prestigious private school.  He had

10  subsequently graduated with a degree from Buchtel

11  University.  Following that, he had more than 10

12  subsequent years as a working professional, including

13  most recently as an executive working for AT&T, a

14  Fortune 50 company.

15           Now, Your Honor, you'll hear all of

16  these facts today.  They're all consistent and they

17  form relevant and compelling evidence establishing

18  voluntary consent from the totality of the

19  circumstances.

20           In terms of the particular exhibits

21  that we have given --

22           THE COURT:  Well, we can go through

23  those when --

24           MS. DEAL:  -- to the Court --

25           THE COURT:  -- you present them.

1              MS. DEAL:  My understanding, Your

2    Honor, from defense counsel is that there's no

3    objection to these exhibits.  They are the same

4    materials that were submitted with our opposition

5    brief.  And so, assuming there's no objection, the

6    government would offer them formally into evidence at

7    this point.

8              MR. FAYHEE:  No objection, Your Honor.

9              THE COURT:  Okay.  Thank you.

10    (Government's unopposed exhibits received)

11             THE COURT:  All right.  Would you like

12    to address the Court, Mr. Fayhee?

13             MR. FAYHEE:  Thank you, Your Honor.

14             Just a few points I'd like to draw your

15    attention to as we're talking about the presentation

16    of evidence here on cross-examination, a few points, I

17    think for contextual purposes.  It's true that my

18    client, Mr. Hovan, is educated.  In fact, at the time

19    of the arrest, as was stated, he worked at AT&T in

20    their help care solutions arm.  He was a college

21    graduate.  He had never been arrested ever before in

22    his life.  Not even a traffic ticket which is

23    remarkable in particular.  What's missing, though,

24    from that picture that's being painted is less than an

25    hour before he was sitting in that room, he was in

1    another with his back to the door through which and

2    purposefully set out that way in a room with FBI

3    agents and a confidential human source.  They were set

4    to the back of the door for the purposes of allowing

5    the FBI to surprise them with guns drawn, remove him

6    from that location and taken to another one in

7    handcuffs.  And in the course of that interview's

8    significant omissions of what was just the picture

9    that was just painted.

10                   What you didn't hear is that that short

11   while after his arrest at gunpoint for a sanctions or

12   alleged sanctions violation, he's sitting with two

13   handcuffs connected to the table with two FBI agents,

14   a person who's never been arrested, who's used to

15   working at AT&T and is quite obviously scared for his

16   life.  This is an important context in which the

17   alleged consent was given.  This isn't a traffic stop

18   where he's, you know, not in a custodial setting.

19   This isn't at home when the FBI shows up at the door

20   and asks for consent to search the house.  This is the

21   first time arrest of a young man who works at AT&T and

22   is in handcuffs strapped to the table in a nondescript

23   building in a place he has no idea where he's at.

24   Okay?  Clearly, he knew he was in the custody of the

25   FBI.  I'm not seeking to suggest that.  I'm just

1    saying that custodial setting is relevant to the

2    question of whether or not he gave voluntary consent.

3                    Now, Your Honor, this idea that he

4    repeatedly gave consent is absolutely incorrect.  Mr.

5    Hovan absolutely was willing, voluntary and truthful

6    in this interview.  The agents took pains to read

7    through in great detail his Miranda warnings, in fact.

8    They initialed every Miranda warning they gave him and

9    he signed a consent to speak to these agents.  He

10   absolutely offered in that setting to walk through

11   messages that he had had.  Now the product of that --

12   I know this isn't before the Court today but it is

13   important context.  The reason he sought to do that is

14   because one of the confidential human sources that sat

15   before him in this town told him what he was doing did

16   not violate the law.  And he wanted to demonstrate it

17   to the agents.  That is not the same as consenting to

18   the full search of the phone.  And what you're going

19   to hear today from the agents, either on direct or on

20   cross-examination, is, in fact, when Mr. Hovan offers

21   his understanding, comments like "You're probably

22   going to look at these anyway" or when offering the

23   passcode before a consent form is even brought up, the

24   statement made, "Yeah, we're going to look at both of

25   them irregardless".  And so the fact that it wasn't

1    mentioned that there was a search warrant or there

2    might be a search warrant is immaterial.

3                    The key question for Your Honor today,

4    the key question, is whether or not the consent was

5    freely given.  And what you're going to hear again at

6    the end is that he did not believe the consent was

7    freely given because he wasn't actually offered a

8    choice.  In deep contrast to that Miranda form -- in

9    deep contrast to that Miranda form, that form sat in

10   front of another FBI agent across the table.  It was

11   not in front of Mr. Hovan where the agent then

12   carefully, before letting him read it, before walking

13   him through it, carefully wrote down the passcodes to

14   the phone and then, as a mere formality, did not

15   request but instructed him then to sign it.  That's

16   the evidence you're going to hear today.

17                   You're going to hear that from the

18   moment the form actually sat in front of him, it

19   wasn't read to him, it wasn't walked through.  They

20   never asked whether he had any questions.  He just

21   instructed him to sign.  You'll hear on the tape.

22   It's less than 20 seconds from the moment in which

23   it's handed over and sat there.  The idea that that is

24   reasonable consent when that form follows the absolute

25   failure to correct his misimpression that they're

1   going to "look at his phones anyway" and then the

2   reinforcing of that misimpression that "we're going to

3   look at the phones regardless".  Regardless of whether

4   you give the passcodes and regardless of whether you

5   give your consent.

6               And it's very problematic, Your Honor.

7   And just for the record, I know we're limited on

8   consent here today, but it is seriously problematic

9   where we have a search warrant.  In our view, there

10  are material misstatements and material omissions

11  including the direction of what he was doing didn't

12  violate the law.  To be able to have a consent hearing

13  today that is bifurcated from those key issues because

14  I think what you're going to hear today on cross-

15  examination is the key goal was to get Mr. Hovan to

16  cooperate to get consent for this phone and to treat

17  him and coordinate ahead of time with another set of

18  agents who were sitting next door interview another

19  witness to try to get them to speak against each other

20  and to try and compel consent through the fear that

21  the first time arrestee had for being arrested, for

22  being put in a room in handcuffs, taken there after

23  being -- you know, having a gun pointed at him for the

24  first time in his life.  And so that's the environment

25  that he's in, not the one that was described here

 1   today.

 2                     And we look forward to examining the

 3   evidence and come back to you and argue later.

 4                     THE COURT:  Okay.  Thank you.

 5                     All right.  Who's going to be -- okay.

 6                     MR. MURRAY:  May I call our first

 7   witness, Your Honor?

 8                     THE COURT:  You certainly may.

 9                     MR. MURRAY:  The United States calls

10   Agent Jackson to the stand.

11                     Your Honor, may I approach?  I'd like

12   to provide the witness with the exhibits.

13                     THE COURT:  Absolutely.

14                     MR. MURRAY:  Thank you.

15                     THE COURT:  You don't have to ask me.

16                     MR. MURRAY:  Thanks very much.

17        (Pause)

18                     THE COURT:  Do you have any objection

19   to my not wearing a mask?

20                     MR. JACKSON:  No, Your Honor.

21                     THE CLERK:  Please raise your right

22   hand.

23        GOVERNMENT WITNESS, CHRISTOPHER JACKSON, SWORN

24                     THE CLERK:  If you move that

25   (indiscernible) before you.

```
 1                   THE WITNESS:  Thank you.

 2                       THE CLERK:  Sir, would you state and

 3       spell your name for the record, please.

 4                       THE WITNESS:  Christopher Jackson,

 5       C-H-R-I-S-T-O-P-H-E-R, J-A-C-K-S-O-N.

 6                       THE CLERK:  Thank you.

 7                       MR. MURRAY:  Your Honor, may I proceed?

 8                       THE COURT:  GATS --

 9                       THE WITNESS:  J-A-C-K-S-O-N.

10                       THE COURT:  G-A-T -- okay.  Thank you.

11                       THE WITNESS:  Yes, ma'am.

12                       THE COURT:  Okay, Agent.

13                       MR. MURRAY:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15       BY MR. MURRAY:

16            Q    So, Agent Jackson, how are you employed?

17            A    I'm employed with the FBI --

18            Q    And --

19            A    -- as a special agent.

20            Q    And for how long have you been a special

21       agent with the FBI?

22            A    Since 2016.

23            Q    I'm going to ask you about an arrest that

24       occurred about a year ago, little more than a year

25       ago.  But before we do that, have you participated in
```

1    arrests before when you were working with the FBI?

2        A    Yes.

3        Q    About how many times?

4        A    Probably around 20.

5        Q    And have you also participated in post-

6    arrest interviews?

7        A    Yes.

8        Q    About how many times?

9        A    Probably around the same range.

10        Q    And have you obtained consent from arrested

11    individuals or witnesses in your cases?

12        A    Yes.

13        Q    And about how many times have you done that?

14        A    Probably 10 to 20.

15        Q    Okay.  Now I'm going to ask you to draw your

16    attention back to February 10th, 2020.  Did you

17    participate in a series of arrests that day?

18        A    Yes.

19        Q    And what were your responsibilities on that

20    day?

21        A    To effect the arrest and transportation of

22    Mr. Nicholas Hovan.

23        Q    And did you do that?

24        A    Yes.

25        Q    Where did that occur?

```
1         A     At Hotel Monaco.

2         Q     And where is that located?

3         A     Here in Philadelphia, in the city.

4         Q     About how far from the courthouse here?

5         A     Maybe like one mile.  Couple blocks.

6         Q     Okay.  And about what time of the day of

7    February 10th was that?

8         A     Late morning.

9         Q     Do you have an approximate time?

10        A     Probably like 11:45, 11:55, somewhere in

11   there.

12        Q     Okay.  And during that arrest, did you take

13   any objects from Mr. Hovan?

14        A     Yes.

15        Q     What did you take?

16        A     He had two cell phones on his person and I

17   believe a bag as well.

18        Q     Okay.  Now after or at the time of the

19   arrest, did you or any of the agents that you observed

20   mention the fact that there was a search warrant in

21   the case?

22        A     No.

23        Q     After Mr. Hovan was arrested, what happened?

24        A     After he was arrested, we transported him to

25   FBI headquarters at 701 Market Street and --
```

```
 1        Q     About --

 2        A     Okay.

 3        Q     About how long did that take?

 4        A     Probably like 10 minutes.

 5        Q     All right.  And you did that yourself?

 6        A     No.  I had another agent with me.

 7        Q     And who was that?

 8        A     Special Agent Jessica Fear.

 9        Q     And during that trip, did you mention that

10   there was a search warrant in this case?

11        A     No.

12        Q     Can you describe Mr. Hovan's demeanor during

13   that trip?

14        A     He seemed fine.  He seemed lucid.  Was -- he

15   said he'd be willing to cooperate.  I didn't have any

16   reason to think that he was under any duress.

17        Q     Okay.  During that trip, did he seem alert

18   to you?

19        A     Yes.

20        Q     Was he responsive to your statements and

21   questions?

22        A     Yes.

23        Q     Did he seem to understand them?

24        A     Yes.

25        Q     Now did you question Mr. Hovan during the
```

1    stop?

2        A    During the --

3        Q    Sorry.  Sorry.  During the trip.

4        A    No.

5        Q    Okay.  Now when you arrived at FBI

6    offices -- I think you said it's at 701 Market Street,

7    is that right?

8        A    Yeah.

9        Q    That's about a block from here, the next

10   building over from the courthouse?

11       A    Yes.

12       Q    And when you arrived at the FBI offices,

13   what did you do?

14       A    We transferred Mr. Hovan upstairs and put

15   him into an interview room.

16       Q    Okay.  And at that point in time, did you

17   proceed with an interview?

18       A    Yes.

19       Q    About what time was it?

20       A    Probably around like 12, quarter after 12,

21   12:19, something like that.

22       Q    Okay.  And who was present at the time?

23       A    Myself, Special Agent Jessica Fear and a

24   forensic accountant Megan Weber (ph).

25       Q    And can you describe the room to the Court

1    that you put him in and started the interview in?

2         A    It was an average size room, well lit, that

3    was comfortable.  It seemed like it was fine for just

4    sitting and talking.

5         Q    And when you say average size, approximately

6    how large was this room?

7         A    Probably like 12 by 10 maybe, something like

8    that.

9         Q    Was there a table in the room?

10        A    Yes.

11        Q    What shape table?

12        A    Circle.

13        Q    And then who were the -- who was present

14   during this interview?

15        A    Myself, Mr. Hovan, Special Agent Fear and

16   Forensic Accountant Weber.

17        Q    And where was everybody seated?

18        A    We were all seated across the table from Mr.

19   Hovan.

20        Q    And at the time frame, was the room noisy?

21        A    No.

22        Q    And I think you mentioned this but what was

23   the lighting like?

24        A    It was well lit.

25        Q    All right.  Was Mr. Hovan provided the

```
 1    opportunity to have any water or anything?

 2        A    Yes.

 3        Q    And at that point in time, when the

 4    interview started, was Mr. Hovan restrained?

 5        A    He had leg irons on.

 6        Q    Okay.  Can you explain to the Court what leg

 7    irons are and how they work?

 8        A    They're pretty much cuffs around the ankles

 9    instead of the hands.

10        Q    Were his hands handcuffed?

11        A    No.

12        Q    Okay.  And why were his hands free at the

13    time?

14        A    In case he wanted to sign a consent form or

15    anything he might have to use for writing purposes.

16             THE COURT:  Why were you putting him --

17    why were his legs constrained?  What were you afraid

18    of?

19             THE WITNESS:  Officer safety, ma'am.

20             THE COURT:  Officer safety.

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  Oh.

23    BY MR. MURRAY:

24        Q    Were you in the normal interview room where

25    you normally conduct interviews?
```

1        A    Yes.  I mean, we did go either one -- or

2   there's another location across the street that we

3   conduct interviews there as well.

4        Q    Were there other interviews going on that

5   day?

6        A    Yes.

7        Q    And was this interview in a separate office

8   from where the other interviews were happening?

9        A    Yes.

10       Q    And was that because a number of people had

11   been arrested that day?

12       A    Yes.

13       Q    And you needed to use some additional rooms?

14       A    Yes.

15       Q    Now when this interview started around

16   12:19, you said, was it recorded?

17       A    Yes.

18       Q    I'm going to ask you to look into the

19   exhibit binder before you.  Do you see a disc there

20   that should be marked Exhibit 1A?

21       A    Yes.

22       Q    And is this a recording of the full

23   interview from February 10th, 2020?

24       A    Yes.

25       Q    And have you listened to this?

1        A     Yes.

2        Q     And is this an accurate recording of that

3    interview that day?

4        A     Yes.

5        Q     All right.  And then if you can look behind

6    that in the binder, behind that white sheet of paper,

7    is there an exhibit that's been marked 1A (sic)?

8        A     1A or 1B?

9        Q     I'm sorry.  1B.  Thank you very much.

10       A     Yes.

11       Q     And is that the transcript of that

12   recording?

13       A     Yes.

14       Q     And have you reviewed that and is that

15   accurate to the best of your knowledge?

16       A     Yes.

17       Q     Okay.  Now about how long did this interview

18   take place?

19       A     I think it was just shy of an hour.

20       Q     Okay.  And can you describe generally what

21   was Mr. Hovan's demeanor at the start of this

22   interview?

23       A     He was very cooperative.  Didn't seem to

24   have any like undue stress or anything like that.

25   Wanted to help in any way he could.

 1        Q    Okay.  And did he again seem alert and lucid

 2   during the interview?

 3        A    Yes.

 4        Q    And was he understanding your directions and

 5   statements at the beginning of the interview?

 6        A    Yes.

 7        Q    Now during the interview, did you provide

 8   him with his constitutional rights, his Miranda

 9   warnings?

10        A    Yes.

11        Q    And about when in the interview was that?

12        A    In the beginning.

13        Q    And when that occurred, did he appear to

14   understand those rights and express his desire to

15   proceed?

16        A    Yeah.

17        Q    Did he express that to you?

18        A    Yeah.

19        Q    And at that point in time, was there any

20   reason for you to question that his consent was free

21   and voluntary?

22        A    No.

23        Q    Okay.

24        A    And he was -- he never -- he could stop the

25   interview at any point in time.

1       Q    You're saying through the remainder of the

2  interview he didn't stop it at any point in time after

3  you're advising those rights.  Is that right?

4       A    Yes.

5       Q    Now can I ask you to look at Exhibit 2?

6  What's Exhibit 2 in the binder?

7       A    Exhibit 2 is the advice of rights form that

8  was signed by myself and Mr. Hovan --

9       Q    Okay.

10       A    -- and Jessica Fear.

11       Q    So can you explain what happened when this

12  was prepared?

13       A    I pretty much told Mr. Hovan at the

14  beginning of the interview I want to make you --

15  advise you of your rights.  If you would like to speak

16  to us after I advise you of these rights, great; if

17  not, that's fine, too.  But I want to read you your

18  rights to rights and I want you to look over it before

19  I proceed.

20            I then filled out the address, date and

21  time, read all the bullets to Mr. Hovan and then asked

22  him to review it himself and, if he agreed, to initial

23  each bullet and to sign it.

24       Q    So is that his writing where the initials

25  are written on that form?

1        A     Yes.

2        Q     And then the first signature under

3    "Consent", is -- did you observe Mr. Hovan write that

4    signature on the form?

5        A     Yes.

6        Q     And then there are two witness signatures on

7    the form.  Do you recognize those or do you know who

8    signed those?

9        A     Yes.  The top witness signature is mine and

10   the other one is SA Fear's.

11       Q     And at this point in time, had there been

12   any mention of the search warrant that the -- in the

13   case?

14       A     No.

15       Q     And at any point after this, was the search

16   warrant mentioned?

17       A     No.

18       Q     Now at this point in time, did Mr. Hovan

19   hear these statements?

20       A     Yes.

21       Q     Did he appear to understand them?

22       A     Yes.

23       Q     And was there any question as to his

24   voluntary signature of this form?

25       A     No.

1        Q     Now after this, what happened in the

2   interview?

3        A     After this, we began the interview.  Mr.

4   Hovan was very -- and overly cooperative and wanted to

5   provide any information, anything he could.  He wanted

6   to be -- he advised that he wanted to be very truthful

7   and at some point (indiscernible) be involved with

8   this.

9        Q     Sorry.  I didn't hear the last statement.

10       A     And at some point (indiscernible) great at

11  being involved.

12       Q     And did he summarize to you certain of the

13  facts in the case?

14       A     Yes.

15       Q     Now during that interview, did the topic of

16  messages on his phones come up?

17       A     Yes.

18       Q     And how so?

19       A     He was offering to direct us to messages on

20  his phone where he was talking with other people that

21  might have been known in the case.

22       Q     And at some point in that discussion, did he

23  provide consent to searching his phones?

24       A     Yes.

25       Q     And at any point in that discussion of his

1    phones and those messages, did he mention or did you

2    mention a search warrant?

3         A    No.

4         Q    And now I'm going to ask you to look at

5    Exhibit 3.  Do you recognize that?

6         A    Yes.  It's the (indiscernible) consent to

7    search form.

8         Q    Is that a form that was executed by Mr.

9    Hovan during this interview?

10        A    Yeah.

11        Q    And there's handwriting -- or there's four

12   points on this.  Under point 1, whose handwriting is

13   that?

14        A    Mine.

15        Q    And what have you written there?

16        A    The two types of phones and the passwords if

17   they applied.

18        Q    So was that the items that Mr. Hovan was

19   providing you consent to search?

20        A    Yes.

21        Q    And what were the two phones over which he

22   provided consent?

23        A    An iPhone X and a Samsung.  I believe one

24   was his work phone and one was his personal.

25        Q    And he -- had he identified to you that that

1     was his work phone?

2          A     Yes.

3          Q     Now at the bottom of this form, there are

4     three additional points.  And then there are several

5     signatures.  Do you recognize those signatures or know

6     whose signatures those are?

7          A     Yes.  The first signature is Mr. Hovan's.

8     The witness is my signature.

9          Q     Did Mr. Hovan sign that in front of you?

10         A     Yes.

11         Q     And then there's a date there.  Who wrote

12    the date?

13         A     Mr. Hovan.

14         Q     Okay.  And on this form, there's three

15    statements.  Was he -- where was Mr. Hovan while you

16    and he were filling out this form?

17         A     Sitting across from me across the table.

18         Q     Okay.  And at some point in time, did you

19    provide the form to him?

20         A     I'm sorry.

21         Q     Did you provide the form to him?

22         A     Yes.

23         Q     Did he read the form?

24         A     Yes.

25         Q     Did he appear to understand the form?

1      A     Yes.

2      Q     And did he, at any point, indicate that he

3   was not really or voluntarily consenting to the

4   search?

5      A     No.  He -- the second bullet on here says

6   he's not going to refuse consent at any point.

7      Q     Okay.  And that bullet states that.  How was

8   he advised that he was -- had a right to refuse

9   consent?

10      A     In writing on this form.

11      Q     Okay.  And then the third bullet point says

12   that I give permission voluntarily.  Was there any

13   reason from your interaction with Mr. Hovan to think

14   that was not true?

15      A     No.

16      Q     And throughout this process, was Mr. Hovan

17   alert?

18      A     Yes.

19      Q     Did he understand your statements and

20   questions during this interchange?

21      A     Yes.

22      Q     And did he respond appropriately to your

23   questions?

24      A     Yes.

25      Q     Now at any point after that or any point

1    before this -- excuse me -- did you or Agent Fear

2    indicate that he was required to consent to this form?

3         A    No.

4         Q    Did you ever imply it?

5         A    No.

6         Q    And prior to the execution of the form, how

7    would you describe the atmosphere in this interview

8    room?

9         A    It was very laid back.  At times, we shared

10   a couple laughs.  So it was -- it was nothing as far

11   as an aggressive atmosphere.

12        Q    Did you ever make any threats?

13        A    No.

14        Q    And did you ever make any promises to him if

15   he provided consent?

16        A    No.

17        Q    Was there any times during this interview

18   where you tried to trick him with what he said?

19        A    No.

20        Q    And was there any yelling during this

21   interview?

22        A    No, none at all.

23        Q    And you've listened to the recording, I

24   believe you said earlier, right?

25        A    Correct.

1        Q    I'm going to play a number of clips from

2   this interview.

3                MR. MURRAY:  So if I could ask Agent

4   Vacanti to pull up the first clip.

5                Your Honor, we're going to play some

6   portions and I'll intersperse it with some questions.

7                THE COURT:  Fine.

8                MR. MURRAY:  Okay.

9                MR. PICANTE:  1 or 1-1?

10               MR. MURRAY:  1-1.

11               So, Your Honor, just to let the --

12   before we proceed, there are -- the Court can follow

13   on the screen in front of the Court if the Court has

14   one.  If the Court doesn't, I can direct you to the

15   transcript  in the binder.  So how would the Court --

16   I'd like to let you know where we are to make it

17   easier to follow.

18               THE COURT:  No.  I -- no.  I can look

19   but it is easier if you let me --

20               MR. MURRAY:  If you want to look in the

21   binder then that might be easier if you don't have a

22   screen.

23               THE COURT:  Yeah.  I think maybe it is.

24               MR. MURRAY:  Okay.  Good.  There is --

25               THE COURT:  With that --

```
 1                    MR. MURRAY:  You will follow along but
 2    --
 3                    THE COURT:  I cannot see that.
 4                    MR. MURRAY:  I appreciate that --
 5                    THE COURT:  I have one.
 6                    MR. MURRAY:  -- so I'm happy to do it
 7    with the binder here.  So, Your Honor, if you could go
 8    to page 2 at the top of the page.
 9                    THE COURT:  So that's --
10                    MR. MURRAY:  So this would be 1 --
11                    THE COURT:  -- Government's Exhibit 1B.
12                    MR. MURRAY:  Yes, it is.
13                    THE COURT:  All right.
14                    MR. MURRAY:  So I'm going to -- these
15    clips are labeled 1-1, 1-2, 1-3.  They're just
16    different clips from Exhibit 1.  So 1-1, Your Honor --
17                    THE COURT:  Is what page?
18                    MR. MURRAY:  -- starts on page 2 at the
19    top.  And this is going to go till about the middle of
20    page 3.  And then we'll stop there and --
21                    THE COURT:  All right.  I'm going to
22    mark this up.
23                    MR. MURRAY:  Okay.
24                    THE COURT:  All right?
25                    MR. MURRAY:  And please, if you want --
```

```
1    if it's going too quick or you want me to go back,

2    please let me know.

3                    THE COURT:  I will.

4                    MR. MURRAY:  Thank you.

5                    Can I proceed?

6                    THE COURT:  Oh, sure.

7           (Begin playing audio clip of 2/10/20 interview:)

8                    "AGENT JACKSON:  And so we're going to

9    start this interview.  It is now 12:19 on Monday,

10   February 10th.  Special Agent CJ Jackson, Special

11   Agent Jessica Fear, Forensic Accountant Megan Weber

12   are here.  And what's your first name?

13                   "MR. HOVAN:  Nick.

14                   "AGENT FEAR:  Nicholas.

15                   "MR. HOVAN:  Nicholas Hovan,

16   H-O-V-A-N."

17                   MR. MURRAY:  And can you pause for a

18   second?

19   BY MR. MURRAY:

20        Q    The transcript here says "CJ".  Who is that

21   speaking when it marks "CJ"?

22        A    Myself.

23        Q    And then it also has "NH" in the transcript.

24   Who is that?

25        A    Mr. Hovan.  Nicholas Hovan.
```

```
1        Q    And then "JF".  Who is that?

2        A    Special Agent Jessica Fear.

3        Q    Thank you.

4             MR. MURRAY:  If you could proceed.

5        (Resume playing audio clip of 2/10/20 interview:)

6             "AGENT JACKSON:  So the first thing we

7    want to do is we want to make you aware of all your

8    rights.  Okay?

9             "MR. HOVAN:  Okay.

10            "AGENT JACKSON:  So it's protecting

11   you.  (Indiscernible) you number one and also for us

12   that you're aware of everything that is about to

13   transpire.  Okay?  So let me fill the top of this

14   out."

15            THE COURT:  I don't see -- what line is

16   that?

17            "AGENT JACKSON:  What is

18   (indiscernible) today" --

19            THE COURT:  One second.

20            MR. MURRAY:  Line 25 or 26 where

21   they're saying the 10th.

22            THE COURT:  Okay.  Fine.

23            MR. MURRAY:  Thank you.  And sometimes,

24   Your Honor, I found it -- we tried to pick up the ums

25   and the okays so it skips ahead and that sometimes
```

1   makes it hard to follow.

2                 THE COURT:  That's okay.  Go -- I don't

3   -- the judge doesn't need any excuses for herself.

4                 MR. MURRAY:  Thank you.

5                 THE COURT:  If I can't understand,

6   you'll hear about it very quickly.  Okay.

7       (Resume playing audio clip of 2/10/20 interview:)

8                 "MR. HOVAN:  All right.  I still never

9   get used to --

10                "AGENT JACKSON:  So this is your advice

11   of rights form.  Okay?

12                "MR. HOVAN:  Uh-huh.

13                "AGENT JACKSON:  So before we ask any

14   questions, you must understand your rights.

15                "You have the right to remain silent.

16   Anything you say can be used against you in court.

17   You have the right to talk to a lawyer for advice

18   before we ask you any questions.  You have the right

19   to have a lawyer with you during questioning.  If you

20   cannot afford a lawyer, one will be appointed for you

21   before any questioning if you wish.  If you decide to

22   answer questions now without a lawyer present, you

23   have the right to stop answering at any time.

24                "Okay?

25                "MR. HOVAN:   Okay.

 1                    "AGENT JACKSON:  All right.  So if you

 2     agree to all of these, I need you to initial each

 3     bullet and then sign right here.

 4                    "MR. HOVAN:  I'm obviously like I'd

 5     rather do this faster -- I really need a lawyer

 6     because I don't really -- I'll tell you everything I

 7     know.

 8                    "AGENT JACKSON:  Yeah.  Please" --

 9     BY MR. MURRAY:

10        Q    So, first of all, Agent Jackson, can you

11     describe Mr. Hovan's demeanor up until this point?

12        A    Same as before.  Just very truthful,

13     forthcoming.  Wanted to cooperate.  No distress.  He's

14     lucid, attentive.

15        Q    And in line -- on page 3, line 5, what does

16     Mr. Hovan offer?

17        A    He says "I'll tell you everything I know".

18        Q    And does he subsequently repeat that offer

19     during the interview?

20        A    Numerous times.

21                    MR. MURRAY:  Can you please proceed?

22         (Resume playing audio clip of 2/10/20 interview:)

23                    "AGENT JACKSON:  So you know.

24                    "MR. HOVAN:  No.  I know.  I'm just

25     saying like I have a right to a lawyer but I'm saying

1    I -- I know what I know and I can tell you everything

2    I know.  And I'm talking about telling the truth on

3    this.

4                    "AGENT JACKSON:  I got you."

5                    MR. MURRAY:  So can you stop it there?

6    BY MR. MURRAY:

7         Q    Was he again indicating he's interested in

8    being cooperative?

9         A    Yes.

10                    MR. MURRAY:  And then we're going to

11    proceed to clip 1-2, Your Honor.  It follows right

12    after this in the transcript.  It picks up at line 17.

13                    THE COURT:  Is this the next -- is this

14    page what?

15                    MR. MURRAY:  It's the same page, Your

16    Honor.

17                    THE COURT:  Same page.  Line 17.  Okay.

18                    MR. MURRAY:  Please go ahead.

19        (Begin playing audio clip G-1-2:)

20                    "AGENT JACKSON:  All right.  So you

21    want to try to walk us through why you think you're

22    here?

23                    "MR. HOVAN:  Well, I think I'm -- I

24    know why I'm here.  Do you want me to start with how

25    this even came about in the first place and how I got

1    involved in this?

2              "AGENT FEAR:  Sure.

3              "MR. HOVAN:  So I was approached by a

4    friend named Jason Mobur (ph) who was an old client of

5    mine when I used to work in Telecom and

6    (indiscernible) Telecom.  And he said that he knew of

7    a supply of oil.

8              "AGENT FEAR:  Okay.

9              "MR. HOVAN:  He said a supply of oil

10   and that he knew it through a friend -- I don't know

11   the guy's name, a co-worker, a client he works with,

12   to buy wholesale Telecom minutes.  And he knows the

13   name of that guy.  I never met him.  Never did

14   business with him.  And that he wanted me to -- he

15   asked if I was like -- he called me and talked about

16   it.  So he -- then one thing led to another and he

17   said do you want to -- this guy wants to meet with us.

18   Do you want to meet with him?  I said okay.  Okay,

19   let's go meet.

20              "So we got into the first meeting and

21   he mentioned kind of what was going on and where the

22   oil was coming from.  And he said it was coming from

23   Iran.  At that point, we were both very

24   (indiscernible) out.  We basically left, went outside.

25   And then I went back to New York.

1                    "AGENT FEAR:  Who was at that first

2       meeting?

3                    "MR. HOVAN:  It was me, Jason, Hal (ph)

4       and a woman.  I don't remember her name.

5                    "AGENT JACKSON:  Okay.

6                    "MR. HOVAN:  And that was the first

7       time I met Hal.  I've only met him -- today was the

8       third time.  So the second time --

9                    "AGENT FEAR:  You went back to New

10      York.  You were sketched out.

11                   "MR. HOVAN:  I went back to New York.

12      I was sketched out.  Robby and Hal -- Hal called me

13      and said he was coming to New York.  So I met him for

14      lunch and Jason came in.  And that was the first time

15      we met Robby who was his financial guy.  And we had

16      lunch.

17                   "I introduced them to -- I said I was

18      going to introduce them to somebody who didn't -- they

19      kicked us out or they were like we don't want to do

20      anything with this.  And then I said that they should

21      meet these guys in Dallas.

22                   "I stayed back.  I never went to

23      Dallas.  They went to Dallas to meet up with Nick, Rob

24      and Bill.  I never met Rob or Bill until today.  I

25      never met Nicky in person until today.  I know Nicky

```
 1    through a family -- through my -- a family friend.

 2    Well, I know -- my brother knows him.  So he said that

 3    he's in the oil business.  I know he's in the oil

 4    business down in Dallas.  But I connected them two

 5    together.  They flew down, Robby and Hal.  And they

 6    started negotiations down there on this.

 7                   "Other than that, I've been on their

 8    WhatsApp chats to catch up but my role in all of this

 9    was just connecting those two parties."

10                   MR. MURRAY:  You can pause there.

11    BY MR. MURRAY:

12    Q    Do you see the line above that, on line 24,

13    it mentions WhatsApp chats?

14    A    Correct.

15    Q    Do you have an understanding as to WhatsApp

16    chats are?

17    A    WhatsApps is kind of like a text messenger

18    service that you utilize primarily through your phone

19    and it's encrypted on both ends.

20    Q    And at this point in time, is this the first

21    time they're mentioned?

22    A    Yes.

23    Q    And are they mentioned repeatedly after

24    this?

25    A    Yes.
```

 1                    MR. MURRAY:  Okay.  If we could

 2      proceed?

 3           (Resume playing audio clip G-1-2:)

 4                    "MR. HOVAN:  Other than that, I mean,

 5      obviously, I was going to drop it off at the end of

 6      the day which is -- but that was my role in this.

 7      I've never gone anywhere else other than New York or

 8      Philly.  I met up with -- I never -- I came down to

 9      Philly again once more.  It was just Robby and it was

10      me and Jason to talk to -- I don't remember his name

11      at the moment but one of the investors that was in the

12      room.  And we just showed them an LOI.  We stayed for

13      15 minutes.  It was in the same hotel.  And then we

14      left and went back to New York.

15                    "At that point, Jason was like -- he

16      told me the next day, like, I don't want to be

17      involved in this anymore.  It's very sketchy.  And I

18      was -- I felt the same way.  I didn't like it.  But I

19      felt at this point I was like so -- basically, like I

20      was already involved.  And I wasn't really doing

21      anything anymore at this point.  I'm like, I'm just

22      here.  I'm sure you have the room -- you can -- you

23      can talk -- when they ask like what are your

24      involvements, like I said, my involvement was

25      connecting one side to the other side and that's it.

1                    "So, I mean, that's -- I mean, if

2     you -- do you want to -- well, that's the timeline of

3     my events.  And then which led to this meeting which

4     was to finalize everything and then -- if there's

5     anything you think I'm leaving out, maybe I forgot

6     something.  But you're free to ask me questions on

7     anything and I'll answer them truthfully."

8                    MR. MURRAY:  That clip ends there.

9     BY MR. MURRAY:

10        Q    After Mr. Hovan summarizes facts in the

11    case, what does he offer at the end of that statement?

12        A    Pretty much his cooperation.  If there's

13    anything that we wanted to ask him, he would

14    truthfully tell us.

15        Q    Now I'm going to ask you to listen to the

16    clip that is 1-3.

17                    MR. MURRAY:  Your Honor, this starts on

18    page 5 on line 21.

19                    Are you there, Your Honor?

20                    THE COURT:  Yeah.

21                    MR. MURRAY:  Please proceed.

22        (Begin playing audio clip G-1-3:)

23                    "MR. HOVAN:  Oh, I have no idea.  But

24    when we were at that meeting, she was -- it was a

25    meeting but really, we don't want to be involved in

 1   this because this is -- doesn't -- and then I -- I

 2   don't know.  Maybe I just didn't feel like it was as

 3   dangerous as it was.  And I just -- I wasn't really

 4   doing much.  I mean, you can read through the WhatsApp

 5   chats and you can see my involvement.  Like I wasn't

 6   doing much.  So I was, like, let me just see it

 7   through and I should have just cut it off like my --

 8                   "AGENT FEAR:  What was your

 9   understanding of what was happening?  What" --

10                   MR. MURRAY:  Stop it, please.

11   BY MR. MURRAY:

12       Q    Here, WhatsApp chats are mentioned again by

13   Mr. Hovan, right?

14       A    Yes.

15       Q    And where are they normally located?

16       A    On a phone.

17       Q    And at that point in time, what did you

18   understand Mr. Hovan to be offering?

19       A    That we can look at all the chats, anything

20   and everything.  I mean, he's pretty much saying that

21   he's going to cooperate in any way he can and be

22   truthful.

23       Q    Did he volunteer this at this point?

24       A    Yes.

25       Q    And at this point, have you or your

 1    colleagues made any threats or promises to him?

 2        A    No.

 3        Q    And was this offer here unprompted?

 4        A    Yes.

 5        Q    And after this, were there additional offers

 6    to review those materials?

 7        A    Yes.

 8        Q

 9            MR. MURRAY:  You could proceed.

10        (Resume playing audio clip G-1-3:)

11            "MR. HOVAN:  Just cut it off like my --

12            "AGENT FEAR:  What was your

13    understanding of what was happening?  What were you

14    connecting the parties to?  Like, explain it to us as

15    if we didn't know.

16            "MR. HOVAN:  I was connecting the

17    supplier to a buyer.  That's what I thought.  So it

18    was going from the supply to China.  And that was -- I

19    didn't even know that it was going to be going to

20    China.  I was just connecting them to talk to somebody

21    that said they had supply.  So I didn't even know that

22    it was involving China but it started because I never

23    met Nicky (indiscernible) or Rob in my life till

24    today.  And I didn't -- I -- before  I sent them down

25    to visit them, I had never really known them or had a

1   conversation.  And Nicky wasn't  my friend or

2   anything.  I had never really talked to her before

3   then.  I mean, you can look through my history.

4   You'll see that that's exactly when conversations

5   started between any of them."

6   BY MR. MURRAY:

7        Q    Now what was it that Mr. Hovan said at the

8   end of that clip?

9        A    They can look through the history and see

10   exactly where the conversations were.

11        Q    And where did you understand these

12   conversations were located?

13        A    In the phone.

14        Q    And this was the phone that you had

15   previously taken from him at the time of arrest, is

16   that right?

17        A    Correct.

18        Q    Or phones, I should say, right?  There were

19   multiple phones?

20        A    Two.

21             MR. MURRAY:  If we could play clip 1-4,

22   please.

23        (Begin playing audio clip G-1-4:)

24             MR. MURRAY:  Oh, forgive me, Your

25   Honor.  It starts at the beginning of the next page.

1          "AGENT JACKSON:  Does the name of these

2    confidantes" --

3         (Pause playing audio clip G-1-4)

4          MR. MURRAY:  You can play it.  I'm

5    sorry.

6         (Resume playing audio clip G-1-4:)

7          "AGENT JACKSON:  Does the name of Aziz

8    Hassanali sound familiar to you?

9          "MR. HOVAN:  Oh.  So Aziz is -- is that

10   his last name?  In New York?

11          "AGENT JACKSON:  Well, you tell me.  I

12   mean, as far as --

13          "MR. HOVAN:  Well, I have a friend

14   named Aziz who we went to go talk to and he was like

15   get the hell out of the office.  He was like, I don't

16   want to have anything to do with us.

17          "AGENT JACKSON:  Okay.  You said we

18   went to talk to him.  Who --

19          "MR. HOVAN:  Hal and Robbie --

20          "AGENT JACKSON:  Okay.

21          "MR. HOVAN:  -- and Jason.

22          "AGENT JACKSON:  Okay.

23          "MR. HOVAN:  That's who we met in New

24   York.  And I said you might want to talk to him to see

25   -- just kind of tell him the opportunity.  And he said

1   he heard the opportunity for five minutes and then he

2   was like, let's get the hell out of here.

3                 "AGENT FEAR:  So you had the potential

4   (indiscernible)?

5                 "MR. HOVAN:  He didn't know what he was

6   --

7                 "AGENT FEAR:  From your standpoint.

8                 "MR. HOVAN:  Yes.  And he was only

9   involved because -- oh.  He had a co-worker named Arif

10  (ph) who I was talking to.  And he was -- and then I

11  guess it was -- he was just like -- he was like I

12  don't want to do -- have anything to do with this.

13  He's like, if you're smart, you shouldn't have

14  anything to do with this either.  And I

15  (indiscernible).

16                "AGENT JACKSON:  So that was Aziz and

17  (indiscernible).  What's his (indiscernible)?  Arif?

18                "MR. HOVAN:  Arif.  Arif, yeah.

19                "AGENT JACKSON:  You know what Arif's

20  last name is?

21                "MR. HOVAN:  I don't.

22                "AGENT JACKSON:  Okay.

23                "MR. HOVAN:  He's in my WhatsApp.  I

24  think as Arif.  Maybe his last name is in there.

25                "AGENT JACKSON:  Okay.

```
 1              "MR. HOVAN:  I can show it to you.

 2              "AGENT JACKSON:  Was he

 3   (indiscernible)?

 4              "MR. HOVAN:  No.  He was in London.  I

 5   never met him in my life."

 6              MR. MURRAY:  Stop for a second there.

 7   BY MR. MURRAY:

 8      Q    So in line -- on page 7, on line 3, what are

 9   you asking about?

10      A    If he knows someone named Arif and what

11   Arif's last name is.

12      Q    Now, by the way, were you a case agent on

13   the case?

14      A    No.

15      Q    So were you intimately familiar with all the

16   facts of the case?

17      A    No.

18      Q    In this clip, you're asking about a number

19   of names.  How did you know to ask about those names?

20      A    The case agent gave me a prep packet to just

21   ask questions about certain names.

22      Q    So were you assisting with a series of

23   arrests that had happened on this day?

24      A    Correct.

25      Q    And you ask about Arif.  In response to
```

1    that, on line 9, what does Mr. Hovan say?

2        A    He says "He's in my WhatsApp.  I think it's

3    Arif.  Maybe his last name is in there."  And then he

4    goes on to say "I can show you -- show it to you".

5        Q    Okay.  And at that time, where did you

6    understand him to be showing you these messages from?

7        A    Within his phone.

8        Q    Okay.  And was this another offer by Mr.

9    Hovan to show you things on his phone?

10       A    Yes.

11              MR. MURRAY:  If you could proceed,

12   please.

13       (Resume playing audio clip G-1-4:)

14              "MR. HOVAN:  -- from my life.

15              "AGENT JACKSON:  Okay.

16              "AGENT FEAR:  How do you know him?

17              "MR. HOVAN:  Aziz?

18              "AGENT FEAR:  Arif.

19              "MR. HOVAN:  Arif I know through Aziz

20   just from something else before.  My brother -- he

21   went to -- Aziz went to college with my brother at

22   MIT.

23              "AGENT FEAR:  Okay."

24       (Pause playing audio clip G-1-4)

25   BY MR. MURRAY:

```
 1        Q    So we're now about five minutes

 2   approximately into this interview.  You previously

 3   describe Mr. Hovan's demeanor.  Has it changed any

 4   way?

 5        A    No, sir.

 6        Q    Is he still cooperative?

 7        A    Yes.

 8        Q    Is he still offering to show you things on

 9   his phone?

10        A    Yeah, up to this point.  Showing what's in

11   the WhatsApp, directing us.

12        Q    Did he appear to be intelligent when you

13   were having this conversation?

14        A    Yes.

15        Q    And was he responsive to your questions?

16        A    Yes.

17        Q    And was he sometimes providing unprovoked

18   information?

19        A    Numerous times.

20             THE COURT:  Listen, is it very hot in

21   here, Jim?  Are you all very warm?

22             MR. MURRAY:  I'm not cool, Your Honor,

23   but I assume that it's --

24             THE COURT:  Well, listen.  I have no

25   problem if you pull your ties down or whatever you do
```

 1   or take your jackets off.  That's fine.  Better you

 2   shouldn't be hot.

 3                    MR. MURRAY:  I'm comfortable.

 4                    THE COURT:  Warm.

 5                    MR. MURRAY:  Thank you.

 6                    THE COURT:  Okay.  Sure.

 7                    MR. MURRAY:  Yes.  Absolutely.

 8                    THE COURT:  Okay.  If anyone feels that

 9   way, please -- you know, I never forget the first

10   hearing I had in the Advil (ph) case.  Everybody

11   practically stripped.

12                    MR. MURRAY:  Well, thank you, Your

13   Honor, for your consideration.

14                    THE COURT:  And one of them said, does

15   she really mean it and the other one said, yep, you'll

16   do better.  You'll do better.

17                    MR. MURRAY:  Thank you.

18                    THE COURT:  No.  Seriously.  I don't

19   want you -- it's very hot.  Your job is hard enough.

20   You don't need this.

21                    MR. MURRAY:  Thank you very much.

22                    THE COURT:  Yeah.  You, too, Jim.  Take

23   your --

24        (Pause)

25                    THE COURT:  Oh, okay.  All right.

1    Okay.  You may continue.

2                    MR. MURRAY:  Thank you.

3                    So, Your Honor, we're now going to pick

4    up with clip 1-5.  And this picks up right after this

5    one on line 32 of page 7.

6                    MR. MURRAY:  If we can proceed.

7         (Begin playing audio clip G-1-5:)

8                    "AGENT JACKSON:  What about a

9    (indiscernible).  Does the name Adis Kan (ph) --

10                    "MR. HOVAN:  Never heard of it.

11                    "AGENT JACKSON:  Never heard of Adis

12    Kan.  Okay.

13                    "MR. HOVAN:  I guess I've only talked

14    to Hal about the supplies.  I don't know what he does

15    when he goes over there.  I've never been involved in

16    that.  You can look at my passport.  I've never gone

17    to the Middle East in my life.  I just -- I don't -- I

18    won't be (indiscernible).  If I could, I would.  So

19    I'll tell you everything I know.

20                    "AGENT JACKSON:  Okay."

21    BY MR. MURRAY:

22         Q    And again, what does Mr. Hovan offer at the

23    end of that clip?

24         A    At this point, he offered to look at his

25    passport and again reiterated that I'll tell you

 1    everything I know.

 2                    MR. MURRAY:  Now, Your Honor, we're

 3    going to skip forward a bit in this to page 11.  This

 4    is going to be clip 1-6.  And we're going to pick up

 5    at line 17 of the transcript.

 6                    THE COURT:  Okay.

 7                    MR. MURRAY:  All right.

 8        (Begin playing audio clip G-1-6:)

 9                    "AGENT JACKSON:  Everyone has their own

10    role in this.  Like we said, we just want to know

11    yours (indiscernible).

12                    "MR. HOVAN:  Yeah.  And this -- I'm

13    telling you my exact role right now.  I'm really

14    telling you.  This is all the times I've had contact

15    with anybody, like in person.  Like you -- I'm sure

16    you have that room -- like if you could hear in the

17    room.  Like they say go around the table and say what

18    you bring.  Literally, what I brought was put in --

19    outside of the table was outside of the table and

20    that's it.  I don't know anything about the buy side

21    of this whole sale.  I don't know any of the names.  I

22    don't know -- I don't know who was buying in China or

23    anything like that.  I just know it's coming from

24    those two countries.

25                    "AGENT JACKSON:  Got you.

 1                  "MR. HOVAN:  And I know the two people

 2     that -- Bill's the name guy for China and Hal's the

 3     main guy for (indiscernible) supply side on my end.

 4     But I've never been in another country.  I don't know

 5     who was buying -- who's the people on the other side.

 6                  "AGENT FEAR:  Okay.

 7                  "MR. HOVAN:  So -- but I'll help you as

 8     much as I can in trying to find them.  I really --

 9                  "AGENT JACKSON:  No.  We appreciate

10     that.

11                  "MR. HOVAN:  Really.  Like I want to be

12     100 percent cooperative for whatever you need.

13                  "AGENT JACKSON:  Okay.

14                  "AGENT FEAR:  Appreciate it."

15     BY MR. MURRAY:

16         Q    So what does Mr. Hovan say he'll do at the

17     end of that clip?

18         A    He said he'd be 100 percent cooperative for

19     whatever we need.  I mean, (indiscernible), even the

20     parts that we -- he might not know about, he would be

21     willing to help us find out.

22         Q    And is that consistent with how he'd been

23     acting so far during this interview?

24         A    Completely.

25         Q    Now looking at the bottom of page 12, at

1    line 38, I'm going to ask Agent Vacanti to play clip

2    1-7.

3        (Begin playing audio clip G-1-7:)

4            "AGENT JACKSON:  Yeah.  This is not --

5    (indiscernible).

6            "MR. HOVAN:  Oh, okay.

7            "AGENT JACKSON:  Rob Thwaite.

8            "MR. HOVAN:  Yeah.  So he was at the

9    end of the table.  That was the first time I ever met

10   him today.  And I was late to the meeting so I didn't

11   even get to introduce myself --

12           "AGENT JACKSON:  Okay.

13           "MR. HOVAN:  -- to anybody.  But he --

14   he was friends with Nick and already worked with

15   Nickie.  So I never really met Rob.  He just -- I

16   introduced Nickie and he introduced Rob and Bill.  So

17   I've never met Rob or Bill until today in my life.

18           "AGENT JACKSON:  Okay.  Do you know --

19   what's Nick's last name?

20           "MR. HOVAN:  Fuchs.

21           "AGENT JACKSON:  Okay.  I got you.  Did

22   you know another Nick, like a (indiscernible) Hovan?

23           "MR. HOVAN:  I'm Nick Hovan.

24           "AGENT JACKSON:  Oh, I'm sorry.  I'm

25   writing the name -- apologies.  My apologies.  Yeah.

1    I'm looking at Nick and Nick and --

2                "MR. HOVAN:  No.  There are two Nicks.

3    Nick and -- it's funny because we probably have the

4    same kind of involvement 'cause he's like -- he was

5    just -- we were just liaisons between the two sides.

6                "AGENT JACKSON:  Yeah.

7                "MR. HOVAN:  Because, like, I just knew

8    Nick and" --

9        (Pause playing audio clip G-1-7)

10   BY MR. MURRAY:

11       Q    So in that section, there's a bunch of

12   laughter, right?  What had happened?

13       A    I got Mr. Hovan's name wrong.  And that was

14   consistent for over the course of the interview.  I

15   mean, there was several times that we had shared

16   laughs, (indiscernible) phones, talking about money.

17   So that was not the first and last time that we shared

18   a laugh.

19       Q    So you were laughing at the fact that you

20   were asking Mr. Hovan who Nick Hovan --

21       A    Mr. Hovan was --

22       Q    -- was.

23       A    -- correct.

24       Q    And am I right, too, that you were doing

25   that because you weren't the case agent and you were

1    reading from a list of names?

2         A     Correct.

3         Q     And you made a mistake, correct?

4         A     Correct.

5                    MR. MURRAY:  If you could proceed.

6         (Resume playing audio clip G-1-7:)

7                    "MR. HOVAN:  So the other side got --

8                    "AGENT FEAR:  How did you know him

9    again?

10                   "MR. HOVAN:  I knew him through -- my

11   brother used to tutor him when he was a kid and he was

12   just like this guy works in the oil industry so you

13   might want to talk to him.  My brother has no

14   involvement in this.  Like --

15                   "AGENT JACKSON:  Okay.

16                   "MR. HOVAN:  But he's just like -- he

17   was like, I know this guy.  He's in the oil industry.

18   You should talk to him.  So I was like, I told him and

19   I said there might be an opportunity for -- for like

20   (indiscernible).  And then he was like -- and then I

21   was like this is the guy's number.  And they called

22   and they talked.  But like I never -- I wasn't part of

23   that conversation.  It was a call that I wasn't on.

24   And then they were just talking directly the whole

25   time.  It was never -- I was just kind of like -- I

1    made the introduction and then they started -- the two

2    sides started talking directly about it.

3              "And I'm on these like group chats but,

4    like, you can see, I don't contribute anything to

5    them.

6              "AGENT JACKSON:  That's the WhatsApp?

7              "MR. HOVAN:  Yeah.  And again, you can

8    take them.  You can look at them.  I don't really care

9    'cause like, you can see the involvement.  There's

10   like three chats.

11             "AGENT JACKSON:  Okay."

12        (Pause playing audio clip G-1-7)

13   BY MR. MURRAY:

14        Q    So in line 6 on page 14, Mr. Hovan mentions

15   group chats.  And then what do you follow up and ask

16   about?

17        A    Clarification.  Which group chats we're

18   talking about.

19        Q    Okay.  And in response to that

20   clarification, what does Mr. Hovan offer?

21        A    That we can look at them and he doesn't

22   really care.  Just to show what his involvement was.

23        Q    Okay.  At that point in time, when you asked

24   about them, had you asked for permission to look at

25   them?

1       A    No.

2       Q    Was that an unprompted offer?

3       A    Yes.

4       Q    And those chats, where did you understand

5    them to be located?

6       A    In his phone.

7               MR. MURRAY:  Now, Your Honor, I'm going

8    to ask that we play Exhibit -- or clip 1-8.  It starts

9    on page 15 at line 38.

10      (Begin playing audio clip G-1-8:)

11              "AGENT JACKSON:  So if everything went

12   as planned today, what were you actually going to

13   gain?

14              "MR. HOVAN:  From what I was told, I

15   was going to get 2.5 percent of the profit.  So it was

16   never written down anywhere unless it was.  But that's

17   what I was told I was going to get.

18              "AGENT JACKSON:  Okay.  Do you have any

19   idea what that would have actually amounted to?

20              "MR. HOVAN:  No idea.

21              "AGENT JACKSON:  Okay.

22              "AGENT FEAR:  Okay.

23              "AGENT JACKSON:  A good amount of

24   money?

25              "MR. HOVAN:  I really don't -- I don't

1  know.  I didn't know like how much was actually going

2  or anything because I wasn't involved in that.  I know

3  that the idea was for a lot but like I wasn't involved

4  in the details.

5             "AGENT FEAR:  So you don't know what

6  the quantity was that they were working with?

7             "MR. HOVAN:  I could guess but like I

8  don't know.  Like, I should be telling the truth and I

9  don't really know the -- I don't really know the exact

10 numbers.

11            "AGENT FEAR:  Okay.

12            "AGENT JACKSON:  Okay.  And you don't

13 have anything -- like if you took an educated guess --

14 I'm not saying you know the exact amount.

15            "MR. HOVAN:  I know from the meeting

16 that the initial -- the initial shipment was supposed

17 to be $500,000.  And then it was supposed to ramp up

18 from there.  But I don't know the specific numbers

19 because that wasn't -- I wasn't involved in that part.

20            "AGENT JACKSON:  Okay.  So you weren't

21 involved in that part but you just knew you were going

22 to get a percentage of it.

23            "MR. HOVAN:  Yes.

24            "AGENT JACKSON:  Okay.  Hal reached out

25 to me and I said -- I said, so I know this is going

```
 1    on.  I said, like, so like what is -- you know,

 2    obviously, (indiscernible) like this should be --

 3    you're going to -- (indiscernible) I guess some type

 4    of compensation.  So I said whatever you think is

 5    fair.  And he said 2.5 percent.  So -- I never really

 6    expected to get anything out of this.  I thought it

 7    was kind of just like -- like finding this guy, it

 8    doesn't actually happen.  You know, so I never really

 9    talked about it.

10              "AGENT JACKSON:  It seems like an

11    unnecessary risk to (indiscernible) --

12              "MR. HOVAN:  It's like I was in the

13    car.  I said -- this is a -- it was a side thing I was

14    doing that was a risk that I never should have

15    entertained in the first place.

16              "AGENT JACKSON:  Right.

17              "MR. HOVAN:  It was nothing I was ever

18    involved in until I was introduced to it.

19              "AGENT JACKSON:  Right.

20              "MR. HOVAN:  And I just like -- if I

21    could go back in time and just not do this, it would

22    be the easiest decision of my life.  But obviously, I

23    made a mistake and I was introduced to the wrong

24    people and followed through with it.  And if I could

25    take it back, I would.  But the best thing I can do is
```

1    just tell you guys everything I know and the truth.

2                    "AGENT JACKSON:  Right."

3         (Pause playing audio clip G-1-8)

4    BY MR. MURRAY:

5         Q    Now, Agent Jackson, was this another offer

6    by Mr. Hovan to cooperate?

7         A    Yes.

8         Q    And at this time, can you describe his

9    demeanor?

10        A    It was the same.  Lucid, articulate.  Again,

11   offering to cooperate in every way he could.

12        Q    And in this section but at the end, on line

13   approximately 20 of page 17, did Mr. Hovan say why he

14   was being so cooperative?

15        A    Pretty much that he just wants to tell the

16   truth.  If he could take it back, he would and the

17   best thing is to just be truthful about it.

18                    MR. MURRAY:  So turning to --

19                    THE COURT:  One second.  Jim, let me

20   speak to you a second, please.

21        (Pause)

22                    MR. MURRAY:  Thank you, Your Honor.

23                    THE COURT:  Okay.

24                    MR. MURRAY:  Turning to page 20,

25   starting at line 28, we're going to play clip 1-9.

1          (Begin playing audio clip G-1-9:)

2                    "AGENT FEAR:  The purpose of today's

3     meeting was?

4                    "MR. HOVAN:  Just to finalize

5     everything, I think.  I had a -- I had a bad -- this

6     morning when I left, I had a bad feeling anyway.  But

7     --

8                    "AGENT JACKSON:  Yeah.

9                    "MR. HOVAN:  It's just -- you know,

10    it's just I never really should have gotten involved

11    in this in the first place.  I'm so mad at my friend

12    for even bringing me into this but I'd like -- I

13    should have just backed out.  And I just feel like it

14    just moved along without me.  And then we just got so

15    far in the point where we're like -- I didn't really

16    know what was going on.  And it was -- and, like, it

17    just seemed like, okay, I could just sit here and do

18    nothing and it'll work -- and like it'll -- and, you

19    know, that was the wrong mentality to have.  I mean, I

20    don't know what I should have done.  Should I have

21    gone to the FBI myself?  Or like -- but I think the

22    best thing I can do is just tell you the exact truth

23    and every single thing I know."

24         (Pause playing audio clip G-1-9)

25    BY MR. MURRAY:

1        Q    And at the end there, what does Mr. Hovan

2    say was the best thing for him to do?

3        A    To tell the truth and tell us everything he

4    knows.

5        Q    Now I'm going to play you a longer clip that

6    starts in the middle of page 21 at line 22.  And we're

7    going to play the first question and then I'm going to

8    ask you a couple questions.  So I'm going to ask Agent

9    Vacanti to go quickly and then stop on that one.

10                    MR. PICANTE:  1-10?

11                    MR. MURRAY:  On, yeah, 1-10, please.

12        (Begin playing audio clip G-1-10:)

13                    "AGENT FEAR:  Is there anything that we

14    haven't asked you that would be helpful for us to know

15    about this deal or these people?"

16        (Pause playing audio clip G-1-10)

17                    MR. MURRAY:  Can you pause there.

18    BY MR. MURRAY:

19        Q    So you hear at line 23 and 24 on page 20?

20        A    Yes.

21        Q    That's Agent Fear asking the question,

22    right?

23        A    Correct.

24        Q    She's asking an open-ended question here,

25    right?

1        A    Yes.  That's what we usually do at the end

2    of an interview.

3        Q    You've gone through a lot of the facts and

4    now are asking an open-ended question.  Is that right?

5        A    Correct.

6        Q    And then over the next approximately half a

7    page of the transcript, what happens?  What does Mr.

8    Hovan say here?

9        A    Again, just being -- being truthful.  Saying

10   he's going to cooperate in any way he can.  Suggests

11   the WhatsApp conversations again.  And he goes -- it

12   sounds like he goes a little bit further because he

13   says "WhatsApp conversations and things like that"

14   were all going to be kind of like fair game.

15       Q    So after the open-ended question's answered,

16   does he offer the WhatsApp messages and other

17   messages?

18       A    Yes.

19       Q    And then do you proceed with a discussion

20   about it?

21       A    Yes.

22       Q    All right.  We're going to listen to that.

23   But before we go, do you -- what was Mr. Hovan's

24   demeanor at this point in time?

25       A    The same.  It was a -- the same forthright,

1    lucid, articulate.  Still cooperative.

2                     MR. MURRAY:  So if we could just start

3    from the beginning of that clip, that would be great.

4         (Begin playing audio clip G-1-10:)

5                     "AGENT FEAR:  Anything else that we

6    haven't asked you that would be helpful for us to know

7    about this deal or these people?

8                     "MR. HOVAN:  No.  Like I said, I -- the

9    -- I knew everybody -- like I kind of met everyone in

10   that room by name except for the one person next to

11   the other investor.  I never met him before.  But

12   other than that, I don't -- I don't really know how

13   much more I know.  Like I said, I don't really know

14   that much.  You'll probably get a lot more information

15   from a lot of people in the room.  But, like, I'll

16   answer any question that I can answer or anything,

17   like -- but I can try and answer.  Like I said, I got

18   to tell the truth.  And I'm not going to -- I'm not

19   going to lie to you to try and help my case out any."

20        (Pause audio clip G-1-10)

21   BY MR. MURRAY:

22        Q    Stopping there.  At about lines 31, 32, 34,

23   what does Mr. Hovan offer to do here?

24        A    Still answering questions, be truthful and

25   help in any way he can.

1      Q    And that was a repetition of the many

2    previous times he'd done that earlier, correct?

3      A    Correct.

4              MR. MURRAY:  If you could proceed.

5         (Resume playing audio clip G-1-10:)

6              "MR. HOVAN:  But all I can do is tell

7    you the truth of my involvement and what I know from

8    involvement of other people.  And like I said,

9    (indiscernible) looking at WhatsApp conversations or

10    things like that because I -- they're fair game for

11    (indiscernible) involvement but I'll point you to the

12    ones -- I'll point you to every single conversation

13    I've ever had.

14              "AGENT JACKSON:  All right.

15              "MR. HOVAN:  Because" --

16         (Pause playing audio clip G-1-10)

17    BY MR. MURRAY:

18      Q    So looking at lines 40 on page 21 through 2

19    on page 22, what --

20              THE COURT:  What line?  Say that again.

21              MR. MURRAY:  Yes, Your Honor.  40 on

22    page 21 --

23              THE COURT:  Okay.

24              MR. MURRAY:  -- to line 2 on page 22.

25    BY MR. MURRAY:

1    Q    So, Agent Jackson, in that part of the

2    dialogue, what does Mr. Hovan say there?

3    A    Pretty much that he's going to be truthful,

4    tell us the truth.  We can look at the WhatsApp

5    conversations and things like that and everything's

6    fair game.  He'll point us out to every single

7    conversation he's ever had.  So pretty much offering

8    to point us to where he thinks we would like to look

9    at.

10    Q    And at that point in time, had yourself or

11    Agent Fear or the other FBI employee in the room

12    raised the topic of those messages?

13    A    No.

14    Q    And when he does that, what does he say he's

15    willing to point you to?

16    A    Every single conversation that he's had.

17    Q    Now at this point in time, had there been

18    any mention of a search warrant?

19    A    No.

20    Q    Had there been any mention of any other

21    means by which the FBI might get these messages?

22    A    No.

23    Q    Now was this the first time that Mr. Hovan

24    had offered to show you these messages?

25    A    No.

1      Q    And at this point in time, did you consider

2    that he provided to consent to search his phones?

3      A    Yes.

4      Q    After he gave you this oral consent, what

5    did you do?

6      A    I was looking for an actual consent form for

7    Mr. Hovan to read through to make sure he is

8    comfortable with giving his consent and that he knows

9    that if he is, that he could take it back at any time.

10   So I just wanted to memorialize it in writing.

11     Q    And is that one of the frequent practices

12   that you follow as part of the FBI?

13     A    Yes.

14          MR. MURRAY:  Now if you could proceed.

15     (Resume playing audio clip G-1-10:)

16          "MR. HOVAN:  Personally, like, I don't

17   think anything really hurts my case because, like I

18   said, I pointed two parties together.  And I should

19   have just backed out when I first got the call to be

20   involved in this (indiscernible).

21          "AGENT FEAR:  Do your phones -- do they

22   have passcodes?

23          "MR. HOVAN:  My iPhone does.  But

24   that's my work phone.  There's nothing on there.  I

25   mean, you can look at it but there's nothing on there.

1              "AGENT FEAR:  Okay.  Yeah.  I mean,

2      we're going to look at the phones for (indiscernible).

3      And it's usually easier if --

4              "MR. HOVAN:  Yeah.  I don't know -- I

5      actually don't know these iPhones.  But I can just

6      open it with my face and you can turn off the passcode

7      if you want.  There's no passcode on this one.

8              "AGENT JACKSON:  Okay.  So" --

9              MR. MURRAY:  Okay.

10     BY MR. MURRAY:

11         Q    Now from lines approximately 14 to lines 27

12     on page 22, Agent Fear asks a series of questions,

13     correct?

14         A    Correct.

15         Q    What's the topic of her questioning?

16         A    The cell phones and passcodes.

17         Q    Why was she asking about passcodes for the

18     phones?

19         A    Because since Mr. Hovan was going to give us

20     consent, I mean, we would need the passcodes to

21     actually look through the phones, to get into them.

22         Q    Now in line 19, Agent Fear begins talking

23     and she's cut off.  What did you understand her to be

24     saying in that line?

25         A    I took that as we're going to look at both

1   phones since you're giving us consent and that we want

2   to have -- you know, we're going to -- want to have a

3   thorough investigation.  So we would want to look at

4   both the phones.

5       Q   And at this point in time, had there been

6   any mention of a search warrant?

7       A   No.

8            MR. MURRAY:  If you could proceed.

9      (Resume playing audio clip G-1-10:)

10         "AGENT JACKSON:  What we're going to do

11   is I'm going to have you, if you're good with us

12   looking through your phones, I'm going to have you

13   sign a consent form.

14         "MR. HOVAN:  Okay.

15         "AGENT JACKSON:  Okay?

16         "MR. HOVAN:  Yeah.

17         "AGENT JACKSON:  All right.  So" --

18         MR. MURRAY:  Can you stop that?

19      (Pause playing audio clip G-1-10)

20   BY MR. MURRAY:

21       Q   The topic of conversation pivots, is that

22   right?

23       A   Yes.

24       Q   Do you take over the questioning?

25       A   Yes.

1        Q    What are you asking him about?

2        A    Just reiterating what -- or just telling

3   him, like, look, if you are comfortable with us --

4   comfortable giving us consent to look through your

5   phones, which, at that point, seemed like he was very

6   comfortable because he had offered it numerous times

7   through the interview, that I wanted him to sign a

8   consent form so he actually is advised of his rights.

9        Q    And in line 34 on page 22, do you ask him

10  whether it's okay to sign the consent form?

11       A    Yes.  I asked him if you're okay with it,

12  and he agreed that he was.

13       Q    Okay.  And I'm going to just ask you to go

14  back just a few lines because I believe there's a

15  knock, knock in the audio.  We'll play it.  And at the

16  end, I'm going to ask you what that is.  Just a few

17  lines.  But not that far.  Just --

18       (Resume playing audio clip G-1-10:)

19            "AGENT JACKSON:  So what we're going to

20  do is I'm going to have you -- if you're good with us"

21  --

22       (Pause playing audio clip G-1-10)

23            MR. MURRAY:  Starting with, yeah, okay,

24  "So we're going to do this".  It looks like you're

25  there.  Sorry.

```
 1              (Resume playing audio clip G-1-10:)

 2                   "AGENT JACKSON:  -- "with us looking

 3        through your phones, I'm going to have you sign that

 4        consent form.

 5                   "MR. HOVAN:  Okay.

 6                   "AGENT JACKSON:  Okay?

 7                   "MR. HOVAN:  Yeah?

 8                   "AGENT JACKSON:  All right.  So" --

 9                   MR. MURRAY:  Would you stop, please?

10                   "AGENT JACKSON:  -- "this is a iPhone

11        and this is your work phone."

12        BY MR. MURRAY:

13             Q    There's a knock, knock when you're talking

14        about the consent form.  What's going on there?

15             A    Just the consent form was on the table and

16        I'm just tapping -- putting my finger on my pen and

17        showing that this is the consent form.

18             Q    Okay.

19                   MR. MURRAY:  If you could proceed now?

20              (Resume playing audio clip G-1-10:)

21                   "AGENT JACKSON:  Right here.  Okay.

22        What type of iPhone is it?

23                   "MR. HOVAN:  iPhoneX.

24                   "AGENT JACKSON:  And does it have a PIN

25        associated with it?
```

```
1                    "MR. HOVAN:  Yeah.  It's 0510HO -- H --

2                    "AGENT JACKSON:  Sorry.  I'm sorry.

3       0510 --

4                    "MR. HOVAN:  10.  It's my birthday.

5       And then H-O-V-A.  It's lower case.

6                    "AGENT JACKSON:  All right.  All lower

7       case?

8                    "MR. HOVAN:  Yeah.  And there's no

9       password on my other phone.

10                   "AGENT JACKSON:  All right.  So

11      0510hova?

12                   "MR. HOVAN:  Uh-huh."

13                   MR. MURRAY:  Can you pause?

14      BY MR. MURRAY:

15          Q    So what are you doing at this point of the

16      interview?

17          A    I'm filling out the consent portion as far

18      as the phones, what the passwords were, types of

19      phones they are.

20          Q    So looking at Government Exhibit 3

21      simultaneously, is this -- which portion of Exhibit 3

22      on the consent form are you filling out?

23          A    Right under number 1, under bullet 1.

24          Q    And is this when you were filling out the

25      two phones?  Is that right?
```

1       A      Correct.

2       Q      And we see a crossout with respect to the

3    password.  What was happening there?

4       A      As he was giving me his password, I

5    automatically assumed it was capitals.  But when I

6    verified with him, he said it was lower case.  So I

7    scratched out the capitals and filled in as lower.

8       Q      Okay.  And looking back at the transcript,

9    did he tell you it was lowercase unprompted?

10      A      Yes.

11      Q      If you look --

12               THE COURT:  Where are we?

13               MR. MURRAY:  Thank you.  I'm flipping

14   back.  Forgive me, Your Honor.

15   BY MR. MURRAY:

16      Q      On page 23, on line 11, does Mr. Hovan, as

17   you're writing out the incorrect password with capital

18   letters, tell you it's lowercase and correct you?

19      A      Yes.  Unprovoked, he told me it's lowercase

20   and then I confirmed with him.  I said, "All right.

21   All lowercase?"  "Yes."

22      Q      Okay.  And at this point, where are you

23   sitting vis-à-vis each other?

24      A      Still across from each other.

25      Q      Okay.

```
 1                    MR. MURRAY:  Can you please proceed?

 2          (Resume playing audio clip G-1-10:)

 3                    "MR. HOVAN:  And then HOV" --

 4                    THE COURT:  Tell me where you are.

 5          (Pause playing audio clip G-1-10)

 6                    MR. MURRAY:  Let's see, Your Honor.  We

 7     are at line 13.

 8                    THE COURT:  Of page 24.

 9                    MR. MURRAY:  23, Your Honor.

10                    THE WITNESS:  23.

11                    THE COURT:  Still on -- oh, okay.  So

12     we're going back.  Okay.

13          (Resume playing audio clip G-1-10:)

14                    "MR. HOVAN:  Lowercase.

15                    "AGENT JACKSON:  All right.  All

16     lowercase?

17                    "MR. HOVAN:  Yeah.  And there's no

18     password on my other phone.

19                    "AGENT JACKSON:  So 0510hova?

20                    "MR. HOVAN:  Uh-huh.

21                    "AGENT JACKSON:  Okay.  And this is

22     your work phone.

23                    "MR. HOVAN:  Yep.

24                    "AGENT JACKSON:  All right.  And the

25     other one?
```

1                    "MR. HOVAN:  There's no password.

2                    "AGENT JACKSON:  All right.  Well, what

3      kind of phone?

4                    "MR. HOVAN:  (Indiscernible).

5                    "AGENT JACKSON:  So is that AT&T?

6      Samsung?

7                    "MR. HOVAN:  Samsung.  Samsung.

8                    "AGENT JACKSON:  Okay.

9      (Indiscernible).

10                    "MR. HOVAN:  There (indiscernible)

11     phones anyway.

12                    "AGENT JACKSON:  That's why I was

13     (indiscernible).

14                    "MR. HOVAN:  (Indiscernible).

15                    "AGENT JACKSON:  All right.

16                    "MR. HOVAN:  I used to have an AT&T.

17     (indiscernible) phones.

18                    "AGENT JACKSON:  Yeah.

19                    "AGENT FEAR:  Yeah.  I remember that.

20                    "AGENT JACKSON:  So the Samsung doesn't

21     have a password on it.

22                    "MR. HOVAN:  No password.  And do you

23     want me to -- I can show you -- I can point you to all

24     the WhatsApp conversations that are relevant to you.

25                    "AGENT FEAR:  Sure

1                    "MR. HOVAN:  I could save you time.

2      And feel free to look through everything but I'll show

3      you that I have more important ones.

4                    "AGENT FEAR:  Okay."

5          (Pause playing audio clip G-1-10)

6      BY MR. MURRAY:

7          Q    At the end there, Mr. Hovan makes a series

8      of offers.  What does he offer to do?

9          A    Offering to show us -- point us to WhatsApp

10     conversations and which ones he thinks is prevalent to

11     us and save us some time.  And pretty much saying feel

12     free to look through everything but he'll show us what

13     he thinks is the important ones.

14         Q    And was there any reticence by Mr. Hovan at

15     that point in time or before?

16         A    No.

17         Q    And at this point in time, was there any

18     doubt in your mind that he was consenting to the

19     search of these phones?

20         A    No.

21         Q    At this point in time, had there been any

22     mention of a search warrant?

23         A    No.

24                    MR. MURRAY:  Can you please proceed?

25         (Resume playing audio clip G-1-10:)

 1                    "AGENT FEAR:  It doesn't have one.

 2                    "AGENT JACKSON:  So this one has on

 3       password.  And iPhoneX -- can you get to it through --

 4       if you can't use your face, can you just put the

 5       passcode in and it's going to let you in the phone?

 6                    "MR. HOVAN:  It should work 'cause I'm

 7       -- I think if you just do it a couple times it should

 8       but let me just turn off the password (indiscernible).

 9       And like I said, there's nothing on it.  The password

10       didn't work.

11                    "AGENT FEAR:  I think it was just not

12       taking (indiscernible).

13                    "MR. HOVAN:  Okay.

14          (Pause)

15                    "AGENT FEAR:  Yeah.  It's confusing.

16       Your --

17                    "MR. HOVAN:  Samsung -- do you know

18       (indiscernible)?

19                    "AGENT FEAR:  (Indiscernible).

20                    "MR. HOVAN:  Yeah.

21                    "AGENT FEAR:  Let's see.

22                    "MR. HOVAN:  So like I said" --

23          (Pause playing audio clip G-1-10)

24       BY MR. MURRAY:

25          Q    The dialogue there is a little confusing.

1   What's going on as there's some pauses in the

2   dialogue?

3        A    I believe they're trying to figure out how

4   to take the passcodes off the phones.

5        Q    So for future access to the phones?

6        A    Correct.

7                  MR. MURRAY:  Thank you.

8        (Resume playing audio clip G-1-10:)

9                  "MR. HOVAN:  I never did anything with

10   the work phone so you (indiscernible).

11                  "AGENT JACKSON:  Okay.

12                  "AGENT FEAR:  Okay.  It's --

13                  "MR. HOVAN:  I'm not going to get that

14   back for a long -- I'm not getting that back for a

15   while --

16                  "AGENT FEAR:  I think it might be off.

17   Let's try it.

18                  "AGENT JACKSON:  I don't know.  It

19   depends on what they find on there.  If they don't, so

20   I can't really say (indiscernible).  I don't want to

21   give you a date --

22                  "AGENT FEAR:  All right.  I'll let you

23   get it (indiscernible) in the end.

24                  "MR. HOVAN:  I'm still being recorded,

25   yeah?

```
1                    "AGENT JACKSON:  Yes.
2                    "MR. HOVAN:  So what are the -- what
3      are the next steps, I guess -- can I ask that?  Or --
4                    "AGENT JACKSON:  Yes.  Well, let me get
5      through this real quick.
6                    "AGENT FEAR:  We're still trying to
7      turn the phone off.  But I mean, the passcode works."
8                    THE COURT:  What page -- where are you?
9                    MR. MURRAY:  Please pause it.
10          (Pause playing audio clip G-1-10)
11                    MR. MURRAY:  We're at the top of page
12     26, Your Honor.
13                    THE COURT:  Oh.  That's --
14                    MR. MURRAY:  If we could start with the
15     line that starts with "All right", which is line 9.
16     It will help us follow.
17                    THE COURT:  Well, you've been doing
18     everything in between.
19                    MR. MURRAY:  Yes.  You're right.
20                    THE COURT:  Okay.
21                    MR. MURRAY:  Exactly, Your Honor.  I'm
22     just trying to give you --
23                    THE COURT:  Okay.
24                    MR. MURRAY:  -- the line --
25                    THE COURT:  Yeah.  So that I can know
```

1   where we are.  Okay.  Just be helpful when I write --

2   if I decided to write something --

3                  MR. MURRAY:  Of course.

4                  THE COURT:  -- where it is.

5                  MR. MURRAY:  And let me -- before we go

6   ahead, just for the Court, this clip's almost over.

7   BY MR. MURRAY:

8       Q    Agent Jackson, looking at lines 12 through

9   16, what's happening there when those words are

10  spoken?

11      A    Mr. Hovan is signing that consent form and

12  asking what the date is.

13      Q    Okay.  And we hear a sound.  Looks like

14  something run across the table.  Do you recall what

15  that sound was in this section?

16      A    I believe the signature.  I have a pen on

17  the table.

18                  MR. MURRAY:  If you could proceed.

19      (Resume playing audio clip G-1-10:)

20                  "AGENT FEAR:  But I mean, the passcode

21  works which is fine.

22                  "AGENT JACKSON:  Signature and date.

23                  "MR. HOVAN:  The 10th?

24                  "AGENT JACKSON:  Yes.  2/10/20.  Thank

25  you.

```
 1                    "AGENT FEAR:  It's not letting me --
 2    but you gave us it so for right now, that should be
 3    fine.
 4                    "MR. HOVAN:  Yeah.
 5                    "AGENT FEAR:  Can you show us which
 6    strings you were talking about on this
 7    (indiscernible)?
 8                    "MR. HOVAN:  There's nothing on my work
 9    phone.  I don't have WhatsApp on there.
10                    "AGENT FEAR:  Oh."
11         (Pause playing audio clip G-1-10)
12    BY MR. MURRAY:
13         Q    So there' a mention on lines 14 and line 16
14    about the 10th and February 10th, 2020.  Why is that
15    being discussed?
16         A    It was the date of the interview.
17         Q    So looking at Exhibit 3, there's a date
18    written down.  Who wrote that date on Exhibit 3?
19         A    Mr. Hovan.
20         Q    And so you were providing him the date so
21    that he could write that there?
22         A    Correct.
23         Q    And then there's a sound.  And is that sound
24    -- you said was Mr. Hovan signing this form?
25         A    Yes.
```

1      Q     And at this point in time, what was his

2   demeanor like?

3      A     The demeanor never changed.  Still

4   articulate, lucid and wanted to cooperate.

5      Q     And had he had an opportunity to read this

6   form?

7      A     Yes.

8      Q     Now I want to play for you one more clip.

9   And this is near the end of the transcript.

10                 MR. MURRAY:  So turning to page 34.

11   This is line 34 on page 34, Your Honor.  And this is

12   1-12.

13                 Can you play it, please?

14      (Begin playing audio clip G-1-12:)

15                 "AGENT JACKSON:  So then if there's

16   nothing else you can think of (indiscernible)?

17                 "MR. HOVAN:  That's pretty much it.

18   Like I am trying to tell the truth and tell you my

19   involvement and anything I can do to help you guys

20   with this investigation, I'll do.

21                 "AGENT JACKSON:  We appreciate that.

22                 "MR. HOVAN:  If you need me to be a --

23                 "AGENT FEAR:  We appreciate that.

24                 "MR. HOVAN:  -- witness or anything,

25   like, I'll do it."

1    BY MR. MURRAY:

2        Q    So in this final section right before the

3    end of the transcript, what does Mr. Hovan offer?

4        A    Again, he reiterates just like he did from

5    the beginning throughout the entire interview that

6    he's willing to cooperate, tell the truth and help in

7    any way he can with the investigation.

8        Q    Okay.  Now so, just in summary, about how

9    long did this interview last?

10       A    A little less than an hour.

11       Q    And how would you describe the atmosphere

12   throughout the entire interview?

13       A    It was very laid back.  It wasn't a

14   stressful environment.  No aggression.  No yelling.

15   No raised voices.  Like I said, the room was

16   comfortable, well lit.  Yeah.  So I think it was just

17   a general conversation type environment.

18       Q    And did Mr. Hovan's demeanor stay the same

19   throughout the entire interview?

20       A    Yes.

21       Q    Now did you ever threaten him throughout the

22   interview?

23       A    No.

24       Q    Make any promises?

25       A    No.

1        Q     Brandish any weapons or otherwise make a

2    show of force?

3        A     No.

4        Q     And he waived his Miranda rights, correct?

5        A     Correct.

6        Q     And  was there any reason to doubt that was

7    a knowing and voluntary waiver?

8        A     No.

9        Q     And during this, he offered to show you his

10   WhatsApp messages and other messages.  Is that right?

11       A     Correct.

12       Q     And that was unprompted at times, correct?

13       A     Yes.

14       Q     And that was repeated?

15       A     Yes.

16       Q     Now did you understand while he was doing

17   that that he was providing consent to review those on

18   his phones?

19       A     Yes.

20       Q     And did you memorialize his consent to

21   search his phones?

22       A     Yes.

23       Q     And during the entire interview before -- at

24   the time of his execution of the search warrant or

25   after, did you ever mention -- I said search warrant.

1        A    Consent form

2        Q    Let's start that again.

3        A    The consent form.

4        Q    During the entire interview before he signed

5    the consent form, while he did or after, did you ever

6    mention a search warrant?

7        A    No.

8        Q    And during the entire interview, did Mr.

9    Hovan ever attempt to withdraw the consent?

10       A    No.

11       Q    Or did he ever express concerns about the

12   consent that he'd given orally and in writing?

13       A    No.

14       Q    And did he ever give you any reason to think

15   that his consent was not knowing and voluntary?

16       A    No.

17                  MR. MURRAY:  No further questions, Your

18   Honor.

19                  THE COURT:  Okay.  Cross-examination.

20                  MR. FAYHEE:  Thank you, Your Honor.

21                  CROSS-EXAMINATION

22   BY MR. FAYHEE:

23       Q    And good afternoon, Special Agent Jackson.

24   My name's Ryan Fayhee.  I'm representing Mr. Hovan.

25                  Coming back to your role in the

```
 1    investigation, you testified on direct examination
 2    that you were not the lead case agent on this matter,
 3    that you were helping out on the day of the arrest.
 4    Is that correct?
 5        A    Correct.
 6        Q    Now are you on the same squad as the lead
 7    case agent or a different squad at this time, February
 8    of 2020?
 9        A    I'm on the same squad as one of the case
10    agents.
11        Q    The same squad.  And did you have a general
12    familiarity with the investigation?
13        A    No.
14        Q    Okay.  And in your role as a special agent
15    on the squad, is it a white collar squad or how would
16    you describe the squad?
17        A    White collar.
18        Q    White collar.  Okay.  And I'm interested in
19    your preparation for the day of the arrest.  If you
20    can remember -- if you can remember, when did you
21    first learn that you would be participating in the
22    arrest?  I don't need a specific day but was it a few
23    days?  A few months?
24        A    I'll say maybe a day or two prior to.
25        Q    Okay.  And what steps did you take to
```

 1   prepare for the day of the arrest?  And I don't mean

 2   sort of physically prepare or those sorts of things.

 3   I mean more to get background on the case, to prepare

 4   for the interview.

 5        A     Basically, just a -- like I said before, we

 6   had a packet which was just pretty much like a bio and

 7   just questions to ask if the -- if Mr. Hovan didn't

 8   want to actually speak in the interview.

 9        Q     Okay.  And who gave you that packet?

10        A     One of the case agents.

11        Q     Okay.  Was it the lead case agent?  Do you

12   remember which agent gave it to you?

13        A     I don't recall.

14        Q     Okay.  And what was contained within this

15   packet?

16        A     Best -- from my recollection, I remember it

17   was just a lot of names of, I guess, people who were

18   actually involved in the case itself.

19        Q     Okay.  And this document or the names, that

20   was for the purposes of preparing for an interview?

21        A     Yes.

22        Q     Okay.  And was there any other detail in

23   this briefing packet?

24        A     Not to my recollection.  I can't -- I just

25   know -- not specifically remember the names.

1       Q    And was there, for example, the affidavit

2  that had been used to support the execution of a

3  search warrant?

4       A    I don't recall if that was in the packet.

5       Q    Or an affidavit used to support the criminal

6  complaint that had been issued in the case.

7       A    That was in the packet?

8       Q    Yes.

9       A    I don't recall.

10      Q    Okay.  Do you recall reading the affidavit

11 that was used in support of the search warrant?

12      A    I don't recall reading the affidavit.  I

13 remember seeing the search warrant.

14      Q    Okay.  Just the face sheet of the search

15 warrant?

16      A    Yes, sir.

17      Q    Okay.  And were there any materials other

18 than the names and the background for the purposes of

19 the interview within the briefing packet in terms of

20 the strategy to use in the course of the interview?

21      A    No.

22      Q    Any documents that set out the goals of the

23 interview?

24      A    No.

25      Q    Okay.  Did you receive an oral briefing from

1   any of your fellow case agents before the -- you know,

2   attempting the interview?

3       A    We received a briefing as we would do for

4   general practice before effecting the arrest on safety

5   procedures as far as who possibly would be in the

6   room, things of that nature.

7       Q    And that's the -- is that the morning of the

8   arrest before -- or at least at some point prior to

9   the arrest but on the same day?

10      A    It was prior to the arrest, yes.

11      Q    Yeah.  It's more of a safety security

12  briefing than --

13      A    Yes.

14      Q    -- than what to achieve in the course of the

15  interview.

16      A    Yes.

17      Q    Okay.  And on that day, you were assigned,

18  as I understand it from your direct testimony, was to

19  effectuate the arrest of Mr. Hovan, specifically.

20      A    Correct.

21      Q    So your goal was to come in, secure him

22  alongside Special Agent Fear, you know, place him

23  under handcuffs.  The typical routine.  Is that

24  correct?

25      A    Correct.

1     Q    Okay.  Now before you approached the arrest

2     the day of, you testified on direct that it occurred

3     inside of a conference room at the Hotel Monaco which

4     I understand is just down the street, correct?

5     A    I said it occurred at the Hotel Monaco, yes.

6     Q    And my understanding is it's in a -- was in

7     a conference room of the Hotel Monaco.  Is that

8     correct?

9     A    Correct.

10     Q    All right.  And you remember what other

11     persons were being arrested that day besides Mr.

12     Hovan?

13     A    Not by name.  I just know there were several

14     individuals.

15     Q    Okay.  Do you remember how many -- just even

16     the number of individuals?

17     A    Maybe two to four, somewhere's around there.

18     Q    Okay.  Less than -- less than four.

19     A    Yeah.

20     Q    And do you remember how many other persons

21     were in the room at the time.  This is prior to you

22     coming in to have the arrest.

23     A    How many people were in the room together

24     altogether?

25     Q    Besides the four that we've referenced that

1   were placed under arrest.

2        A    I don't know an exact number, no.

3        Q    Okay.  Can you give me even a rough estimate

4   at all.  Was there one person?

5        A    No.  Probably like maybe seven, eight all

6   together.

7        Q    Okay.  So more than five at least that were

8   there.  Okay.  And were any of those persons placed

9   under arrest?

10        A    Some of them, yes.

11        Q    So sorry.  Let me -- to make clear on the

12   record.  So other than the four that were arrested on

13   that day, inclusive of Mr. Hovan, how many additional

14   people were in the room?

15        A    Like I say, it could be anywhere's up to

16   eight.

17        Q    Okay.  So in total, there may have been, to

18   your best recollection, 13 people?

19        A    I don't know about 13.  Maybe 8 -- 8 or 9 at

20   best.

21        Q    But collectively.  I'm just trying to make

22   sure I understand in addition to -- so four persons

23   placed under arrest and potentially, is it your

24   testimony that there are four or five others?

25        A    Yes.

1          Q    Okay.  Understood.  And those four or five

2     others, were those all FBI agents that were in the

3     room?

4          A    I don't know if they were all FBI agents.

5     I'm not sure.

6          Q    Okay.  So no FBI agents were arrested that

7     day, I take it.

8          A    As far as FBI agents being arrested?

9          Q    Yes.

10         A    I believe everyone in there probably was in

11    cuffs at some point.

12         Q    Every single person in the room was in

13    handcuffs at the end?

14         A    I would assume.  Like I said, I came in, got

15    Mr. Hovan and then we escorted him out.  I didn't stay

16    the whole time.

17         Q    Let me approach the question in a slightly

18    different way.

19              Do you recall the safety briefing even

20    loosely that morning?

21         A    Yes.

22         Q    And do you know where the persons to be

23    arrested were placed in that conference room?  In

24    other words, were their backs to the door of the

25    conference room through which you would enter, for the

```
 1    purposes of having an element of surprise and for your
 2    own safety?  Is that correct?  Do you recall?
 3         A    Can you repeat that?  Where they were
 4    actually sitting?
 5         Q    Sure.  It was a little garbled there.  My
 6    apologies.
 7              So when preparing for the execution of the
 8    arrest and getting that brief in the morning, did you
 9    learn at that time that the defendants to be arrested,
10    the four that would be arrested, would have their
11    backs placed to the door that you would enter from?
12         A    I don't recall.
13         Q    You don't recall that?
14         A    No.
15         Q    Okay.  Okay.  Do you remember the conference
16    room where the arrests took place?  Do you recall
17    whether there was a conference room table --
18         A    Yes.
19         Q    -- that persons would be seated at?
20         A    Yes.
21         Q    Okay.  And do you remember -- once again, I
22    think you just testified but just to confirm.  There
23    were four persons placed under arrest.  Yes?
24         A    Roughly, I would say, yes.
25         Q    Okay.  And the remaining persons in the room
```

1   -- in other words, the persons who were not subject to

2   arrest.  Were all of the remainder FBI agents?

3        A    Were the remainder FBI agents?

4        Q    That's my question.

5        A    I believe they were.  Like I said, I didn't

6   know everyone in the room.

7        Q    Okay.  Okay.  So you didn't recognize the

8   other people or some of them?

9        A    Some of them but not all of them, no.

10       Q    Okay.  Okay.  And that didn't come up in the

11   course of the briefing who would be in the room?  In

12   other words, which were the defendants and which were

13   the other FBI agents?

14       A    I was familiar with who -- the FBI agents I

15   knew by face.  But as far as the defendants, I didn't

16   know -- like I said, my focus was Mr. Hovan.  And I

17   just had his bio.  I didn't know who else was going to

18   be affected.

19       Q    Okay.  Now on direct examination when you

20   were going through the interview, Mr. Hovan, my

21   client, made a few statements regarding this person

22   Hal.  Do you recall that on direct examination?

23       A    Yes.

24       Q    And do you recall whether that person, Hal,

25   was in the room at the time of the arrest?

1    A    I don't recall.  Like I said, I didn't know

2    the names of all the people.  I didn't know the -- I

3    didn't know the names.  I didn't know where they were

4    going to be sitting in the room.  Like I said, my

5    total tactic was to get Mr. Hovan and get him out and

6    secure him safely.

7    Q    Okay.  Did you ever perform an arrest -- I

8    heard you had 20 or so arrests since 2016.  Have you

9    ever performed one in the presence of a confidential

10    human source?

11    A    I believe so.  I can't think off the top of

12    my head but I think I have.

13    Q    Okay.  And -- now at the time that you

14    entered the room, do you remember actually entering

15    the room where you got, I assume behind the scenes, a

16    go ahead, that it was time to go through the door?

17    A    Yes.

18    Q    Okay.  Do you remember whether you knocked

19    on the door or an agent in front of you knocked on the

20    door or was it just swung open and you came in?

21    A    I don't recall if there was a knock or not.

22    I'm not sure.

23    Q    Okay.  No one kicked the door down.  It was

24    open.

25    A    No.  No one kicked it, no.

1    Q    And do you remember -- I know there's four

2    persons being under arrest -- placed under arrest.

3    And it sounds like there's two agents per person.  And

4    so my question is, do you recall how many total agents

5    were part of the arrest team?

6    A    No.  I don't recall the total amount.

7    Q    Okay.  Do you recall whether there were more

8    than the eight agents, two per defendant, present?

9    A    That were effecting the arrest?

10   Q    Exactly.

11   A    I don't really know the exact amount, sir.

12   Q    Okay.  Do you remember whether or not any of

13   the agents that were effecting or participating in the

14   arrest had their guns, their firearms, drawn?

15   A    I don't recall anyone's firearms being

16   drawn.

17   Q    Okay.  Do you recall whether your firearm

18   was drawn?

19   A    No.

20   Q    No.  But you were armed.

21   A    Yes.

22   Q    Per FBI policy.

23   A    Correct.

24   Q    Yeah.  Okay.  But you don't recall, your

25   testimony today, best of your recollection, whether

1    anyone else had their guns drawn.

2        A    I don't recall anyone else's gun being

3    drawn.  I know mine was not.

4        Q    Okay.  And do you recall in the course of

5    the briefing that morning, the written briefing or the

6    oral recitation of the briefing, any indication or

7    direction that an agent should enter with his or her

8    firearm drawn?

9        A    That they should enter with it?

10       Q    Correct.

11       A    Not to my recollection.

12       Q    Okay.  When you were through with this

13   briefing paper, do you recall what you did with it?

14       A    With the briefing paper.

15       Q    Yeah.  The briefing paperwork you spoke

16   about that had the names on it and --

17       A    Oh.  As far as for the interview?

18       Q    Yeah.

19       A    What I did with it as far as -- like --

20       Q    What did you with it --

21       A    -- was it present with me when I was --

22       Q    What did you with it following the

23   interview?

24       A    It's probably in my desk maybe.

25       Q    Okay.  You didn't make it part of the case

1    file?

2         A    No.  I did not put it with the case file.

3         Q    Okay.  And you haven't submitted it for

4    discovery review?

5         A    I have not, no.

6         Q    Okay.  Now at the time of the arrest --

7    again, we're still in the prep mode here.  I know it's

8    a short period of time.  But prior to effectuating the

9    arrest, did you conduct or review Mr. Hovan's criminal

10   history?

11        A    I might have looked at his criminal history

12   prior to.

13        Q    And what did you understand his criminal

14   history to be?

15        A    From my recollection, I don't think he had

16   much of a criminal history.

17        Q    He didn't have much of a criminal history or

18   --

19        A    I can't speak to it.  I know I looked at it.

20   I don't recall him having any like violent past or

21   anything like that.

22        Q    Okay.  But you don't recall he has no

23   criminal history at all.

24        A    I don't recall exactly.  I just remember

25   looking at it, yes.

1       Q    Okay.  Okay.  Or that he had ever been

2    arrested at any time prior to February 10th of 2020.

3       A    Correct.

4       Q    Okay.  Have you had an understanding of

5    where he was presently employed at the time of the

6    arrest?

7       A    I don't know if I knew it prior to.  I mean,

8    it came up in the interview where he was working at.

9       Q    Okay.  But you're not sure whether you had

10   learned that he worked at AT&T in the help care

11   division prior to the arrest.

12      A    I don't recall if I knew that before going

13   into it.

14      Q    Or his educational background for that

15   matter?

16      A    Not that I recall.

17      Q    Okay.  And had you had an understanding that

18   this case, this investigation, that it involved the

19   use of undercover FBI resources -- I don't need all

20   the specific details, but that it was generally an FBI

21   undercover operation?

22      A    Yes.

23      Q    You had an awareness of that.

24      A    Uh-huh.

25      Q    Okay.  All right.  Now with respect to the

1    two persons who were in the room with you, Special

2    Agent Fear and Ms. Weber, an analyst, did both of

3    those agents support the investiga -- excuse me --

4    Special Agent Fear and Analyst Ms. Weber, were they

5    assigned to the investigation or, like you, were they

6    just helping out the day of?

7         A    I believe they were just helping the day of.

8         Q    Okay.  So although I can ask them my own

9    questions and you're probably not aware of their

10   background, but from your perspective, they were not

11   assigned.  They were not deeply steeped in the facts.

12        A    No.  I don't believe so.

13        Q    Okay.  And why did you have an analyst with

14   you there today (sic) rather than just two case

15   agents?

16        A    I think we had her there for just the

17   purpose of taking notes.

18        Q    Okay.  She was supposed to take notes.

19   Okay.  And with respect to Special Agent Fear, prior

20   to the arrest and interview, at any point, did you

21   speak with her about what the investigative strategy

22   would be in the course of the interview?

23        A    I believe so, yes.

24        Q    Okay.  And what did you discuss?

25        A    Just the particulars as far as transport,

1    who's driving, you know, what room are we going to get

2    him in.  Specifics like that.

3         Q    So sound like logistical things.

4         A    Yeah.

5         Q    Okay.  So other than the logistical matters

6    that you were discussing, was there any discussions

7    around the actual interview strategy?  In other words,

8    what you were going to seek to accomplish in the

9    course of the interview that took place?

10        A    No.  I think the only thing was I would

11   probably take the lead on questioning and then just go

12   down the list of names and see if anything rings a

13   bell and if Mr. Hovan was willing to -- if he was

14   willing to speak to us, just have him explain the

15   whole situation.

16        Q    Okay.  And was there any alignment at any

17   time between the way that you two would be conducting

18   this interview and the way that other agents who were

19   conducting interviews of other defendants, was there

20   any alignment on the strategies between your interview

21   and other interviews being held simultaneously?

22        A    No.  We just spoke on our interview

23   particularly.

24        Q    Okay.  And was there ever any instruction at

25   all -- let's start with a written instruction, in

1   fact.  Was there anything, a written instruction to

2   inform or update Mr. Hovan on an interview that was

3   taking place elsewhere with respect to Mr. Fuchs?

4        A    Was there any written instruction to inform

5   him of other interviews?

6        Q    For example -- let me offer an example.  Was

7   there an instruction written to you to suggest, if Mr.

8   Hovan wasn't speaking in the course of the interview,

9   to inform him that Mr. Fuchs, in fact, was?

10       A    Not to my knowledge, no.

11       Q    Okay.  That's not something you recall from

12  the course of the interview?

13       A    No.

14       Q    Nothing that was written on paper in front

15  of you?

16       A    Nothing I recall, no.

17       Q    Okay.  Okay.  Now with respect to the

18  arrest, I think it was covered very, very well on

19  direct examination so I'll move through it fairly

20  quickly here.  But at the time Mr. Hovan was placed

21  under arrest in that room at the Hotel Monaco, he was

22  placed in handcuffs at that time?

23       A    Correct.

24       Q    Okay.  I heard a mention earlier of leg

25  irons.  But there were no leg irons placed on him at

1    the Hotel Monaco?

2        A    No.  I don't believe we placed them on him

3    at the Hotel Monaco, no.

4        Q    Okay.  So just handcuffed with his hands

5    behind his back.

6        A    Correct.

7        Q    The usual routine.

8        A    Correct.

9        Q    Okay.  And then from there, he was taken

10   outside the back of the Hotel Monaco --

11       A    Yes.

12       Q    -- and placed into a transport car?

13       A    Correct.

14       Q    And that was with you and Special Agent

15   Fear.

16       A    Correct.

17       Q    Okay.  And then driven a short distance to

18   the FBI building?

19       A    Yes.

20       Q    Okay.  And that's very nearby as I

21   understand it.

22       A    Yes.

23       Q    Okay.  Probably longer to drive in traffic

24   than it would be to walk.

25       A    Probably yes.  Correct, yeah.

1      Q    And he's then taken into the FBI building.

2  Do you recall what entrance you used?  I assume it's

3  not through the front door like a member of the public

4  would come.

5      A    No.  We took him in the back and up the

6  elevator.

7      Q    Okay.  Is it an alleyway or can you describe

8  it for me?

9      A    It's an alleyway that has like a delivery

10 port in the back of the building.

11     Q    Oh.  So sort of to receive materials --

12     A    Correct.

13     Q    -- that you use in the course of your work.

14 Big trucks can back up to it.

15     A    Correct.

16     Q    All right.  And it's typical, I presume, to

17 bring persons who have been placed under arrest for

18 processing through that same entrance.

19     A    Yes.

20     Q    But it's not as if there's a sign that says,

21 you know, FBI.  It's nondescript, if that's a fair way

22 --

23     A    Yeah.  That's --

24     Q    -- to characterize it.

25     A    Yeah.  There's nothing.  No insignia saying

1    FBI, no.

2        Q    Okay.  Okay.  Now at this point, you hadn't

3    asked Mr. Hovan any questions.

4        A    No.

5        Q    And you hadn't yet advised him of any of his

6    rights, so-called Miranda rights.

7        A    No.

8        Q    Okay.  And then at that point, you bring him

9    inside and you utilize an elevator to go to a higher

10   floor?

11       A    Yes.

12       Q    Okay.  And then at that point, you find a

13   pre-arranged room for the purposes of the interview.

14       A    Correct.

15       Q    Okay.  Now to your best recollection, at

16   that point, Mr. Hovan is still handcuffed?

17       A    Correct.

18       Q    Okay.  Now you made this mention of leg

19   irons.  I understand there's a table in the room.  Do

20   you remember what that table looks like?

21       A    It's just a basic circular table.

22       Q    Okay.  So is it a metal table?

23       A    Wooden, I think.

24       Q    Is it -- is the table metal -- oh, sorry.

25       A    I said wooden --

1      Q    Oh.  Excuse me.

2      A    I believe, yeah.

3      Q    I didn't hear.  A wooden table, okay.  And

4   at this point, as Mr. Hovan sits down at the table, is

5   he still in -- does he still have handcuffs on his

6   hands?

7      A    As he sits down?

8      Q    Yes.

9      A    I don't recall if he had them when he sat

10  down or not.  I believe before I took them off when he

11  sat down to put his leg irons on.

12     Q    Okay.  So if I could take just one step

13  back.  Now at the time of his arrest in the conference

14  room, he's placed in handcuffs.  Now at any point, do

15  you perform a search of his body to determine whether

16  he has things in his pockets or otherwise?

17     A    Yeah.  I believe we performed a quick search

18  of him, yes.

19     Q    Sort of a pat down search if I can

20  characterize it that way.

21     A    I believe so, yes.

22     Q    Okay.  And did you remove items from him at

23  that time?

24     A    I believe he had two cell phones on his

25  person and he had a bag, I think, that was in the

1    room, if I'm not mistaken.

2         Q    Okay.  A backpack or something of the sort.

3         A    Uh-huh.

4         Q    Okay.  Now did you -- do you recall whether

5    you removed those items while still in the hotel area

6    in the conference room or was that upon exiting the

7    building?

8         A    I believe we would have removed them prior

9    to -- prior to leaving the building.

10        Q    Okay.  So in the area of the hotel inside

11   the building.

12        A    Yes.

13        Q    Okay.  And do you recall whether you secured

14   those or one of your colleagues would have secured

15   them, the phones?

16        A    I don't recall.

17        Q    Okay.  Okay.  Do you recall whether they

18   were placed in an evidence bag or how they were

19   maintained during the course of the transport?

20        A    More likely, they were placed in a bag and

21   taken with us.

22        Q    Excuse me?

23        A    More likely, they were probably placed into

24   a bag or some sort and taken with us.

25        Q    Okay.  Okay.  So at that point, was Mr.

1    Hovan -- so prior to entering the FBI building

2    subjected to a fuller search of his person, of his

3    body, just for the purposes of understanding whether

4    he has things in his pockets?

5        A    More than likely, I believe so before I did

6    more -- once we got to a secure area in the FBI space,

7    we would have done more of a full search of him, yes.

8        Q    And this is prior to attaching the leg irons

9    to his legs.

10       A    More than likely.

11       Q    Okay.  You wouldn't put the leg irons on

12   first and then search him to determine.

13       A    It depends.

14       Q    Okay.

15       A    Yeah.

16       Q    And in your experience and training, is it

17   the protocol at the FBI, at least at the field office

18   here in Philadelphia, to always secure people with leg

19   irons to the table or are there some exceptions to

20   that rule?

21       A    It all depends on the circumstances where

22   you're interviewing them.

23       Q    Okay.  Was there a particular set of

24   circumstances here that justified the use of those leg

25   irons?

1          A    Officer safety.

2          Q    Okay.  And was there something that alerted

3    Mr. Hovan, who had never been arrested, who was highly

4    educated, worked at AT&T, that presented some unusual

5    safety risk?

6          A    I wasn't going to take that chance

7    nevertheless.

8          Q    Okay.  And so, in your experience, the -- I

9    don't know -- 20 or so arrests that you've done and

10   around the same number of interviews, have any

11   defendants that you've ever been in the room with ever

12   not had on those leg irons?

13         A    Anyone that I've ever interviewed is either

14   going to have handcuff on or a leg iron on, yes.

15         Q    Okay.  In every one of the interviews you

16   conduct.

17         A    Yes.

18         Q    Okay.  Okay.  But that's not FBI protocol,

19   to your knowledge, to have those leg irons on.

20         A    I can't speak to their protocol but I know

21   we're supposed to have them secured when they're in

22   custody, yes.

23         Q    Okay.  All right.

24              MR. FAYHEE:  Now I hopefully skipping

25   over a few questions here to move things along.  So if

```
 1    you give me just one minute --

 2                    THE COURT:  How long do you think

 3    you'll be --

 4                    MR. FAYHEE:  Your Honor, if you'd like

 5    to take a break --

 6                    THE COURT:  No.  I just --

 7                    MR. FAYHEE:  A significant amount of

 8    additional questions in light of the time the

 9    government used to work through the full interview.

10                    THE COURT:  Oh, I'm not -- I'm not

11    equating it.  I just wonder how much longer you -- 20

12    minutes?  A half hour?  An hour?

13                    MR. FAYHEE:  Oh.  I'd say probably at

14    least an hour, Your Honor.

15                    THE COURT:  Oh, really?  Okay.  I'll

16    let you certainly go to 1 o'clock.

17                    MR. FAYHEE:  Okay.

18                    THE COURT:  Yeah.  Okay.

19                    MR. FAYHEE:  Thank you, Your Honor.

20                    THE COURT:  If somebody has to leave --

21    you know, it's like kindergarten.  Just raise your

22    hand.  Okay?

23                    MR. MURRAY:  Thank you.

24                    MR. FAYHEE:  All right.

25                    THE COURT:  I think maybe I'll take a
```

1    break.  I changed my mind.  Okay.

2                    All right.  Why don't we get back --

3    why don't we come back at -- we'll just take a short

4    one, say, about 20 minutes.

5                    MR. FAYHEE:  Okay.  That'd be fine.

6                    THE COURT:  Okay.

7                    MR. FAYHEE:  Thank you, Your Honor.

8                    MR. MURRAY:  Thank you, Your Honor.

9                    THE COURT:  All right.  Court is in

10   recess.  You're excused.

11       (Recess from 12:39 p.m. until 1:07 p.m.)

12                    THE COURT:  I don't know if that's good

13   or bad.  Okay.  All right.

14                    Mr. Fayhee?

15                    MR. FAYHEE:  Thank you, Your Honor.

16                    THE COURT:  You're still under oath,

17   Agent.  Okay.

18                    CROSS-EXAMINATION (RESUMED)

19   BY MR. FAYHEE:

20       Q    Special Agent Jackson, I'm going to refer

21   you to the -- as we move through these questions, to

22   the binder that is still in front of you.  And I'll

23   refer to the same exhibits that have already been

24   placed into the record.

25                    I want to direct your attention first to the

1      --

2                      THE COURT:  Well, one second.  Before

3      you --

4                      MR. FAYHEE:  Yes, Your Honor.

5                      THE COURT:  -- continue, I do have to

6      reveal to you that Jennifer Williams is a former law

7      clerk of mine, for better or for worse, Jennifer.  But

8      you already know that.

9                      MR. FAYHEE:  I've known Ms. Williams

10     for about 10 years, in fact.  And so --

11                     THE COURT:  Oh, really?

12                     MR. FAYHEE:  -- I think very highly of

13     her.  So no problem at all.  You had a good law clerk.

14                     THE COURT:  You knew her?  You knew

15     her.

16                     MR. FAYHEE:  Yeah.

17                     THE COURT:  Oh, okay.

18                     MR. FAYHEE:  We once worked together

19     before I went for private practice.

20                     THE COURT:  Till you traded sides.

21                     MR. FAYHEE:  That's right.  That's

22     right.

23                     THE COURT:  Oh, okay.  All right.

24                     MR. FAYHEE:  Thank you, Your Honor.

25     BY MR. FAYHEE:

1        Q    So, Special Agent Jackson, I want you to

2    refer to the beginning of what's been marked as

3    Exhibit 1B which is the transcript of the interview.

4    And in particular, you'll note and you testified on

5    direct that at the beginning of the interview, you had

6    presented Mr. Hovan with his Miranda warnings.  Do you

7    recall that testimony?

8        A    Correct.

9        Q    Now I'd like to draw your attention -- I'm

10   not going to play the audio so I just would like to

11   make use of the transcript if it makes things move

12   along a bit faster.  So I'd like to direct your

13   attention down to line 29.  And this is, as you had

14   testified before, you're in the effort of advising Mr.

15   Hovan of his rights and you have a --

16                THE COURT:  What page are you on?

17                MR. FAYHEE:  Your Honor, excuse me.

18   I'm on page 2 --

19                THE COURT:  Oh, okay.

20                MR. FAYHEE:  -- of the transcript.  And

21   that's line, once again, 29.

22                THE COURT:  All right.

23   BY MR. FAYHEE:

24       Q    So in this effort and as was depicted on the

25   audio, you state the time, 12:20.  And then you say,

1    "All right.  All right.  Let me scoop here and read

2    these to you.  Okay.  So this your advice of rights

3    form."  Have I got that right?

4        A    Yes.

5        Q    Okay.  And so what appears to be happening

6    based on what you're saying at the time is you're

7    moving your location to be next to Mr. Hovan to place

8    this Miranda form in front of him.  Is that correct?

9        A    Correct.

10       Q    Okay.  Now if you flip to what's been

11   marked, I believe, as Government Exhibit 2, you have a

12   copy of that Miranda form in front of you, correct?

13       A    Correct.

14       Q    Okay.  Now -- I can tell because you've only

15   been an agent since 2016 that you didn't write this

16   form.  I see it's been revised there in 2002.

17   Correct?

18       A    Yes.

19       Q    You see it in the corner, in the upper left-

20   hand corner?  And so this is a document that is very

21   much standard FBI protocol, right?

22       A    Correct.

23       Q    Yeah.  And so, at this time as depicted

24   here, you sit next to him and take care to recite

25   verbatim as you're required to do by FBI policy each

1    of these warnings.  Is that correct?

2         A    Yes.  I recited each one, yes.

3         Q    And at that time, Mr. Hovan is reading along

4    with you -- to the best of your knowledge anyway he's

5    reading along to each of these warnings, correct?

6         A    Correct.

7         Q    And these initials here, did you witness

8    personally Mr. Hovan draw his initials at that time --

9         A    Yes.

10        Q    -- acknowledging that he fully understood

11   his rights?

12        A    Yes.

13        Q    And for each one of these, you read out

14   loud.  And then you gave him the opportunity to sign

15   it, correct?

16        A    Correct.

17        Q    And then you signed it yourself --

18        A    Yes.

19        Q    -- which was not acknowledgment that you

20   had, in fact, complied with the FBI protocol to walk

21   through with each of these warnings verbatim.

22   Correct?

23        A    I was just signing as a witness to say that

24   I viewed him sign himself, yes.

25        Q    And you administered the warnings.

1       A    Correct.

2       Q    Very well.  And you were sitting just

3    alongside him.  And then presumably, after you were

4    done and he signed, you moved back to across the table

5    from him.

6       A    Correct.

7       Q    Okay.  And for the rest of the interview,

8    you had effectively sat across and performed the

9    interview across the table.

10       A    Yes.

11       Q    Yeah.  Okay.  All right.  Now moving on with

12    the interview, I'm going to be referring now to the

13    transcript of the interview.  And in particular, I'd

14    like to draw your attention to page 21.  And I'll give

15    you a moment to get there.  And in particular, I'm

16    going to come down to around line 40 of page 21.

17       A    Okay.

18       Q    Now just to reference back that that Miranda

19    warning you just gave -- now if I understand the way

20    things go, standard FBI protocol is first you give the

21    Miranda warnings verbatim, you get the initials, you

22    have him sign it, and then you start asking questions,

23    right?

24       A    Yes.

25       Q    And in fact, you're not allowed, under FBI

1    protocol, to begin asking questions until -- in a

2    custodial setting until you advise him of those

3    rights, each and every one of them verbatim.

4        A    Yeah.  Nothing sub -- no.  We're not

5    going -- we're not talking about anything case

6    specific, no.

7        Q    Yeah, exactly.  Right.  And because if you

8    do, there's a risk you can't use the statement later

9    as is advised in the Miranda warnings.

10       A    Correct.

11       Q    Yeah.  Okay.  So now we're at 21 -- page 21,

12   line 40.  And up to this point, to the best of your

13   knowledge, Mr. Hovan has been cooperative?

14       A    Yes.

15       Q    Correct?  He's waived his rights formally

16   after they've been read to him by you.  Correct?

17       A    Correct.

18       Q    All right.  Now up to this point -- now here

19   he starts saying things and, around line 42, he says,

20   "And like I said, like, having at -- looking at

21   WhatsApps conversations and things like that, they're

22   fair game to you."  And then he says this, "I mean,

23   you're going to look at them anyway probably but I'll

24   point you to the ones.  I'll point you to every single

25   conversation I ever had."

 1              Now we just played that earlier.  Any reason
 2    to dispute that statement that Mr. Hovan just made?
 3         A    No.
 4              MR. MURRAY:  Your Honor, I just want to
 5    object.  I think that Mr. Fayhee misread it in line --
 6    and it's relevant.  I don't want to -- where it's on
 7    line 42, he said "having at -- looking at".  It states
 8    "have at -- looking at" which I think is a relevant
 9    portion of the transcript.  But other than that, I
10    think it was read correctly.
11              MR. FAYHEE:  Mr. Murray is absolutely
12    correct.  I may have misread it.  I'm not sure exactly
13    what it says anyway but Mr. Hovan may have been a
14    little inarticulate at the moment.  But point well
15    taken.  Just to be clear.
16    BY MR. FAYHEE:
17         Q    "Having" -- excuse me -- "have at looking at
18    WhatsApp conversations and things like that because I
19    -- they're fair game for you.  I mean, you're going to
20    look at them anyway probably but I'll point you to the
21    ones.  I'll point you to every single conversation I
22    ever had."
23              MR. FAYHEE:  Hopefully I did a better
24    job that time.  Good?  All right.
25    BY MR. FAYHEE:

1    Q    Now your response to that question is

2    "Right."  You see that?

3    A    Yes.

4    Q    All right.  Now at this point, Mr. Hovan

5    does not have a consent form in front of him, the one

6    that we'll talk about.  It's been entered into

7    evidence already.  But he doesn't have that in front

8    of him.

9    A    No.

10   Q    Correct?  And you do not at that time inform

11   him, in fact, that in order to look at them, you

12   either have to give consent or go to a court to get a

13   court-authorized search warrant.  Correct?

14   A    I did not inform him, no.

15   Q    Correct.  Okay.  And Special Agent Fear

16   didn't at that time.

17   A    Not at this point, no.

18   Q    All right.  And --

19   A    Shortly after.

20   Q    And you did nothing to correct his

21   misimpression.  That is, that your -- I mean, "You're

22   going to look at them anyway probably".

23   A    You said I did nothing to correct his --

24   Q    Yeah.  You didn't take any steps to correct

25   that misimpression.  You just said "Right", correct?

1        A    I mean, 'cause I didn't see it as a

2   misimpression 'cause we hadn't looked at anything.  We

3   haven't asked to look at anything at that point.

4        Q    Okay.  All right.  All right.  And then

5   later, we're at line 14 of page 22.  At that point,

6   Special Agent Fear says, "Yeah.  Do your phones -- do

7   they have passcodes?"  You see that?

8        A    Yes.

9        Q    Now do you, sitting here today -- we can ask

10  Special Agent Fear, of course, but I'm interested in

11  your impression, why she asked for the codes to the

12  iPhones.

13       A    Because up to this point, he had been

14  volunteering information that we know would be in the

15  phones and we wouldn't be able to get access to them

16  if he's going to give us consent without passcodes.

17       Q    Okay.  So at this stage, he still doesn't

18  have the consent form.  You've not shown him the

19  consent form when he makes this -- excuse me -- when

20  Special Agent Fear says "Do your phones have

21  passcodes?"  Correct?

22       A    I think at this point, I was looking to get

23  the consent form.  I think I was looking through the

24  paperwork to find it.

25       Q    Okay.  So you were looking for a consent

1    form but it wasn't on the table.  It wasn't in front

2    of Mr. Hovan.  Correct?

3         A    I don't -- I don't think so, not at this

4    right exact moment.

5         Q    All right.  Now in response to that, Mr.

6    Hovan identifies, at line 16, that his iPhone has a

7    passcode "but that's my work phone".  He says "There's

8    nothing on there.  I mean, you can look at it but

9    there's nothing on there."  Correct?

10        A    Correct.

11        Q    All right.  Now there's this back and forth

12   as you testified to and as we heard earlier on the

13   audio recording.  And -- excuse me.  I'm getting ahead

14   of myself here.

15        (Pause)

16             MR. FAYHEE:  One moment, please.

17   BY MR. FAYHEE:

18        Q    Now going to line 16, he says, "There's

19   nothing on there.  You can look at it.  There's

20   nothing on there."  And in response, Special Agent

21   Fear says, "Okay.  Yeah.  I mean, we're going to look

22   at both phones regardless and it's usually just

23   easier."  Okay.  Now at this stage, when that

24   statement by a special agent of the FBI to Mr. Hovan,

25   who's been placed under arrest, says "I mean, we're

1    going to look at both phone regardless and it's

2    usually just easier", at that point, does Mr. Hovan

3    have a consent form in front of him?  Do you recall?

4         A    I don't recall if he had it in front of him.

5    I think at that point, I might have had it in hand but

6    I'm not sure.

7         Q    But in your hand.

8         A    Yeah.  It was either in my hand or I was

9    placing it on the table.  I don't know if I actually

10   had it in front of him or not.

11        Q    In your hand across the table from him.

12        A    Correct.

13        Q    All right.  Okay.  And at that point, after

14   Special Agent Fear makes the statement "We're going to

15   look at both phones regardless.  It's usually just

16   easier", at that point, did you say or correct any

17   misimpression that a warrant would be required or that

18   Mr. Hovan would consent?

19              MR. MURRAY:  Objection.  Assumes the

20   facts not in evidence.

21              THE COURT:  What --

22              MR. MURRAY:  That there was a

23   misimpression.

24              THE COURT:  Well, he can -- rephrase

25   the question.

```
 1                    MR. FAYHEE:  All right.

 2     BY MR. FAYHEE:

 3          Q    After Special Agent Fear made the statement,

 4     "We're going to look at both phones regardless", did

 5     you make any statement in response to that immediately

 6     after?

 7          A    No.

 8          Q    No.  Okay.  Did you place the consent form

 9     in front of Mr. Hovan immediately after?

10          A    After SA Fear's comment?

11          Q    After Special Agent Fear made the statement

12     that she was going to look at the phones regardless.

13          A    I don't remember if it was immediately after

14     but it was very soon after.

15          Q    Okay.

16          A    I don't know if it's right at that moment.

17          Q    Well, we can go back to the transcript.  In

18     fact, after it's determined that there's a passcode on

19     the iPhone and that there's no passcode on another

20     phone, you make the following statement:  "Okay.  So

21     what we're going to do is I'm going to have you -- if

22     you're good with this -- with us looking through your

23     phones, I'm going to have you sign a consent form."

24     That's at line 29.  You see that?

25          A    Yes.
```

1          Q     Correct.  Now at this point, Mr. Hovan still

2     doesn't have a consent form sitting in front of him,

3     does he?

4          A     I don't believe so.

5          Q     In fact, the consent form is sitting in

6     front of you across the table, correct?

7          A     Possibly.

8          Q     Possibly?

9          A     Yeah.  Either it's in my hand or sitting on

10    the table.

11         Q     Well, you heard, during the direct

12    examination, Mr. Murray -- you heard him.  He's got

13    very good ears.  He heard the shuffling of the paper

14    across the table.  But it wasn't at this point, was

15    it?

16               MR. MURRAY:  Objection.  I think that

17    mischaracterizes the evidence.  That was discussion of

18    signing the paperwork but there wasn't shuffling the

19    paper across the --

20               THE COURT:  Well, you can argue that.

21    I'm not going to -- I'll allow the question.

22               MR. FAYHEE:  Well, if the agent's

23    having trouble remembering where on the table the form

24    is, maybe it will help clear it up in a minute --

25    BY MR. FAYHEE:

1      Q     -- because at this point, you say -- and now

2   I'm on the next page --

3               THE COURT:  What page --

4               MR. FAYHEE:  Page 23.  And I'm at line

5   3.  Well, let me start at line 1.

6   BY MR. FAYHEE:

7      Q     Mr. Hovan identifies his iPhoneX

8      A     Yes.

9      Q     Okay.  And then you ask, "And does it have a

10   PIN associated with it?"  Correct?

11      A     Yes.

12      Q     And Mr. Hovan responds with a series of

13   numbers and letters.  Now the reason you're asking

14   that question, as I recall on direct examination, is

15   because you, with your hand and your pen, are filling

16   out the consent form to identify the iPhone.  Isn't

17   that correct?

18      A     Correct.

19      Q     All right.  And so the form is still in

20   front of you.  You haven't -- in other words, as in

21   the case of the Miranda rights, come over and sat next

22   to Mr. Hovan.  You're still across the table with the

23   form in front of you.

24      A     Correct.

25      Q     And it's facing -- it's facing you.  You're

1    writing legibly directly in front of you.

2         A    Correct.

3         Q    All right.  Okay.

4         A    But where Mr. Hovan was in plain sight where

5    he could see me correct it.

6         Q    He could see you correct what?

7         A    As I was writing in the -- I was writing

8    uppercase.  He corrected me in lowercase so he could

9    see the form that I was writing on.

10        Q    Okay.  But you didn't give him his Miranda

11   rights on that side of the table.  You came -- sat

12   next to him, didn't you?

13        A    For his --

14        Q    Because you wanted him to see the form?

15        A    For his Miranda rights?

16        Q    Yes.

17        A    Yes.

18        Q    Yeah.  But here, for this form, you stayed

19   seated on the other side of the table, correct?

20        A    For him to sign it?

21        Q    No, no.  At this moment, at line 5, when you

22   are writing the passcode, you were sitting on the

23   other side of the table not next to Mr. Hovan.

24        A    Correct.

25        Q    Correct.  All right.  So then we go at line

1    11 and 13 and 14.  At this point, you're clarifying

2    the actual passcode to ensure that you have it right

3    which you do ultimately at 17 where it says, "All

4    right.  So 0510hova."  Is that correct?

5         A    Correct.

6         Q    Still the form's in front of you on the

7    other side of the table.  Correct?

8         A    Correct.

9         Q    And the phones are in your possession.

10   They're not as if they're in Mr. Hovan's possession at

11   this stage or do you recall?  I know there's a back

12   and forth about trying to open it.  So --

13        A    I don't recall if he had them at this

14   particular time or not.

15        Q    Okay.  All right.  Now leading up to this

16   point where you're having this back and forth, Mr.

17   Hovan has offered numerous times to demonstrate and to

18   show certain WhatsApp conversations or chats.  Is that

19   correct?

20        A    Correct.

21        Q    Numerous times he offered to do that.

22        A    Correct.

23        Q    And did you interpret prior to handing him

24   that consent form -- I believe that conversation

25   starts  all the way back on page 21 of the transcript.

1    Did you interpret his offer to show you WhatsApp

2    conversations to allow for a full and complete search

3    of his mobile device?

4         A    Yes.  When he said WhatsApp conversations

5    and things like that and everything leading up to that

6    where he was giving pretty much full -- like he said,

7    I'll cooperate in any way I can.  I interpreted it as,

8    yes, he would be giving consent (indiscernible) for

9    everything.

10        Q    So when he says "and things like that", you

11   meant you can look at the WhatsApp conversations --

12   when he says -- in fact, I believe he said, "I'll walk

13   you through the WhatsApp conversations and things like

14   that".  You interpreted "things like that" to be a

15   full search of the phone.

16        A    Yeah.  Anything similar to it, whatever else

17   would be in the phone.

18        Q    And those statements were made, once again,

19   before Mr. Hovan was presented with the consent form.

20        A    Yes.  And we hadn't looked at the phone

21   before we had signed a consent form either.

22        Q    No.  You just asked him questions about what

23   the passcodes were over the course of several pages of

24   transcript before putting the consent form in front of

25   him.  Correct?

1    A    Yes, because he kept giving us consent.  So

2    we would need the passcodes, yes.

3    Q    Right.  Okay.  Now we're on page 24.

4    There's continued back and forth about phones.  At

5    line 30, you say, "All right.  So this one has no

6    passcode and the iPhoneX -- can you get to it through

7    -- if you can't use your face, can you just put the

8    passcode in and it still will let you in the phone?"

9         At that point even, on page 24, does Mr.

10   Hovan have the consent form in front of him or is it

11   still in front of you?

12   A    I don't recall.  It might still be in front

13   of me but I think it was in plain view at that point.

14   Q    Okay.  And when you say it's in plain view,

15   you mean that Mr. Hovan is close enough where he can

16   read the document or that he can see a piece of paper

17   across the table in front of you?

18   A    I don't recall.  I know I was filling it

19   out.  So I don't know if I was leaning and kind of

20   filling it on an angle where he could possibly still

21   read it.

22   Q    Okay.  All right.  Now we're on page 25

23   where  the conversation continues.  For example, at

24   page -- at line 28, Special Agent Fear says, "I think

25   it might be off.  Let's try it."  You state

 1   thereafter, at line 30, "Possibly not.  I mean, I
 2   don't know.  It depends on what they find on there,
 3   what they don't."
 4           When you're making that statement, what are
 5   you referring to?  "It depends on what they find on
 6   there, what they don't."
 7               THE COURT:  I don't see it.
 8       A   I think --
 9               MR. FAYHEE:  Excuse me.  That's at line
10   -- it's at line 30, the second sentence.
11               THE COURT:  Oh, line 30.
12               MR. FAYHEE:  -- beginning "It depends".
13               THE COURT:  Okay.
14   BY MR. FAYHEE:
15       Q   Do you recall --
16       A   Are we good?
17       Q   I think we're in the same place.
18       A   Okay.
19       Q   Yeah.  Do you recall what you meant by that
20   statement?
21       A   I was referring to -- 'cause he inquired if
22   he would be getting that -- if he was not going to get
23   that phone back for a while.  And just for any piece
24   of evidence, it depends on, as I said, anything found
25   on it that they need or if they don't need.  So I

 1   can't -- I didn't want to give him a time frame when

 2   he could get it back or not.

 3        Q    It depends -- so your point, if I understand

 4   it correctly.  You correct me if I get it wrong.  The

 5   statement means it depends whether we, the FBI, who

 6   are about to search your phone, determine if there's

 7   anything on it.  That will determine how long it is

 8   before it's returned to you.  Is that correct?

 9        A    Yes.

10        Q    And do you know, sitting here today, whether

11   this phone has ever been returned to Mr. Hovan?

12        A    I do not.

13        Q    Okay.  And once again, this at line 30, the

14   statement you just made, "It depends" -- starting "It

15   depends", still at this point, does Mr. Hovan have

16   that consent form in front of him?

17        A    I don't think so.  But again, we weren't

18   looking through the phone if he didn't sign it.  So --

19        Q    Yeah.  But that wasn't my question.  My

20   question wasn't what you intended to do.

21        A    That was --

22        Q    My question is what statement did you -- at

23   the time -- excuse me -- at the time you made the

24   statement, did Mr. Hovan have the consent form in

25   front of him.

1       A     That's what I was saying.  I don't think he

2    did.

3       Q     Had he yet been offered the opportunity to

4    review the form?

5       A     At that point, I don't recall.

6       Q     Well, let me help you out.  At the top of

7    page 26, at line 3, Mr. Hovan says, "So what are

8    the -- what are the next steps -- I guess -- are you

9    going to answer -- can I ask that or --"  And then you

10   respond at line 6, "Yeah.  Umm -- but let me -- let me

11   get through this real quick if, uh -- okay.  So you

12   just put your --"  You see where I am?

13      A     Yes.

14      Q     Now as I believe you testified on direct

15   examination, is it at that point, at line 6, where, in

16   fact, you hand the consent form over to him?

17      A     I think at this point is when I physically

18   handed it over to him.  That's when he was looking

19   through it and asking for the date to sign.

20      Q     All right.  And so between line 6 and line

21   16, where you testified you're offering and telling

22   him the date, the date of his arrest, "Yes.  Yep.

23   February 10, '20.  Thank you."  That's the point at

24   which he's actually applying his signature.  Is that

25   correct?

1        A     If that coincides with the scratching that

2     was on the audio, yes.

3        Q     Yep.  And so the -- so -- now we started in

4     this cross-examination, I think we were on page 21 of

5     the transcript at the time in which Mr. Hovan said at

6     the bottom, at line 43, "I mean, you're going to look

7     at them anyway probably."  That's where we started

8     this line of questioning.  And then we got all the way

9     to page 26 at which point, at line -- you know,

10    between -- at some point between 6 and 16, he actually

11    has the form in front of him.  Correct?

12       A     To the point where he signed it, yes.

13    Correct.

14       Q     Yeah.  Now we can play it again if it would

15    be useful.  But I happened to be counting when it was

16    played earlier today at the time period between around

17    page (sic) 6 and page 16 -- and you're welcome to

18    dispute it.  I'll be rough but it was about 20

19    seconds, that time frame.

20                   THE COURT:  Not page.  You meant line.

21                   MR. MURRAY:  Yeah.

22                   MR. FAYHEE:  I'm sorry.

23    BY MR. FAYHEE:

24       Q     Once again, page 26, line 6, where he says

25    "Yes.  Umm -- but let me -- let me get through this

1   real quick" and ending at the point at which where, at

2   16, "Yes.  Yep.  2/10/20."  Do you remember that?

3          Now we don't have to get down to the exact

4   seconds.  I don't want to have a dispute or a debate

5   about it.  But it's a very short period of time that

6   you just listened to on direct examination.  And it

7   takes up 10 lines of the transcript.  Is that fair

8   enough?

9      A    As far as the consent form itself?

10     Q    As far as the moment you placed the consent

11  form in front of him to the moment at which it's

12  signed.

13     A    Fair enough.

14     Q    Okay.  We'll quibble over a second or two.

15  And now between that time period, 6 and 16, I don't

16  see or hear, and believe there's enough time even, for

17  you to verbally advise him of his right to refuse

18  consent.  Is that correct?

19     A    No.  I didn't verbally because it's in

20  writing.

21     Q    You didn't verbally because it was in

22  writing.  But you didn't verbally.  Correct?  And you

23  know Mr. Hovan can read.

24     A    Yes.

25     Q    Yeah.  If he's given enough time to read.

```
 1        A    Yes.  I did not rush him through.  I mean,
 2   when I handed it to him, he had as much time in the
 3   world if he wanted to look at it.
 4        Q    Right.  Now I'd like to refer actually to
 5   the consent form.  I believe it was Exhibit 3 if you
 6   can flip to that.
 7        A    Okay.
 8        Q    Okay?  Now -- now once again, I'll ask
 9   'cause I know the answer.  You didn't create this
10   form.  It's a standard FBI form.
11        A    Correct.
12        Q    Correct?  All right.
13        A    Yes.
14        Q    Do you see the upper left-hand corner of
15   this form?
16        A    Yes.
17        Q    And when was it last revised?
18        A    '94.
19        Q    1994?
20        A    Yes.
21        Q    Some 27 years ago?
22        A    Yes.
23        Q    Correct?  Yep?  All right.  Now this form
24   that you're looking at here, it doesn't -- correct me
25   if I'm wrong but it doesn't have any initials on it in
```

1   comparison to, say, the Miranda form, correct?

2       A    No.

3       Q    Now is it FBI protocol for individuals who

4   are presented with this form to be asked to initial

5   it?

6       A    I don't believe so.

7       Q    Okay.  And is it FBI protocol that they'll

8   be verbally informed -- that is, a witness be verbally

9   informed of the consent to search?

10      A    I don't believe so.

11      Q    Okay.  Now -- all right.  So -- now looking

12  at the form at Exhibit 3 --

13              MR. FAYHEE:  I don't know if Your Honor

14  has one in front of you just to --

15              THE COURT:  Yes.

16              MR. FAYHEE:  -- double check -- okay.

17  BY MR. FAYHEE:

18      Q    Now -- and, Special Agent Jackson, you have

19  one in front of you as well?

20      A    Correct?

21      Q    The -- okay.  Now question number 1, you

22  testified on direct that this is your handwriting that

23  is identifying the iPhoneX and the password.  Correct?

24      A    Yes.

25      Q    And then the Samsung phone as well.

1     A     Yes.

2     Q     Correct?  Okay.  Now here, I see number 2.

3   It says, "I have been advised of my right to refuse

4   consent."  Do you see that?

5     A     Yes.

6     Q     And this is the one that the absence -- the

7   omission of any initial next to it indicating that Mr.

8   Hovan or anyone else has read it.  Right?  A blank

9   spot, correct?

10    A     Yes.

11    Q     Okay.  Now I've scoured this transcript but

12   I think we covered, in those 10 or so lines, the

13   discussions around this document.  And I didn't hear

14   anywhere in there you or anyone else advising Mr.

15   Hovan of his right to refuse consent.  Have I missed

16   something?

17    A     No, 'cause he -- he kept giving it

18   unprovoked.  No.  We didn't verbally advise him, if

19   that's what you're asking.  No.

20    Q     Well, he gave it unprovoked.  I'm interested

21   in that term because when you say unprovoked -- now

22   this interview, again, happened after Mr. Hovan was

23   placed under arrest.  Correct?

24    A     Correct.

25    Q     And he was taken into custody?

1      A      Correct.

2      Q      Yeah.  And he was sitting in at least leg

3  irons, we can agree, at the FBI, correct?

4      A      Correct.

5      Q      Yeah.  And two FBI agents are interviewing

6  him, one of which said "We're going to search your

7  phones regardless".  You heard that in the transcript,

8  didn't you?

9      A      Yes.

10      Q      Prior to receiving a consent form -- so I'm

11  interested in what you mean by "unprovoked".

12      A      When he kept voluntarily saying that he'd

13  help any way, shape or form, look through this, look

14  through that.  Yeah.

15      Q      And before he was shown this consent form,

16  correct?

17      A      Correct.

18      Q      Yeah.  A consent form that says I have been

19  advised of my right to refuse consent.  Now this

20  number 2 -- it says, "I've been advised of my right to

21  refuse consent".  But where is the advice provided?

22  That's what I'm interested in.  Do you know?

23      A      We never verbally told him that, no.

24      Q      No.  I didn't think so.  And then it says,

25  "I give this permission voluntarily."  I suppose that

1   one speaks for itself, doesn't it?

2      A    Correct.

3      Q    And then it says, "I authorize these agents

4   to take any items which they determine to be related

5   to their investigation."  Correct?

6      A    Correct.

7      Q    Right.  Now I don't know if you recall

8   sitting here today whether you saw or witnessed Mr.

9   Hovan read each and every one of these points prior to

10  putting his signature on.  But it would have had to

11  leave, if I understand correct within that same time

12  frame, the time to put the date on, put his signature,

13  and then put your signature on.  Isn't that correct?

14               MR. MURRAY:  Objection.  They're ending

15  up with a question but there was a long statement in

16  the middle there.

17               MR. FAYHEE:  Sometimes I can ask better

18  questions, Your Honor.  Let me give it a shot.

19               THE COURT:  Okay.

20  BY MR. FAYHEE:

21     Q    The point I'm making is -- and you can refer

22  back to the transcript between 6 and 16.  During that

23  time period -- now you had already filled out the work

24  at the top, correct?  That is the iPhone

25  identification.  I think we've established that,

1    correct?

2        A    Correct.

3        Q    So for the remainder of that 20 or so

4    seconds, Mr. Hovan would have had to read each of

5    these four points, clarify what date it was and then

6    sign this document.  Isn't that correct?

7        A    Correct.

8        Q    Yeah.  Okay.  Good.

9        A    Which I don't think it would take that long

10   to read this document.  It's only four points.

11       Q    Well --

12       A    And going back -- advice of rights, he could

13   have terminated it at any time.

14       Q    Sure.  No, no, no.  I heard that.  I

15   appreciate -- I appreciate the additional question.

16   He understood those well because I know you took pains

17   at the beginning of the interview to sit next to him

18   and walk through every single one of those Miranda

19   rights and have him initial it and make sure he

20   understood it.  Correct?

21       A    Correct.

22       Q    But you never asked him here whether he

23   understood the consent form, did you?

24       A    No, 'cause once I read him his Miranda

25   rights, I knew that he could speak and read the

1    English language.  So, I mean, he could take as much

2    time as he saw fit.  If he had a question, we would

3    have been more than happy to ask him -- or answer for

4    him.

5          Q    Yeah.  If.  But you never did disabuse in

6    leading up to the point where he had that form that he

7    had the right to refuse consent, did you?  You never

8    said -- stated that, did you?

9          A    No.

10                   MR. MURRAY:  Objection.

11                   THE COURT:  It was state -- asked

12   already.

13                   MR. MURRAY:  That there's no

14   question -- there's no evidence that he needed to be

15   disabused of --

16                   THE COURT:  Well, that's a matter of

17   law --

18                   MR. MURRAY:  But there --

19                   THE COURT:  -- whether I have -- that's

20   a matter of whether I ruled he had a -- he had to be

21   disabused.  I haven't ruled on that yet.  I mean, I

22   may decide that way that he --

23                   MR. MURRAY:  My point is there's no

24   evidence that he had a misimpression regarding that

25   right whether or not he could refuse consent or not.

1    There's no indication.  There's a statement in the

2    transcript where he says that "You're probably going

3    to look at them anyways".  But that doesn't go in any

4    way -- it's not clear that that goes to consent or not

5    or search or obtaining them from another witness or

6    obtaining --

7                    THE COURT:  That's --

8                    MR. MURRAY:  -- the --

9                    THE COURT:  That's a legal argument.

10   I'll accept that as a legal argument.

11                   MR. MURRAY:  Okay.

12                   THE COURT:  But I don't think it

13   impacts on the questioning.

14                   MR. FAYHEE:  Your Honor, I'll move

15   along in any event.

16                   THE COURT:  I think I understand what

17   you've done.

18                   MR. FAYHEE:  Okay.  So -- now I have --

19   Your Honor, just briefly here.  I have two documents

20   provided by the government.  They're aware.  We worked

21   out ahead of time.  They're just not electronically in

22   your binder.  We're going to submit them ourselves.

23   We couldn't get our computer to work on your screen

24   but we have them in paper copies.  Is it okay?  I'll -

25   -

1              THE COURT:  It's fine.  I don't care.

2    Just as long as --

3              MR. FAYHEE:  I'll hand them up

4    individually.

5              THE COURT:  Just as long as the

6    government has a copy, you can do that.

7              MR. FAYHEE:  Yep.  Yeah.  I think they

8    do but I'll -- I will make doubly sure.

9        (Pause)

10             MR. FAYHEE:  So, Your Honor, just

11   following the Government's exhibit numbering --

12             THE COURT:  So this is Defense --

13   Defense exhibit --

14             MR. FAYHEE:  This is Defense exhibit

15   and it's Exhibit Number 5.  And I'll give the

16   Government, obviously, an opportunity to object while

17   I hand it up.  If I may approach --

18             THE COURT:  Sure.

19             MR. FAYHEE:  -- one for the witness and

20   one for --

21             THE COURT:  Do you have an extra one

22   for the law clerk?  Well, she can use --

23             MR. FAYHEE:  We have additional copies.

24   Do you have another one there?

25             THE COURT:  I don't want them to

1    deprive the witness.

2              MR. MURRAY:  I guess my question is,

3    are you refreshing his recollection with this or are

4    you offering it into evidence?  What's the purpose

5    that this is being offered for?

6              MR. FAYHEE:  Well, first of all, I'm

7    going to ask questions about this.  The Agent has just

8    testified, I'd like to refer back to this 302 in the

9    course of his testimony.  So if I could be given the

10   opportunity to ask him a couple of questions, I'll

11   work it in.  I'm sure Mr. Murray --

12             THE COURT:  I don't know what it is.

13             MR. MURRAY:  I have no question to him

14   being asking questions about it, I'm just wondering if

15   it's being offered.  I'm not sure if there's an

16   appropriate purpose to offer it into evidence.

17             THE COURT:  Well, let him ask questions

18   first and then --

19             MR. FAYHEE:  Yeah, I was just going to

20   hand it up --

21             THE COURT:  Right.

22             MR. FAYHEE:  -- for logistic purposes

23   to make it easy.  I'm sorry about that.

24             THE COURT: Don't forget to -- I mean,

25   after -- they have not been admitted, this has not

 1    been admitted.

 2                    MR. FAYHEE:  Understood, understood,

 3    Your Honor.

 4    BY MR. FAYHEE:

 5         Q    But what I have handed up to you has been

 6    marked as Exhibit 5 and my first question to you is,

 7    is just whether you recognize this document.

 8         A    Yes.

 9         Q    Okay.  And what is the document?

10         A    This is a 302 of the synopsis of the

11    interview.

12         Q    Okay.  And when you say interview, you mean

13    the interview transcript?

14         A    Correct.

15         Q    Which is, of course, the transcript of an

16    audio recording of the interview?

17         A    What?

18                    MR. MURRAY:  Objection.  He said of the

19    interview, not of the transcript.

20                    THE WITNESS:  Right.

21                    MR. FAYHEE:  Excuse me.  To be clear,

22    I'll just -- I'll restate it --

23                    THE COURT:  That's correct.

24                    MR. FAYHEE:  -- entirely.

25                    THE COURT:  Sustained.

1    BY MR. FAYHEE:

2        Q    This document sitting before you, as you've

3    just said, is a synopsis of the interview, correct?

4        A    Yes.

5        Q    And the interview that we're referring to is

6    the same one we've been discussing as depicted in the

7    transcript, correct?

8        A    Yes.

9        Q    Okay.  Mr. Hovan's interview?

10       A    Correct.

11       Q    Correct?  Okay, good.  Now, did you draft

12   this summary of the interview?

13       A    I did not draft it, no, but I was on it as

14   far as an approver.

15       Q    Okay.  Who drafted the summary?

16       A    SA Fear --

17       Q    Okay.

18       A    -- Special Agent Fear.

19       Q    Your co-agent in the interview?

20       A    Yes.

21       Q    Yes, okay.  And when you say you approved

22   it, what does that mean?

23       A    Reviewed it.  I reviewed it and was in

24   agreeance (sic) with her writing.

25       Q    That is -- what do you mean, in agreement

1    with the writing?

2         A    That everything -- that I agree with

3    everything that she wrote.

4         Q    Okay.  In other words, if I can characterize

5    it, you correct me if I'm wrong, but that it fairly

6    and accurately depicted the interview that you had sat

7    through?

8         A    Yes.

9         Q    And at the time that -- and you approved

10   this as a second agent, in other words, as a verifier,

11   is what you're saying, correct?

12        A    Correct.

13        Q    You're not Special Agent Fear's supervisor,

14   it's just a verification?

15        A    Correct.

16        Q    Correct?  Okay.  And when you approved this

17   document, had you listened again to the audio of the

18   interview?

19        A    I don't recall.

20        Q    Do you recall whether you reviewed a

21   transcript from the interview?

22        A    At this point, I don't think we had a

23   transcript of it.

24        Q    Okay.  And so, you know, again, to the best

25   of your recollection, did you approve it simply based

1   on what you personally had witnessed in the course of

2   this interview?

3        A     Yeah, from what I can recall, yes.

4        Q     From what you could recall?

5        A     Yeah.

6        Q     Okay.  And what is the date -- now, there's

7   two dates on this exhibit, right?  There's one in the

8   upper right-hand corner, the date of entry, and what's

9   that date?

10       A     The date of entry is when it was actually

11  serialized into the case law when it was approved,

12  supervision approved.

13       Q     Sort of an administrative process to record

14  when the document has gone through the verification

15  process you've described?

16       A     Correct.

17       Q     And formally added to the case file?

18       A     Correct.

19       Q     Got it.  And then there's a date down at the

20  bottom -- there's actually two dates down at the

21  bottom, but I'm interested in the one on the right,

22  the date drafted, do you see that?

23       A     Yes.

24       Q     And what date is that?

25       A     February 11th.

1       Q     February 11th?

2       A     Yes.

3       Q     Okay.  Which is the day after the interview

4    that had taken place February 10th?

5       A     Correct.

6       Q     So very close in time, the next day?

7       A     Correct.

8       Q     Yes, okay.

9             MR. FAYHEE:  Now, Your Honor, I would

10   like to now at this time publish this document.  I'd

11   like to ask Special Agent Jackson some questions

12   regarding it.

13            MR. MURRAY:  I'm not sure, Your Honor

14   -- I believe this could be used to refresh his

15   recollection, but it's not -- you know, it's a hearsay

16   statement and I'm not sure that it's appropriate for

17   it to be admitted into evidence.

18            MR. FAYHEE:  Your Honor, respectfully,

19   this is a suppression hearing, I'm not sure the Rules

20   of Evidence apply.  Second, I'm going to use it to

21   impeach him -- hopefully effectively, but I'm going to

22   use it to impeach him on the testimony he just

23   provided and it's being offered for that purpose.

24            THE COURT:  Well, does it have to be

25   admitted for that under those circumstances?  Is your

```
 1    position that it doesn't have to be admitted?
 2                    MR. FAYHEE:  Your Honor, I don't
 3    believe it has to be formally admitted, but I would
 4    like for it to be published so everybody can follow
 5    along.
 6                    THE COURT:  Well, there's no question
 7    that everybody can follow it along.  I'm not going to
 8    decide at this moment whether it should be admitted --
 9                    MR. FAYHEE:  Fair enough.
10                    THE COURT:  -- but you can ask
11    questions and --
12                    MR. FAYHEE:  Thank you.
13                    THE COURT:  -- we all have a copy.
14                    MR. FAYHEE:  Thank you, Your Honor.
15                    THE COURT:  So let's see what happens.
16    BY MR. FAYHEE:
17        Q    So, Special Agent Jackson, I'm not sure if
18    you've reviewed this document --
19                    THE COURT:  This is probably part of
20    the record, isn't it, already?
21                    MR. MURRAY:  It's been produced in
22    discovery, but it's not one of the Government's
23    exhibits in this moment.
24                    THE COURT:  Okay, all right.
25    BY MR. FAYHEE:
```

1        Q     Excuse me, Special Agent Jackson, I know I'm

2   giving you this document at this time and I know

3   you've read it previously because you just testified

4   that you approved it, I don't want to catch you off

5   guard at all.  So if you need a couple of moments to

6   review it, I'd be glad to give it to you, unless you

7   can recall it specifically.

8        A     If you can give me a minute.

9        Q     Sure.

10       (Pause)

11             MR. FAYHEE:  Excuse me, Your Honor, I

12   think -- we recognize, I think, we have given your law

13   clerk an incorrect document --

14             THE COURT:  That would be better if she

15   has a correct one.  Thank you.  All right, let the

16   record reflect that this new --

17             MR. GROVE:  Exhibit 5, Your Honor.

18             THE COURT:  -- Exhibit 5 is the

19   accurate one.  Okay, Beatrix?

20       (Pause)

21             THE WITNESS:  Okay.

22   BY MR. FAYHEE:

23       Q     Okay?  So having just re-reviewed the

24   document again, drafted by Special Agent Fear and

25   validated or approved by yourself, at the bottom of

1   what's marked as page 141 on the document, if you can

2   get there, there's brackets and it says, "Agent note."

3       A    Yes.

4                THE COURT:  What page is it?

5                MR. FAYHEE:  Your Honor, it's the

6   bottom of page 141 on Exhibit 5.

7                THE COURT:  I don't see it.

8                MR. FAYHEE:  Excuse me, I'm referring,

9   Your Honor -- by the way, when I say page number, I'm

10  referring to the Bates labels.  I apologize.  You'll

11  see Bates labels at the bottom of the page.  It should

12  say USA000-141.

13               THE COURT:  139 -- oh, I see.

14               MR. FAYHEE:  Do you see it?  Do you

15  have it?  Okay.

16               THE COURT:  All right, so it's Bates

17  number 141, right?

18               MR. FAYHEE:  That's correct, Your

19  Honor.  That's correct, Your Honor.

20               THE COURT:  Okay.  I have it as page 3,

21  is that correct?

22               MR. FAYHEE:  Probably page 3 of that,

23  yeah.  I should have said Bates number --

24               THE COURT:  That's okay.

25               MR. FAYHEE:  -- instead of page number.

1    That's correct.

2                    THE COURT:  Okay.

3    BY MR. FAYHEE:

4        Q    Now, at the bottom there in brackets,

5    Special Agent Jackson, it says, "Agent's note.  Hovan

6    signed an FD-26 consent to search form authorizing

7    agents to search both his iPhone X, which is his work

8    phone, and his Samsung Note 9 phone, which is his

9    personal phone.  Hovan provided as his passcode to his

10   iPhone and stated that there was no passcode on his

11   Samsung phone."

12       Do you see that?

13       A    Yes.

14       Q    And that's the statement that you approved?

15       A    Yes.

16       Q    Okay.  Now, do you recall who specifically

17   drafted this agent note?  Was it Special Agent Fear or

18   was that something you made as an addition later?

19       A    The agent note portion of it?

20       Q    Uh-huh.

21       A    That was Special Agent Fear.

22       Q    Okay.  And nowhere in this 302 that's

23   intended to be a summary of the interview does it

24   indicate that Mr. Hovan's passcodes were provided

25   prior to him receiving the consent form, you didn't

1  find that anywhere in there, did you?

2      A    Those passcodes were provided prior to him

3  signing?

4      Q    Correct.

5      A    No, I don't see it in here, no.

6      Q    All right.  And nowhere in there does it

7  indicate that Mr. Hovan was advised, verbally advised

8  of his right to refuse consent?

9      A    No.

10     Q    And nowhere does Special Agent Fear in that

11 document state or reflect in summary even that it was

12 stated we're going to look at both phones regardless,

13 did you find that anywhere?

14     A    No.

15     Q    No.  Does it reflect anywhere in that

16 document that Mr. Hovan, prior to receiving the

17 consent form, stated, "You're probably going to look

18 at them" -- referring to the phones -- "anyway"?

19     A    No.

20     Q    No.  Now, as part of your role as an FBI

21 Special Agent on the squad and having participated in

22 this interview, were you involved at all in assisting

23 the U.S. Attorney's Office in identifying discovery in

24 this matter?

25     A    No.

1      Q     No?   Okay.   And was it your responsibility

2    to maintain the audio recording of Mr. Hovan's

3    interview?

4      A     We submitted it to our -- what do you call

5    it, our ELSUR department where they maintain all the

6    recordings of any interviews.

7      Q     And ELSUR refers to what?

8      A     Electronic surveillance.   They take care of

9    all the interviews, anything that's documented or

10   recorded; they keep a copy of it there.

11     Q     Sometimes FBI agents will refer to them as

12   the tech guys, is that right?

13     A     No, that's a different set --

14     Q     You never heard that?

15     A     That's a different set of people, yeah.

16     Q     A different set of people.   What does the

17   ELSUR -- what does ELSUR stand for?

18     A     Electronic surveillance.

19     Q     Surveillance?   And what do they do?

20     A     Like I said, they document and they -- once

21   we submit a recording, it's their responsibility to

22   maintain it and make sure it's not tampered with,

23   anything of that nature.

24     Q     They sort of maintain it as evidence?

25     A     Yes.

1    Q    Okay.  And do you recall whether you -- do

2    you remember how the interview was recorded, through

3    what means?

4    A    A recorder.

5    Q    Okay.  So like a -- surely not the old-

6    fashioned audio recorder, it's a digital recorder of

7    some sort?

8    A    Yes.

9    Q    And is that something that you possess and

10   put on the table or is it already in the room?

11   A    No, it was on the table.

12   Q    Okay.  So you place it on the table

13   yourself?

14   A    Correct.

15   Q    And was that your role or was that Special

16   Agent Fear, do you remember?

17   A    As far as the recorder, I believe I put it

18   on there.

19   Q    You did, okay.  And once the interview is

20   done, what do you do with that recorder?

21   A    We download it and then, as soon as we

22   download it, we take it over to the ELSUR department

23   so they can maintain it.

24   Q    Okay.  Now, you download it yourself from

25   the recorder?

1      A    Yes, I believe so.

2      Q    Okay.  And then you hand it off to the ELSUR

3   folks?

4      A    Correct.

5      Q    And so their role is really to maintain it

6   and --

7      A    Yes.

8      Q    -- house it?  Okay.  Do you remember when

9   you provided the audio recording to the ELSUR

10   department?

11           MR. MURRAY:  Your Honor, objection,

12   relevance.  I think there's no question as to the

13   authenticity of this recording.  I don't know where

14   we're going with this.

15           MR. FAYHEE:  Your Honor, I'd be glad to

16   state the relevance.  If I could ask two more

17   questions and then I'll do so, if that's all right.

18           THE COURT:  Okay.

19   BY MR. FAYHEE:

20      Q    Do you recall the day that you handed off

21   the ELSUR recording?

22      A    I don't recall the exact date, but it was

23   probably within a day or so of having the interview

24   conducted.

25      Q    Okay.  It certainly --

1                    THE COURT:  Having what?

2                    THE WITNESS:  Having the interview

3     conducted.

4                    THE COURT:  Okay.

5     BY MR. FAYHEE:

6          Q    It certainly wasn't weeks --

7          A    No, I don't --

8          Q    -- or months, that would be not standard --

9          A    No, I don't believe so.

10         Q    And their job is to maintain it so that

11    later, here in these courtrooms and the U.S.

12    Attorney's Office can make use of that recording,

13    correct?

14         A    Correct.

15         Q    Okay.  And at the time when the Government

16    was bringing this case, do you recall whether you were

17    relied upon in order to produce this audio file or

18    whether that would have been somebody else within the

19    FBI?

20         A    To produce it for discovery?

21         Q    Yes.

22         A    It probably would have been one of the case

23    agents.

24         Q    Okay.  Not you?

25         A    No.

 1      Q    Okay.  And so, even though you checked it

 2   into ELSUR, another case agent can go access it and

 3   produce it for discovery?

 4      A    Yes.

 5      Q    Okay.  And so did the U.S. Attorney's Office

 6   ever ask you to produce directly this recording?

 7      A    Not to my knowledge, no.

 8      Q    Not to your knowledge, okay.  Were you aware

 9   that the Government produced this recording for the

10   first time --

11                MR. MURRAY:  Objection --

12   BY MR. FAYHEE:

13      Q    -- to us on March --

14                MR. MURRAY:  -- objection, Your Honor.

15                THE COURT:  What does this --

16                MR. FAYHEE:  Can I finish the question?

17                THE COURT:  -- have to do --

18                MR. MURRAY:  This doesn't go to consent

19   at all, I don't --

20                THE COURT:  No, please --

21                MR. MURRAY:  Sorry, forgive me.

22                THE COURT:  -- repeat what you were

23   going to say.

24                MR. MURRAY:  Well, just to say, Your

25   Honor, objection.  This doesn't go to consent at all.

1   I think Mr. Fayhee is making a complaint about the

2   timing of the production of this, but the production

3   of this record doesn't go to consent.  I don't see how

4   --

5                    THE COURT:  Well, what are you trying

6   to --

7                    MR. FAYHEE:  Your Honor, it's no

8   problem.  The point I'm making, if I could finish the

9   question, I was about to say March 3rd, 2021, which is

10  more than a year and a month after the arrest --

11                   THE COURT:  Well, this is --

12                   MR. FAYHEE:  -- and the point, Your

13  Honor, I'd make --

14                   THE COURT:  -- it doesn't have anything

15  to do with consent.  So I'm going to sustain the

16  objection, that's --

17                   MR. FAYHEE:  Just for the record, Your

18  Honor, may I please just respond --

19                   THE COURT:  Of course.

20                   MR. FAYHEE:  -- just to perfect the

21  record?  Your Honor, the reason for this examination

22  is because there is sufficient evidence through these

23  questions that there was an effort to compel Mr.

24  Hovan's consent, after having a search warrant in

25  place, we argue, at another day, that that's a

1    deficient search warrant, to obtain his consent and

2    then failed to reflect in the subsequent 302s the

3    problematic statements that the agents made in order

4    to secure that consent.  And whether it's later in

5    argument or otherwise, I just simply wanted to lay the

6    foundation to make a legal argument at a later time

7    that in fact, for the record, I'm not going beyond

8    there, that the consent issue and the Franks issue

9    should in fact not be bifurcated, that they are

10   connected directly, and that's the only point I'm

11   making.

12              THE COURT:  Well, unless I decide

13   against you on this issue.

14              MR. FAYHEE:  And I'm only perfecting

15   the record, Your Honor, and I wanted to lay the

16   foundation to do it that I believe -- my position on

17   behalf of Mr. Hovan is that they are connected and I'd

18   like to make legal arguments to demonstrate that when

19   we conclude with the witness testimony.  I simply

20   wanted to introduce that fact.

21              MR. MURRAY:  And we just vigorously

22   dispute Mr. Fayhee's characterization of those facts

23   and certainly what this memorandum says and whether

24   there's any, you know, information materially left out

25   of it.  So that's it.

1                        THE COURT:  Well, he has to make his

2     argument and you have to certainly make yours.

3                        MR. MURRAY:  Thank you.

4                        MR. FAYHEE:  Thank you, Your Honor.

5     One final -- excuse me, I have two very short exhibits

6     and, Your Honor, I'll follow the same protocol as I --

7                        MR. MURRAY:  Thank you.

8                        MR. FAYHEE:  Your Honor, if I may

9     approach?

10        (Pause)

11                       MR. FAYHEE:  Your Honor, I'm handing up

12    what's been marked as Exhibit 6.

13                       THE COURT:  We don't have one --

14                       MR. FAYHEE:  Oh.

15                       THE COURT:  Thank you.  Thanks.

16    BY MR. FAYHEE:

17        Q    And Special Agent Jackson, once again, this

18    is a much shorter one, but I'd like to give you the

19    opportunity to review that document --

20        A    Okay, thank you.

21        Q    -- and let me know --

22        (Pause)

23        A    Yes, sir.

24        Q    Okay.  Now, we've familiarized ourselves

25    with these forms, so I'll move it through quite

1    quickly, but do you recognize the document marked as

2    Exhibit 6?

3         A    Yes.

4         Q    And what is it?

5         A    It is a 302 memorializing Mr. Hovan gave

6    passwords to his laptop and his iPad and --

7                   THE COURT:  I'm sorry --

8                   THE WITNESS:  -- Mr. Hovan --

9                   THE COURT:  -- I know you don't mean to

10   mumble a little bit --

11                  THE WITNESS:  No, it's fine.  No, Mr.

12   Hovan provided passwords for his laptop, his iPad, and

13   his, I guess, user name for his AT&T ID.

14   BY MR. FAYHEE:

15        Q    Okay.  And can you tell from looking at the

16   document who the primary drafter of this document was?

17        A    That would be me.

18        Q    Okay.  And is that because at the bottom I

19   see your name, but it's in all caps, is that correct?

20        A    No, just whatever name is first --

21        Q    Oh, okay.

22        A    -- is usually the one, yeah.

23        Q    I was thrown by that, okay, because it's the

24   first name.

25        A    Uh-huh.

1       Q    All right.  And then, as we discussed the

2  last time with the last FBI 302, Jessica Fear, Special

3  Agent Fear approves it?

4       A    Correct.

5       Q    In other words, validates the document.  Do

6  you remember drafting this document?

7       A    Vaguely, yes.

8       Q    Okay.  And just to help out to orient you to

9  the time, there's a date at the bottom you see there,

10  "Date drafted"?

11       A    Yes.

12       Q    And what is that?

13       A    February 14th.

14       Q    2020?

15       A    Yes.

16       Q    Okay, some three days following the

17  interview, correct?

18       A    Correct.

19       Q    And then the date of entry, February 24th,

20  2020, some 14 days following the interview, correct?

21       A    Correct.

22       Q    All right.  Now, can you tell me why was

23  this document created?

24       A    To memorialize Mr. Hovan providing us his

25  passwords and username.

1        Q    And is there a reason why this was done

2   separate from the summary of the interview?

3        A    This happened after the interview, if I'm

4   not mistaken.

5        Q    Because it relates to the laptop password,

6   the iPad password, and the username?

7        A    Correct.

8        Q    Rather than the two mobile phones we talked

9   about earlier?

10        A    Correct.

11        Q    Okay.  Do you remember at what point Mr.

12   Hovan provided these passwords?

13        A    I don't remember exactly when, I just know

14   it was after the interview had concluded.

15        Q    Okay.  So it's not captured on the

16   recording?

17        A    No.

18        Q    But it's before he was taken for further

19   processing to be handed off to another agency, the

20   Marshals?

21        A    Yeah, it was sometime between the end of the

22   interview and before he was handed off to the

23   Marshals.

24        Q    Okay.  And was a separate consent form

25   utilized for this?

1    A    No.

2    Q    You relied on the earlier consent form for

3    this or something else?

4    A    I don't really -- we didn't rely on any

5    consent form because it was he provided it, we didn't

6    ask for it, and we didn't have a consent form present

7    I believe when he actually did provide it.

8    Q    Okay.

9    A    And if you read the prior consent form,

10   you'd know that he was doing it voluntarily.

11   Q    Okay.  If he read it?

12   A    Well, I know he read it because he was right

13   in front of me when he signed it, so he should have

14   read it.

15   Q    All right.  And so when you say here, "While

16   in the custody of Special Agent Fear and Special Agent

17   Jackson, Hovan, unprovoked, verbally provided agents

18   with the password and username to his laptop and

19   iPad," and I was just interested in what that means --

20   what you witnessed when he, unprovoked, provided

21   agents with the password and username?

22   A    I'm sorry, so what's your question?

23   Q    What happened?  I see here, I read,

24   "unprovoked," but I'm interested in what you witnessed

25   at that time.

1    A    Just that he volunteered it, and it goes

2    back to the interview where he said he would be

3    willing to cooperate any way he could and be truthful.

4    We didn't ask for any of this, he willingly gave it to

5    us.

6    Q    So the interview concludes, you turn off the

7    recorder, and -- I mean, can you walk me through what

8    happened?  I'm just curious.  I don't -- I'm not

9    following very well.

10    A    After the recorder was turned off, we went

11    over, had him processed, fingerprint, buccal swab, and

12    leaving that with Pretrial Services.  Once he spoke to

13    them, shortly after, he was escorted over to the

14    Marshals.  So this happened sometime in that -- I

15    don't know when, but just in that timeframe.

16    Q    Okay.  So you don't know whether this

17    happened immediately after the interview or through

18    the process of being processed by the Marshals?

19    A    Yeah, I don't recall exactly when.

20    Q    Do you remember -- I know it's been a while

21    ago, February 10th, 2020 -- do you remember how long

22    it took following the conclusion of the interview, in

23    other words, when the recording goes off, to then be

24    processed by the Marshals?

25    A    Uh, maybe -- roughly about two and a half

1    hours maybe, somewhere --

2         Q    Two and a half hours?

3         A    -- somewhere in there.

4         Q    Okay.  And what happened in the course of

5    two and a half hours?

6         A    Two and a half hours, we escorted him over

7    to our processing room in the building across from

8    where he was interviewed at.  We don't have more than

9    one person in there at a time if they're being

10   processed and we had to wait for several people ahead

11   of us.  So it was a waiting time there.  Going in

12   there to process him, fingerprint him -- what do you

13   call him -- fingerprint him, buccal swab him, call

14   Pretrial Services, wait for them to come up.  Once

15   they come up, meet with him however long, they take as

16   long as they need because it's his legal right to talk

17   to them.  Then we go back -- escort him back to the

18   car and then we had to take him over to the Marshals,

19   had to wait for them to actually come out and get him.

20        So, yeah, it's a little timely process.

21        Q    And how long were you -- how long were you

22   waiting and where?

23        A    Waiting --

24        Q    To begin the -- excuse me, let me ask you

25   again -- to begin processing all the things you

1    helpfully set out there, just to begin that process,

2    where were you waiting with Mr. Hovan?  Because you

3    said there's one person at a time that can go in

4    there.

5        A    In a separate room.

6        Q    Just waiting in a separate room?

7        A    Correct.

8        Q    Okay.  You didn't wait in your car or in the

9    transport car?

10       A    No.

11       Q    Did you make use of the car to get from the

12   FBI building --

13            MR. MURRAY:  Objection, Your Honor, on

14   relevance here.  This is no longer about consent with

15   respect to the phones.

16            MR. FAYHEE:  As long as the Government

17   is willing to concede they're not going to use any of

18   the evidence related to this consent.  It doesn't say

19   on the form, Your Honor, when he got this consent, so

20   I'm just trying to figure out what happened.

21            MR. MURRAY:  Your Honor, that's not the

22   issue here.  I mean, we've previously said we don't

23   intend to use information from those devices, you

24   know, but -- you know, if there's something determined

25   on them, we revisit it and ask the Court to address it

1    at that time, but the issue is not the consent with

2    respect to these other devices and this is --

3                    THE COURT:  Okay, the only device --

4                    MR. FAYHEE:  Fair enough.

5                    THE COURT:  -- all right, that's

6    acceptable.

7                    MR. FAYHEE:  I'll move on, Your Honor,

8    I'll move on.  All right, final document, Your Honor,

9    final document.

10                   MR. MURRAY:  Thank you.

11                   MR. FAYHEE:  This one, Your Honor, is

12   marked -- I may be one short here, Tyler.

13       (Pause)

14   BY MR. FAYHEE:

15       Q    I'm handing up what's been marked as Exhibit

16   7.  Please take your time, once again --

17                   THE COURT:  You don't have a -- do you

18   have a copy?  Oh, you have it.  Okay, great.  Thank

19   you.  Sorry.

20                   All right, you may proceed.

21   BY MR. FAYHEE:

22       Q    Special Agent Jackson, if you want to take

23   some time to read through it again, I know you're just

24   reading this.

25       A    Yeah, thank you.

1          (Pause)

2     A    Yes, sir.

3     Q    Okay, thank you.  So this document -- I'll

4     lead you through this a little bit, if it's okay --

5     it's also an FBI 302, the same type of form we talked

6     about earlier, correct?

7     A    Correct.

8     Q    Now, this form doesn't have your name on the

9     byline down here, does it, it has somebody else's

10    name?

11    A    Correct.

12    Q    And who is that?

13    A    One of the case agents.

14    Q    Okay.  And who is it?  Is it Special Agent

15    McKandy (ph) --

16    A    Yes.

17    Q    -- am I saying it right?

18    A    Correct.

19    Q    Okay.  And he's on your squad?

20    A    No, he's on a different squad.

21    Q    On a different squad, okay.  Was he a case

22    agent assigned to this matter at the time of the

23    arrest?

24    A    Yes.

25    Q    Yes, okay.  And it says down here, "Date

1    drafted 4/5/2021," down in the right-hand corner?

2         A    Yes.

3         Q    And, again, that's the date that it's

4    originally transcribed, is that what that means?  Or

5    how do you determine what date that is?

6         A    The date drafted is when the document is

7    actually started.

8         Q    And is that typing rather than handwritten

9    notes, the day it started?

10        A    Yeah, yes, sir.

11        Q    And is that automated in the system when it

12   begins in the FBI system?

13        A    Yes.

14        Q    Okay, makes sense.  And then up at the top

15   it says, "Date of entry," do you see that?

16        A    Yes.

17        Q    And the date of entry here is June 28, 2021,

18   do you see that?

19        A    Yes.

20        Q    And when is that?

21        A    You said -- oh, that's when it's approved

22   and put into the case file.

23        Q    When validated or added to the case file?

24        A    Yeah.

25        Q    And that's yesterday, isn't it?

```
 1        A    Yes.

 2        Q    Yeah, okay.  So this was entered in the case

 3   file yesterday, but drafted on April 5th, 2021.  Now,

 4   correct my mis -- I'm just moving things along here --

 5   correct any misimpressions I have, but it appears to

 6   depict meetings that you were having with the U.S.

 7   Attorney's Office regarding this matter, is that

 8   correct?

 9        A    Correct.

10        Q    Okay.  And is it appropriate to characterize

11   this as sort of preparatory meetings with the U.S.

12   Attorney's Office looking to determine what it is you

13   saw and witnessed for the purposes of preparing for

14   this hearing?

15             MR. MURRAY:  Objection.  It doesn't

16   refer, I don't believe, to a meeting, but it indicates

17   via telephone.

18             MR. FAYHEE:  Excuse me, Your Honor.

19   BY MR. FAYHEE:

20        Q    Does it reflect a telephone conversation you

21   had with the U.S. Attorney's Office for the purposes

22   of preparing for today?

23        A    Correct.

24        Q    Okay.  Now, I was interested -- this is page

25   -- the front page, page 1, and it says in the second
```

1   paragraph, second sentence, "Consistent with Special

2   Agent Jackson's normal process, he read the advice-of-

3   rights form verbatim to Hovan before Hovan signed it,

4   confirming Hovan could read and write."

5        And then it says, "Hovan offered several times to

6   tell/give agents whatever they wanted and that he

7   would tell the truth."  Is that correct?

8        A    Where is that at again?

9        Q    I'm sorry, that's the very -- it's the

10  second paragraph on page 1 --

11       A    Okay.

12       Q    -- beginning with the second sentence.

13       A    Second paragraph, second sentence, from the

14  beginning of the interview?

15       Q    I'm sorry.  So it's the second paragraph

16  beginning, "During his custodial interview"?

17       A    Okay, on 2 -- okay, on 2/10/2020.

18       Q    Yeah.

19            THE COURT:  Well, that's not the second

20  sentence, that's the first sentence.

21            MR. FAYHEE:  Yeah, sorry, I was just

22  indicating the paragraph so he could find it more

23  easily.

24  BY MR. FAYHEE:

25       Q    But I was referring, Special Agent Jackson,

1   just to be certain, to the part where it says

2   "consistent with Special Agent Jackson's normal

3   process."

4                MR. MURRAY:  So, Your Honor, I'm just

5   going to object to this report again.  I thought Mr.

6   Fayhee was going to perhaps confront the witness with

7   an inconsistent statement.  I don't believe this

8   document has been admitted into evidence, I don't

9   think it should be.  If there's an inconsistent

10  statement or prior statement that it would be

11  appropriate to confront him with, but otherwise these

12  aren't his words.  This was a document produced in

13  Jencks and we object to reading through this report

14  that another agent wrote.

15               MR. FAYHEE:  Your Honor, this is a

16  statement of Mr. Jackson regarding the events of

17  question, it was produced to us at 7 o'clock last

18  night.  There's inconsistencies I'm about to get to,

19  particularly with respect to the following paragraph

20  that begins, "Unprompted."  So I'm not sure what the

21  objection is other than, you know -- well, I don't

22  know what the objection is.

23               MR. MURRAY:  The objection is he was

24  just reading the document that's not in evidence, you

25  know, to the agent.  If there's an inconsistent

1    statement, he can ask the agent about that, and that's

2    what we would think would be an appropriate purpose

3    for this document.

4                    MR. FAYHEE:  Your Honor, I was just

5    simply acclimating the agent to the interview.  I'm

6    happy to skip on.  I'm interested to disclose my

7    impeachment theory to the Court --

8                    THE COURT:  Okay.

9                    MR. FAYHEE:  -- to talk about this

10   statement that begins, "Unprompted."

11                   THE COURT:  All right, why don't you do

12   that.

13   BY MR. FAYHEE:

14       Q    Okay.  So next paragraph, Special Agent

15   Jackson, there's a comment here that says,

16   "Unprompted, Hovan told the agents" --

17                   THE COURT:  That's page 2?

18                   MR. FAYHEE:  Excuse me, still page 1,

19   this is paragraph 3 beginning, "Unprompted."

20                   THE COURT:  At one point in Hovan's

21   interview -- I thought it was on the next page.

22   "Unprompted, Hovan told the agents" --

23                   MR. FAYHEE:  That's right, that's

24   correct.

25                   THE COURT:  So that's the second page?

1                    MR. MURRAY:  I think, Your Honor --

2                    MR. FAYHEE:  Oh, I'm sorry, let me --

3                    MR. MURRAY:  -- I think there might be

4       some confusion --

5                    THE WITNESS:  It's two documents.

6                    MR. MURRAY:  -- because the exhibit

7       includes two different reports here.  The first page

8       is the interview of Agent Fear, and I don't believe --

9                    MR. FAYHEE:  It's possible --

10                   MR. MURRAY:  -- that Mr. Fayhee is

11      attempting to ask Agent Jackson what Agent Fear's memo

12      says.  The second page starts with the interview of

13      Agent Jackson.  So the first page of Agent Jackson's

14      memoranda, the third paragraph, I believe is what Mr.

15      Fayhee is asking about.

16                   THE COURT:  Of the second -- of the

17      second page, is that --

18                   MR. FAYHEE:  Yeah, and thanks to Mr.

19      Murray for clarifying.  I'm sorry, Your Honor, what I

20      think has happened is I think I've handed you both

21      interviews as an exhibit and I'll correct that.  My

22      intention was to hand you what's marked as 1 of 2 that

23      begins, "FBI Special Agent SA Christopher Jackson" --

24                   THE COURT:  So you don't even want me

25      to look at 1 of 1?

1                    MR. FAYHEE:  Exactly, Your Honor.

2                    THE COURT:  All right.  Well, let's --

3                    MR. FAYHEE:  That was a mistake --

4                    THE COURT:  -- let's strike this.

5                    MR. FAYHEE:  -- I apologize.

6                    THE COURT:  Okay.  Well, then I have to

7     -- and that's Exhibit 7?

8                    MR. FAYHEE:  That's Exhibit 7.

9                    THE COURT:  Well, one second.  Why

10    don't you -- I'm taking the sticker off and putting it

11    on what you're focusing on, is that correct?

12                   MR. FAYHEE:  That's correct, Your

13    Honor.

14                   THE COURT:  Okay, all right.

15                   MR. FAYHEE:  And so now with what is

16    properly marked as Exhibit 7 --

17                   THE COURT:  All right.

18    BY MR. FAYHEE:

19       Q    I'm referring, Special Agent Jackson, to the

20    paragraph that begins "Unprompted," do you see that?

21       A    Yes.

22       Q    Okay.  It says, "Unprompted, Hovan told the

23    agents they could look through whatever they want and

24    offered to cooperate."

25            Now, when you made that statement as recorded in

1   this interview by another agent, what did you mean by

2   "unprompted"?

3        A    That he was voluntarily offering to

4   cooperate.

5        Q    Okay.  Now, when using that term,

6   "unprompted," did his offer to cooperate and, quote,

7   "look through whatever they want," did that come

8   before or after the consent form was presented to Mr.

9   Hovan?

10       A    Whether he -- say that one more time?  I'm

11   sorry.

12       Q    Yep, so one more time.  When you say

13   "unprompted" --

14       A    Uh-huh.

15       Q    -- yeah?

16       A    Yes.

17       Q    And what you're reflecting here that Mr.

18   Hovan stated they can look through whatever they want

19   and offered to cooperate, was that before or after Mr.

20   Hovan was presented with a consent form?

21            MR. MURRAY:  Objection to the beginning

22   of the form of that question.  Mr. Fayhee says, "when

23   you say unprompted," this is a summary of an interview

24   of this agent, you know, he's not saying that he said

25   it.

1              THE COURT:  All right, why don't you --

2    well, somebody who said it in the FBI?

3              MR. FAYHEE:  Well, Your Honor, this was

4    presented last night at 7:00 p.m. as Jencks material

5    by the Government for the purposes of this witness

6    testimony.  I mean, I can ask him whether he adopts

7    the statements made by him and recorded here, if that

8    would help build a proper foundation.

9              THE COURT:  Okay.  Well, why don't you

10   do that?

11   BY MR. FAYHEE:

12        Q    Special Agent Jackson --

13        A    Yes.

14        Q    -- having reviewed this material related to

15   statements attributed to you, drafted by another FBI

16   agent, does this fairly and accurately depict the

17   conversation you had by phone with the U.S. Attorney's

18   Office on April 5th of 2021?

19        A    To my knowledge, yes.

20        Q    Okay.  So do you recall at that time making

21   a statement to the U.S. Attorney's Office and recorded

22   in this FBI 302 to the following effect:  "Unprompted,

23   Hovan told the agents that they could look through

24   whatever they want and offered to cooperate"?

25        A    Yes.

1    Q    When you made that statement and recounted

2    for the U.S. Attorney's Office what happened on

3    February 10th, 2020, did what you are describing here

4    happen before or after Mr. Hovan was presented with a

5    consent form?

6    A    As far as his cooperation, it was before and

7    after.

8              THE COURT:  I didn't -- say that again?

9              THE WITNESS:  As far as his

10   cooperation, it was before and after.

11   BY MR. FAYHEE:

12   Q    All right.  So -- but the question I asked

13   had to do with his statement that agents could look

14   through whatever they want.

15   A    Correct.

16   Q    Correct it was before the consent form was

17   put before him, yes?

18   A    Yeah, he said it before.

19   Q    Right.  And then next you say, "Before Hovan

20   started voluntarily showing the agents his phone,

21   Special Agent Jackson brought out the consent-to-

22   search form so Hovan could sign it first."  Correct?

23   A    Yes.

24   Q    All right.  And then it reflects here that

25   "Special Agent Jackson did not read the consent-to-

 1   search verbatim to Hovan since Hovan demonstrated he
 2   could read, write, and already had clearly consenting
 3   voluntarily."  Correct?
 4       A    Yes -- well, let me back up.  "Before Hovan
 5   started voluntarily showing the agents his phone," he
 6   didn't really show us his phone.  He was just telling
 7   us the passcodes.  We didn't look through any of it
 8   before the consent was signed.
 9       Q    Well, but you testified earlier that you
10   witnessed Special Agent Fear ask him for the
11   passcodes, correct?
12       A    Ask him for them, yes, but I'm talking about
13   we didn't look through the phone before consent or
14   anything like that.
15       Q    No, understood.  So once again my question
16   is it states, "Special Agent Jackson did not read the
17   consent-to-search form verbatim to Hovan since Hovan
18   demonstrated he could read, write, and he had already
19   been clearly consenting voluntarily," is that correct?
20       A    Yes, that's what it reads, yes.
21       Q    Okay.  Now, this statement in this form
22   drafted April 5th, 2021 and produced last evening
23   after it was entered, that language does not appear,
24   if you refer back -- take all the time you need, but
25   if you refer back to the previous exhibit, Exhibit

1    Number 6, it doesn't appear anywhere in that document,

2    does it?

3         A    As far as the consent -- or as far as

4    reading it to him verbatim, is that what you're

5    referring to?

6         Q    Exactly.

7         A    No, it's not in this -- not in Exhibit 6,

8    no.

9         Q    And in the synopsis 302 that was referenced

10   earlier, that's Exhibit 5 that is intended to

11   summarize the interview, this statement that is

12   reflecting that you had not read verbatim the consent-

13   to-search form because he could read, write, and

14   already had been clearly consenting voluntarily, it

15   didn't appear in that synopsis either, did it?

16        A    That would be Exhibit 5?

17        Q    That would be Exhibit 5.

18        A    No, it's not in this one.

19        Q    In fact, prior to the entry of this form on

20   June 28, 2021, yesterday, in fact the statement only

21   appeared, the only source for it is the audio of the

22   interview and the accompanying transcript prepared for

23   this hearing, isn't that correct?

24        A    Say that one more time?

25        Q    So what I'm -- the question is, this

1    statement made in a document created and entered in

2    fact yesterday, June 28, this statement that I've just

3    read to you regarding your not reading the consent-to-

4    search form, it appears here very clearly in black and

5    white, but it doesn't appear in Exhibit 6, it doesn't

6    appear in Exhibit 5, and in fact only appears from the

7    audio recording or the transcript accompanying the

8    audio recording, isn't that correct?

9         A    Right.

10        Q    Right.

11             MR. FAYHEE:  Your Honor, could I have

12   two minutes just to confer briefly?

13             THE COURT:  Yeah, I'll count.  Yes, you

14   may.

15        (Laughter)

16             MR. FAYHEE:  Fair enough.

17        (Pause)

18             MR. FAYHEE:  Okay, Your Honor, I think

19   that's my final question.

20             THE COURT:  Okay, thank you.  Okay.

21             MR. MURRAY:  May I just do a few

22   questions?  It shouldn't take long.

23             THE COURT:  Oh, redirect?

24             MR. MURRAY:  Yes.

25             THE COURT:  Yeah, of course.

```
 1                    REDIRECT EXAMINATION

 2   BY MR. MURRAY:

 3       Q    Agent Jackson, you've already testified that

 4   you're not the case agent, right?

 5       A    Correct.

 6       Q    But you participated in this interview and

 7   arrest, and then subsequently memorialized some of the

 8   activities or read reports memorializing the

 9   activities from February 2020, is that right?

10       A    Correct.

11       Q    And at that point in time Defendant Hovan

12   and his counsel hadn't yet made a motion challenging

13   the consent that was given in this interview, right?

14       A    Not to my knowledge, no.

15       Q    And so when the memoranda were created back

16   in February 2020, nobody from the U.S. Attorney's

17   Office asked you detailed questions about the consent

18   back at that time, is that right?

19       A    No.

20       Q    Were you made aware at some point --

21            THE COURT:  No, no is a funny answer.

22            MR. MURRAY:  Oh, let me confirm.

23   BY MR. MURRAY:

24       Q    Is it correct that back in 2020 nobody

25   debriefed you regarding the consent that was given by
```

1    Mr. Hovan in this interview?

2         A    Correct.

3         Q    Did you learn at some point in approximately

4    March of 2021 that Mr. Hovan, through his counsel, had

5    made a motion challenging the consent that was given?

6         A    Yes.

7         Q    Were you surprised by that motion?

8         A    Yes.

9         Q    Why?

10        A    Because --

11             MR. FAYHEE:  Your Honor, I have to

12   object to this question.  He's getting into, you know,

13   the statement -- the Agent's reaction to the

14   challenge, the legal challenge to consent, what does

15   that have to do with whether or not my client's

16   consent in the course of an interview occurring on

17   February 10th, 2020 was free and voluntary?

18             MR. MURRAY:  My -- the question goes to

19   what -- let me rephrase it.

20   BY MR. MURRAY:

21        Q    When you heard that there was a challenge,

22   what was your understanding, your recollection in

23   March, approximately March 2021, as to the nature of

24   the consent that was provided back in February 2020?

25             MR. FAYHEE:  Your Honor, it's the same

```
 1    objection.  What relevance is the Agent's reaction to

 2    my legal challenge on behalf of Mr. Hovan?

 3                    THE COURT:  Overruled.

 4                    THE WITNESS:  Could you repeat?

 5    BY MR. MURRAY:

 6         Q    My question is, when there was a challenge,

 7    did you recall the meeting from 2020?

 8         A    Yes.

 9         Q    And can you describe your impression in

10    approximately March 2021 or April 2021, your

11    recollection of that consent?

12         A    That it was always unprompted and willful,

13    that he kept volunteering it.

14         Q    And after you -- after the challenge was

15    made by Mr. Hovan to this consent, did members of the

16    U.S. Attorney's Office contact you to ask you more

17    detailed questions about that consent?

18         A    Yes.

19         Q    And was that a telephone call?

20         A    Yes.

21         Q    And was that approximately in the beginning

22    of April 2021?

23         A    Yes.

24         Q    And you don't know when this hearing was

25    scheduled, do you?
```

```
 1        A    No.

 2        Q    But at that point in time had it -- well,

 3   subsequent --

 4             MR. MURRAY:  -- I'll ask no further

 5   questions.

 6             THE COURT:  Yes, that's better.

 7             MR. MURRAY:  Thank you, Your Honor.

 8             THE COURT:  All right, but I'm going to

 9   allow you further cross.

10             MR. FAYHEE:  Your Honor, I think we've

11   made about every point we want to make --

12             THE COURT:  All right, okay.

13             MR. FAYHEE:  -- so I'm fine.  Thank

14   you.

15   BY MR. MURRAY:

16        Q    So you were asked several questions on page

17   --

18             THE COURT:  Oh, I thought he was --

19             MR. MURRAY:  Oh --

20             THE COURT:  -- I thought you were

21   finished.

22             MR. MURRAY:  Oh, I just had two other

23   sets of questions I wanted to do.

24             THE COURT:  Oh, otherwise I wouldn't

25   have given him a chance to --
```

1             MR. FAYHEE:  That's all right.

2       (Laughter)

3             MR. MURRAY:  Sorry, Your Honor.

4             THE COURT:  No problem.

5  BY MR. MURRAY:

6       Q    Just on page 21 to 22 from line --

7             THE COURT:  What exhibit?

8             MR. MURRAY:  So this is Exhibit 1B,

9  it's the transcript.

10             THE COURT:  Oh, okay.

11  BY MR. MURRAY:

12       Q    Mr. Fayhee asked you a series of questions

13  --

14             THE COURT:  Is that -- all right.  Now,

15  let's -- what's the page?

16             MR. MURRAY:  Page 21, going to page 22.

17  So the last two lines on page 21 starting, "And like I

18  said, like, have that looking at the WhatsApp

19  conversations and things like that."

20  BY MR. MURRAY:

21       Q    At that point you were asked questions about

22  what Mr. Hovan was doing.  Mr. Fayhee then asked you

23  questions about the statement about "probably" and

24  that language.  And then at the end of that, after Mr.

25  Hovan says, "Have at the WhatsApp messages and things

1    like that," what does he offer to point you and Agent

2    Fear and the other representative of the FBI to on

3    lines 1 and 2 of page 22?

4         A    "I'll point you to every single conversation

5    I've ever had."

6         Q    And then my last set of questions is about

7    Exhibit 3.  Can you please turn to that?  This is the

8    consent-to-search form, correct?

9         A    Correct.

10        Q    It only has four points on that, right?

11        A    Yes.

12        Q    And the first point is listing the two

13   devices that were at issue here, correct?

14        A    Yes.

15        Q    And you went through a series of questions

16   with Mr. Hovan regarding those and he saw you write

17   those down on the form, correct?

18        A    Correct.

19        Q    So at the time that he was looking at the

20   form, there was only three more sentences on that

21   form, correct?

22        A    Correct.

23        Q    Point number 2, number 3, and number 4, is

24   that right?

25        A    Correct.

1      Q      Those are short sentences, right?

2      A      Yes.

3      Q      How long would you estimate that it takes

4    you to read those sentences?

5      A      Myself, maybe ten seconds, if that.

6      Q      And Mr. Fayhee in his estimation was that

7    there was 20 seconds when he asked you questions, is

8    that right?

9      A      Yes.

10      Q      And did you give Mr. Hovan a full

11    opportunity to read those sentences?

12      A      Yes.

13      Q      Did he ever ask you for more time?

14      A      No.

15      Q      After you gave him an opportunity to read

16    those sentences, did he sign this form?

17      A      Yes.

18      Q      And was he looking at the form when he

19    signed it?

20      A      Yes.

21      Q      And, lastly, question 2 states, "I have been

22    advised of my right to refuse to consent."  How was

23    Mr. Hovan advised of that right?

24      A      In writing on this document.

25                    MR. MURRAY:  No further questions, Your

1    Honor.

2                    THE COURT:  You can ask -- do you want

3    to go further?

4                    MR. FAYHEE:  Your Honor, I have one

5    question, it will take less than a minute.

6                         RECROSS-EXAMINATION

7    BY MR. FAYHEE:

8        Q    Special Agent Jackson, with respect to the

9    form that AUSA Murray just referenced --

10                   THE COURT:  You're talking about

11   Government Exhibit 3?

12   BY MR. FAYHEE:

13       Q    I'm talking about Government Exhibit Number

14   3 -- it's true, isn't it, at this point, the point

15   that you handed this form to Mr. Hovan, you believed

16   he had already consented to the search, didn't you,

17   before you handed him the form?

18       A    Do I believe he consented to the search

19   before he looked at this form?

20       Q    Yes.

21       A    Based on what he was telling us as far as

22   providing -- yeah.

23       Q    Exactly.  And so you treated this form as a

24   mere formality to put across from him and have him

25   sign it, didn't you?

1        A      I wanted to have him memorize it so he

2    knows, I mean, he's going to consent --

3        Q      And that's why it took -- that's why it took

4    only 20 seconds to both apply the date for him to sign

5    it and for you to sign it because it was a mere

6    formality, wasn't it?

7        A      No, I wouldn't say it was a mere formality,

8    I think I just wanted -- it needed to be memorialized

9    so he knows that he's giving us consent, it's not just

10   -- he's not verbally -- he's not verbally expressing

11   it to us, he can see in writing that he's going to

12   give us that consent.

13                 MR. FAYHEE:  Thank you, Your Honor.

14                 THE COURT:  Okay, that's it.

15       (Witness excused)

16                 THE COURT:  Next witness, please.

17                 MR. MURRAY:  Your Honor, the Government

18   calls Agent Jessica Fear.

19       (Pause)

20                 THE COURT:  Okay.

21                 MR. MURRAY:  May I proceed, Your Honor?

22                 THE COURT:  Uh-huh, yeah --

23                 MR. MURRAY:  Thank you.

24                 THE COURT:  -- sure.

25                 MR. MURRAY:  I believe she needs to be

1   sworn is --

2              THE COURT:  Yeah, I think that would be

3   helpful.

4        GOVERNMENT WITNESS, JESSICA M. FEAR, SWORN

5              THE CLERK:  State and spell your name

6   for the record, please.

7              THE WITNESS:  Jessica Fear, J-E-S-S-I-

8   C-A F-E-A-R.

9              THE COURT:  That's a good name for the

10  agent, Fear.

11     (Laughter)

12             MR. MURRAY:  I'll note that that is --

13  will be fair for it to be part of the argument here,

14  Your Honor.

15             MR. FAYHEE:  I'll try to restrain

16  myself.

17     (Laughter)

18                  DIRECT EXAMINATION

19  BY MR. MURRAY:

20     Q    Agent Fear, how are you employed?

21     A    I am a Special Agent with the FBI.

22     Q    And for how long have you been a Special

23  Agent?

24     A    Approximately eight and a half years.

25     Q    And what type of cases do you normally work

1    on?

2          A     Currently, I work on white collar

3    investigations.

4          Q     Okay.  And approximately how many arrests

5    have you participated in your career?

6          A     Numerous.

7          Q     And how many -- approximately how many post-

8    arrest interviews?

9          A     Numerous as well.

10         Q     And how many times have you obtained consent

11   from a defendant or witnesses?

12         A     Many times.

13         Q     Now, I'm going to ask you about the events

14   on February 10th of 2020.  Did you participate in a

15   series of arrests on that day?

16         A     Yes, I did.

17         Q     And what were your responsibilities?

18         A     I was responsible for arresting Mr. Nicholas

19   Hovan, which included transporting him, making sure

20   that he was processed, including fingerprinting and

21   photographed, as well as interviewing him and ensuring

22   that he was relinquished to the custody of the Federal

23   Detention Center.

24         Q     And were you one of the case agents?

25         A     I was not, no.

1     Q    Were you assisting the other agents on the

2  case?

3     A    Yes, I was.

4     Q    Okay.  And so can you explain to the Court,

5  at the time of the arrests, what happened?

6     A    At the time of the arrests, myself and other

7  agents interrupted a meeting that was occurring at the

8  Hotel Monaco.  There were several people in the room

9  that were going to be arrested that day and we had a

10  group of agents that went into the room.  We asked

11  everyone to put their hands on the table, identified

12  ourselves as FBI, that we had warrants.  And different

13  agents were responsible for just ensuring that we had

14  control of everyone in the room and then taking those

15  people into custody.

16     Q    Did you go immediately to Mr. Hovan?

17     A    I did not, no.

18     Q    What did you do?

19     A    As we filed into the room, I went to the

20  most logical person just to ensure that we were all

21  accounting for everyone in the room.  So it wasn't

22  just because I was going to later be involved in

23  interviewing and transporting Mr. Hovan.  There were

24  too many people in the room to try to focus in on him.

25  For safety reasons, it was just important to ensure

1    that every person in the room was secured.

2        Q    And at some point subsequent to that did you

3    end up beginning to handle your responsibilities

4    directly with respect to Mr. Hovan?

5        A    Yes, I did.

6        Q    Can you explain what happened?

7        A    Sure.  I was still in the meeting room and

8    Mr. Hovan was transported down to a vehicle by two

9    other FBI agents.  Someone notified me that he was in

10   the vehicle and that they were waiting for me.  So I

11   went down and met Agent Jackson and Mr. Hovan and got

12   into the vehicle, and we transported him to the FBI

13   offices.

14       Q    Now, at the time of the -- the time you went

15   into the room, approximately what time of the day was

16   that?

17       A    Just before noon, approximately 11:55.

18       Q    And then when you were down at the vehicle

19   and first encountered Mr. Hovan, approximately when

20   was that?

21       A    About ten minutes later, maybe 12:05.

22       Q    And then after that, when you were at the

23   car with Agent Jackson and Mr. Hovan, what happened

24   next?

25       A    We transported him to 701 Market Street,

1    which is to a small interview room up there, which is

2    where the FBI's white collar branches have their

3    offices.

4         Q    Now, about how long did it take to transfer

5    him?

6         A    About five minutes, it was very short.

7         Q    Okay.  Throughout that time, can you

8    describe the time you were in the car and transferring

9    him to the interview room, can you explain what Mr.

10   Hovan's demeanor was like?

11        A    He was calm, as calm as anyone could be.  He

12   acted remorseful.  I recall him talking about his

13   wife.

14        Q    Okay.  And at that point in time did you

15   begin questioning him substantively about any of the

16   matters in the case?

17        A    No, we did not.

18        Q    Did you at any time when you were

19   transporting him and bringing him to the room mention

20   a search warrant in this case?

21        A    No, we did not.

22        Q    Now, during this time period, did Mr. Hovan

23   appear alert?

24        A    Yes.

25        Q    Did he appear to understand what was

1    happening and respond to your questions and

2    directions?

3          A    Yes, he did.

4          Q    Now, when you got to the FBI room -- you

5    mentioned that it was in one of the FBI's white collar

6    offices?

7          A    That's correct.

8          Q    Now, at that point in time, did you initiate

9    an interview?

10         A    Yes, we did.

11         Q    And approximately when was that on February

12   10th, 2020?

13         A    I believe the recording starts around 12:19.

14         Q    Okay.  And was that about 25 minutes after

15   the arrest?

16         A    Approximately, yes.

17         Q    Okay.  And I'm going to ask you to describe

18   the room.  Is it a room that you've been in before?

19         A    Yes, it is.

20         Q    So can you describe for the Court what the

21   room was like?

22         A    Sure.  It's a small interview room with a

23   circle table in the middle, neutral paint colors,

24   average lighting.  It was a comfortable room

25   temperature.

1       Q     Was it noisy in the room or outside the

2   room?

3       A     No, it wasn't.

4       Q     Okay.  And who was present at the interview?

5       A      There were four of us all together.  So,

6   myself and Agent Jackson, along with Mr. Hovan, and

7   then a forensic accountant, Megan Weber, also joined

8   us for the interview.

9       Q     Okay.  And can you describe where everybody

10  was sitting during this interview?

11      A     Sure.  If you think of a circular table,

12  there was just four of us, so one person on each side.

13  Agent Jackson was to Mr. Hovan's right, I was to Mr.

14  Hovan's left, and Megan Weber, the forensic

15  accountant, was to my left.

16      Q     And then did you end up recording this

17  interview?

18      A     Yes, we did.

19      Q     And I'm going to ask you to look at in the

20  binder before you Exhibit 1.  There's a disc and,

21  behind the disc, there is a transcript marked 1B.  Do

22  you recognize that transcript?

23      A     Yes, I do.

24      Q     Have you had an opportunity to review that

25  transcript and compare it to the audio recording of

1    this meeting?

2        A    Yes, I have.

3        Q    And is that transcript accurate in most

4    respects?

5        A    Yes, it's an accurate reflection of the

6    words spoken with one small exception, there's a

7    slight phrase towards the end that Mr. Hovan speaks

8    that I had a hard time hearing exactly what he's

9    saying and I don't hear quite what's on this paper,

10   but it's just a very short phrase.

11       Q    And we'll address that, but other than that

12   one instance that you heard when listening to it, is

13   it otherwise an accurate transcript, to the best of

14   your ability?

15       A    Yes, it is.

16       Q    Now, about how long did this interview last?

17       A    Approximately 50 minutes.

18       Q    And during the interview was Mr. Hovan

19   provided his Miranda warnings?

20       A    Yes, he was.

21       Q    And about when was this in the interview?

22       A    Immediately, at the beginning.

23       Q    And who did this?

24       A    Agent Jackson walked him through the FD-395,

25   advice-of-rights form, and I witnessed that.

1      Q     And did you -- did Mr. Hovan state that he

2   understood those rights and wanted to proceed?

3      A     Yes, he did.

4      Q     And did he appear to understand them?

5      A     Yes, he did.

6      Q     And did you have any reason to believe that

7   that statement wasn't willing and voluntary?

8      A     No, not at all.

9      Q     Now, can you summarize -- we're going to

10  listen to two clips of this interview, but -- near the

11  end, sort of the second third, can you summarize to

12  the Court what happened in the interview?

13     A     Sure.  So, from the start, Mr. Hovan was

14  very eager to talk to us and wanted to be cooperative.

15  He expressed several times throughout the desire to

16  help us in any way that we could to further the

17  investigation.  He -- so from the start I think he

18  asked us, you know, where should he begin, and then he

19  gave an overall summary of his involvement in the

20  conspiracy from his perspective.  And then we went

21  back through the chronology, and he talked about

22  specific meetings, so we went back over those

23  specifically to ensure that we had the facts in terms

24  of who was at those meetings and what the purpose was.

25          And then towards the end of the recording Mr.

1   Hovan provided verbal consent for us to search his

2   phones, at which point we had discussions about

3   passcodes for his phones and we completed a written

4   consent-to-search form confirming his verbal consent.

5   And he walked me through some of the relevant

6   communications, from his standpoint, in his phone.

7        Q    And we're going to listen to that portion

8   about him walking you through, but we haven't -- it

9   hasn't been before the Court in this hearing yet.

10  When you say he walked you through his phone, what --

11  can you explain what that means?

12       A    Sure.  We were looking at his phone

13  together.  He was flipping through the specific

14  communication strings and pointing out to me the

15  different names of the groups, if it was a group chat,

16  and then the different people that were involved and

17  who they were in terms of who we had been asking about

18  earlier that day.

19       Q    And so were you both looking at the content

20  of the phone simultaneously during that section?

21       A    Yes, we were looking at it together.

22       Q    Now, through that process, can you describe

23  Mr. Hovan's demeanor?

24       A    Sure.  He was calm, as relaxed as anyone

25  could be given the circumstances.  He was alert, like

1    you mentioned earlier; he seemed intelligent.  He was

2    responsive to all the questions that we asked in an

3    appropriate way, and he was very eager to cooperate

4    and help us however he could.

5         Q    Okay.  And you mentioned that he was eager

6    to help you, were you able to assess his intelligence

7    during this meeting?

8         A    He seemed very intelligent and educated.

9         Q    Did he seem to understand the questions and

10   issues that you were raising?

11        A    Yes, he did.

12        Q    Did you have any question that he was

13   confused about the words you were using or the

14   documents that you were putting in front of him?

15        A    Not at all.  In fact, a lot of times he

16   anticipated where we were going.  He was clearly

17   following the interview and understood what was going

18   on.

19        Q    Now I'm going to ask you to look at

20   Government Exhibit 4 --

21        A    Okay.

22        Q    -- in your binder.  Are you familiar with

23   this document?

24        A    Yes, I am.

25        Q    And what is this document?

1       A    This is a LinkedIn page related to Mr. Nick

2   Hovan.

3       Q    Okay.  And is it your understanding that an

4   analyst or somebody working from the FBI obtained this

5   from the Internet from the LinkedIn application?

6       A    Yes, that's correct, from the LinkedIn site.

7       Q    And then, with respect to this, I'm just

8   going to ask you about a couple things.  Turning to

9   the second page, does this LinkedIn profile summarize

10  Mr. Hovan's education?

11      A    Yes, it does.

12      Q    And where does it say he went to high

13  school?

14      A    It says he went to St. Andrew's School.

15      Q    And do you know anything about that?

16      A    I don't.  I imagine it's a private school

17  from the name.

18      Q    All right.  And then it says he went to

19  university, which university?

20      A    He went to Bucknell University.

21      Q    And from what years did he go there?

22      A    Approximately -- it says 2004 to 2008.

23      Q    And does it indicate that he received

24  degrees?

25      A    Yes, it does.

```
1          Q     And what are those?

2          A     B.S.B.A. and E.A.  So I believe a bachelor

3   of science and business administration is I believe

4   what that stands for, and a bachelor of arts in

5   management and English.

6          Q     And then, lastly, does this, going from the

7   second page up to the first page, summarize Mr.

8   Hovan's work experience?

9          A     Yes.

10         Q     And does it summarize approximately ten

11  years of work experience, including a position as a

12  client solutions executive at AT&T starting in 2019?

13         A     Yes, that's right.

14         Q     Now, during the interview, did Mr. Hovan

15  state his age?

16         A     I'm not sure.  I thought he did, but when I

17  went back, I think he may have been talking about a

18  couple of other people.

19         Q     Okay.  Then I want to ask you a couple of

20  questions about the interview.

21         So, during the interview, did Mr. Hovan point you

22  to any evidence?

23         A     Yes, he did.

24         Q     Can you explain what happened?

25         A     Sure.  There were several times throughout
```

1    the interview where he referenced communications he

2    had had with some of the other people involved in the

3    oil deal, and he specifically mentioned WhatsApp

4    communications and other types of chats that he had

5    had.

6         Q    And were some of those instances where he

7    mentioned those unsolicited?

8         A    Yes.

9         Q    And at some point in time -- well, I think

10   you already testified -- at some point in time did the

11   topic of his telephones come up directly?

12        A    Yes, it did.

13        Q    And what happened?

14        A    I had asked him a very open-ended question

15   and he had started discussing his involvement in the

16   conspiracy, and then he offered of his own accord that

17   we could have at looking at WhatsApp communications

18   and things like that, and indicated that he would

19   point us to every single conversation that he has ever

20   had.

21        Q    And after that point in time, what did you

22   do?

23        A    So at that point he had provided verbal

24   consent, so we followed up by asking whether or not

25   his phones had passcodes to determine if we would need

 1   that to get into the phone, and then followed up with

 2   going through a written consent form with Mr. Hovan to

 3   confirm his verbal consent.

 4        Q    And I'm going to ask you to look at, please,

 5   in your exhibit binder Exhibit 3 there, do you see

 6   that?

 7        A    Yes, I do.

 8        Q    Are you familiar with that document?

 9        A    Yes, I am.

10        Q    And what is that?

11        A    This is a standard FD-26, FBI consent-to-

12   search form.

13        Q    And were you present when this was executed

14   by Mr. Hovan?

15        A    Yes.

16        Q    And did he have an opportunity to read this?

17        A    He did.

18        Q    Okay.  And is there any reason that you have

19   from participating in this interview to think that the

20   consent here wasn't knowing and voluntary?

21        A    No, not at all.  He was following Agent

22   Jackson.  He actually corrected him because he was

23   watching what he was writing in terms of the passcode.

24        Q    Okay.  And at this point in time had there

25   been any mention of a search warrant during the

1    interview?

2        A    No.

3        Q    And was there any mention afterwards?

4        A    No.

5        Q    Now I'm going to ask you to listen to two of

6    the clips on this recording, the first one is going to

7    be 1-10.

8                    MR. MURRAY:  Your Honor?

9                    THE COURT:  What page is this?

10                   MR. MURRAY:  This starts -- this is the

11   one that starts on page 21.

12                   THE COURT:  That's in Exhibit 1B,

13   right?

14                   MR. MURRAY:  It's in 1B, yes, Your

15   Honor, it's on page 21.

16                   THE COURT:  All right.

17                   MR. MURRAY:  I'll wait until Your Honor

18   gets to that page.

19                   THE COURT:  That would be nice.

20       (Pause)

21                   MR. MURRAY:  We're going to start, Your

22   Honor, at line 23.

23                   THE COURT:  Okay.

24   BY MR. MURRAY:

25       Q    So starting at line 23, is this where you

1   asked the open-ended question?

2        A    Yes, it is.

3        Q    I'm going to play it for a little bit and

4   then ask you some questions a little further on.

5   Okay?

6        A    Okay.

7              MR. MURRAY:  If you could start it,

8   please?

9        (Begin playing audio clip G-1-10:)

10             "AGENT FEAR:  Anything else that we

11   haven't asked you that would be helpful for us to know

12   about this deal or these people?

13             "MR. HOVAN:  Like I said, I -- the -- I

14   knew everybody, like I've kind of met everyone in that

15   room by name except for the one person, that's the

16   other investor, I never met him before, but other than

17   that, like, I don't -- I don't really know how much

18   more I know of, that's -- like I said, I don't really

19   know that much.  You'll probably get a lot more

20   information from the other people in the room, but

21   like I'll answer any question that I can answer or

22   anything like that I can try and answer.  Like I said,

23   I've got to tell the truth and I'm not going to -- I'm

24   not going to lie to you to try and help my case out

25   any, but all I can do is tell you the truth of my

1    involvement and what I know from involvement of the

2    other people.  And, like I said, like have at looking

3    at WhatsApp conversations and things like that because

4    they're fair game for -- I mean, you're going to look

5    at them anyway probably, but I'll point you to the

6    ones -- I'll point you to every single conversation

7    I've ever had.

8                    "AGENT JACKSON:  Right."

9    BY MR. MURRAY:

10        Q    So at that point, at the start of that

11   section, what did you ask him?

12        A    I asked him if -- do you want me to read it

13   verbatim or summarize?

14        Q    Just summarize it.

15        A    I just asked him in general if there was

16   anything else that we -- it would be helpful for us to

17   know.

18        Q    And why were you doing it at that point?

19        A    Because we were nearing the end of the

20   interview and I wanted to make sure there wasn't

21   something else that Agent Jackson and I should be

22   asking about that, you know, not being the lead agents

23   on this case, perhaps we didn't know and that he would

24   have additional information for us.

25        Q    And when he provided the answer, what did he

1    end up offering to you?

2         A    He provided consent to search his phones.

3         Q    And was that oral consent?

4              THE COURT:  I didn't hear that, the

5    answer.

6              THE WITNESS:  He provided consent to

7    search his phones.

8    BY MR. MURRAY:

9         Q    And was that oral consent at first?

10        A    Yes, it was verbal/oral consent.

11        Q    And did he subsequently provide written

12   consent?

13        A    Yes, he did.

14        Q    And at that point in time, again, had there

15   been any mention of a search warrant?

16        A    No.

17        Q    Or any other means that the case agents

18   might be using to obtain communications on those

19   phones?

20        A    No.

21        Q    And in addition, at that same time, did he

22   offer to point anything out to you?

23        A    Yes, he offered to point out every single

24   conversation he'd ever had.

25              MR. MURRAY:  Could you proceed, please?

1          (Begin playing audio clip G-1-10:)

2                    "MR. HOVAN:  Yes, I personally -- like

3     I don't think anything really hurts my case because

4     like I -- like I said, I pointed two parties together

5     and I should have just backed out when I first got the

6     call to be involved in something like this."

7                    THE COURT:  And where is this?

8                    MR. MURRAY:  Can you stop, please?

9                    This is on page 22, Your Honor, and

10    we're starting at line 14 now.

11    BY MR. MURRAY:

12         Q    On line 14, after he has provided this oral

13    consent, do you pose a question?

14         A    Yes, I do.

15         Q    Is this the question about the passcodes?

16         A    Yes.

17         Q    And why are you doing that?

18         A    I'm just asking him if his phones have

19    passcodes because, if they did, I would ask him to

20    provide them so that we could get in, if he wanted to

21    continue with his consent.

22         Q    And at that point were you asking about the

23    passcodes because you understood he had already

24    provided oral consent and expressed a willingness to

25    let you check those phones?

1        A     Yes.

2        Q     And there were two phones in question?

3        A     Yes, there were.

4        Q     And does he begin to talk about the

5    passwords on those two phones?

6        A     Yes, that's right.

7        Q     And when he talks about that, do you make a

8    follow-up question or comment relating to those

9    passcodes?

10       A     Yes, I do.  So he indicates we -- I ask him

11   about passcodes and he indicates that his work phone

12   does have a passcode, and then tells me that there's

13   nothing on that, but that I can still look at it, you

14   know.  And I then indicate, basically agree with him

15   that we would still want to look at both phones

16   regardless, that we wouldn't just want to take his

17   word that there was nothing on it, that we would want

18   to check on it as well.

19                  MR. MURRAY:  Could you proceed?

20       (Begin playing audio clip G-1-10:)

21                  "AGENT FEAR:  Yeah, uh, do your phones,

22   do they have passcodes?

23                  "MR. HOVAN:  My iPhone does, but that's

24   my work phone, there's nothing on there."

25                  THE COURT:  Is this the same -- is this

1    proceeding on page --

2                    MR. MURRAY:  Yes, it is, Your Honor.

3                    If you could go back, please, to line

4    14, the line that says, "Yeah, uh, do your phones, do

5    they have passcodes?"  That's the beginning of this.

6    That's on line 14 of page 22, Your Honor.

7                    Go ahead, please.

8        (Begin playing audio clip G-1-10:)

9                    "AGENT FEAR:  Yeah, uh, do your phones,

10   do they have passcodes?"

11                   THE COURT:  You're familiar -- you

12   know, familiar with the transcript, I'm not.  So

13   that's why --

14                   MR. MURRAY:  Of course.

15                   THE COURT:  -- you have to make sure

16   that I know exactly where you're reading from.

17                   MR. MURRAY:  I appreciate it, Your

18   Honor, and I know when I stop to ask a question I

19   should repeat the line at the next --

20                   THE COURT:  Yeah, that's a good idea.

21                   MR. MURRAY:  Yes.  So, Your Honor,

22   we're starting at page 22, line 14.

23                   THE COURT:  All right.

24       (Begin playing audio clip G-1-10:)

25                   "AGENT FEAR:  Yeah, uh, do your phones,

1    do they have passcodes?

2                    "MR. HOVAN:  My iPhone does, but that's

3    my work phone, there's nothing on there.  I mean, you

4    can look at it, but there's nothing on there.

5                    "AGENT FEAR:  Okay.  Yeah, I mean,

6    we're going to look at the phones regardless and it's

7    usually just easier to --

8                    "MR. HOVAN:  Yeah, I don't know -- I

9    actually don't know these iPhones well.  Like I could

10   just open it with my face and you can -- you can turn

11   off the passcode, if you want, there's no passcodes.

12                   "AGENT JACKSON:  Okay.  So what we're

13   going to do is I'm going to have you -- if you're good

14   with this" --

15                   MR. MURRAY:  Can you stop right there?

16   BY MR. MURRAY:

17       Q    So focusing in on line 19 where -- and line

18   20 of this transcript, you're making a statement

19   there, correct, and it's cut off by Mr. Hovan?

20       A    Yes.

21       Q    And what was it that you were trying to say

22   at that point in time?

23       A    Well, like I had mentioned before, we're

24   talking about passcodes and he's indicating that there

25   is a passcode on his work phone.  He then follows up

1    by saying that there's nothing on his work phone, but

2    that we can still look at it.  So I'm indicating that,

3    yes, we would still want to look at it regardless just

4    to check it, basically.

5        Q    So at that point in time were you trying to

6    tell him you were going to search the phone regardless

7    of whether he consent?

8        A    No, I was not.

9        Q    Now could we go back just a little bit to

10   line 29?  Is this the portion in which Mr. Jackson,

11   after you've addressed the passcodes, begins to talk

12   about the consent form?

13       A    Yes, it is.

14       Q    Okay.

15            MR. MURRAY:  And would you proceed?

16       (Begin playing audio clip G-1-10:)

17            "AGENT JACKSON:  With us looking

18   through your phones, I'm going to have you sign a

19   consent form.

20            "MR. HOVAN:  Okay.

21            "AGENT JACKSON:  Okay?

22            "MR. HOVAN:  Yeah.

23            "AGENT JACKSON:  All right.  So this is

24   a" --

25            MR. MURRAY:  If we could stop there?

1    BY MR. MURRAY:

2         Q    What happens with respect to the consent

3    form?

4         A    At this point, Agent Jackson has pulled out

5    a consent-to-search form and is showing Mr. Hovan

6    that, if you're okay with this, we'll fill out this

7    consent form, and ensures that Mr. Hovan does agree

8    with it.

9         Q    So in line 34, does Agent Jackson ask him if

10   he's okay?

11        A    Yes, he does.

12        Q    And what does Mr. Hovan say?

13        A    "Yeah."

14        Q    And is that in line 36?

15        A    Yes, it is.  Line 36, Mr. Hovan says,

16   "Yeah."

17             MR. MURRAY:  If you could go on,

18   please?  So we're starting around line 37.

19        (Begin playing audio clip G-1-10:)

20             "AGENT JACKSON:  So this is a iPhone,

21   this is your work phone, right?

22             "MR. HOVAN:  Yeah.

23             "AGENT JACKSON:   Okay.  What type of

24   iPhone is it?

25             "MR. HOVAN:  iPhone X.

```
 1                    "AGENT JACKSON:  And is that the PIN

 2    associated with it?

 3                    "MR. HOVAN:  Yeah.  It's 0510 H-O -- H

 4    --

 5                    "AGENT JACKSON:  I'm sorry, I'm sorry,

 6    it's 0510?

 7                    "MR. HOVAN:  10, it's my birthday, and

 8    then H-O-V-A, lowercase.

 9                    "AGENT JACKSON:  All right.  All

10    lowercase?

11                    "MR. HOVAN:  Yeah.  There's no password

12    on the other phone."

13                    MR. MURRAY:  Can you stop there?

14    BY MR. MURRAY:

15        Q    What's happening there?

16        A    So Agent Jackson is completing the consent-

17    to-search form, he's filling it out with Mr. Hovan's

18    help.  So he's actually writing on the form the phone

19    and then the passcode.  And in this particular

20    instance Agent Jackson starts writing -- so the

21    passcode is 0510hova, so Agent Jackson writes 0510 and

22    H-O-V-A in all capital letters, Mr. Hovan corrects him

23    and says lowercase.  So Agent Jackson crosses that out

24    and writes "hova," lowercase.  So they're working on

25    completing the consent form together.
```

1        Q    Okay.  And at that point in time is the

2   consent form near enough to Mr. Hovan that he's able

3   to see generally what Agent Jackson is doing?

4        A    Yes.  Like I said, he was tracking what

5   Agent Jackson was doing because he saw what he was

6   writing and he corrected it.  Agent Jackson is sitting

7   right next to him as he fills it out.

8                 MR. MURRAY:  Can you please proceed?

9        (Begin playing audio clip G-1-10:)

10                "AGENT JACKSON:  0510hova?

11                "MR. HOVAN:  Uh-huh.

12                "AGENT JACKSON:  Okay.  This is your

13   work phone?

14                "MR. HOVAN:  Yep.

15                "AGENT JACKSON:  All right.  And the

16   other one?

17                "MR. HOVAN:  There's no password.

18                "AGENT JACKSON:  I mean what kind of

19   phone?

20                "MR. HOVAN:  Note 9.

21                "AGENT JACKSON:  Okay.  Is it HTC,

22   Samsung?  What --

23                "MR. HOVAN:  Samsung, Samsung.

24                "AGENT JACKSON:  Okay.

25                "MR. HOVAN:  Nobody has HTC phones

1    anymore.

2              "AGENT JACKSON:  That's why I was like,

3    damn, I don't even see --

4              "MR. HOVAN:  No.  I worked for AT&T --

5              "AGENT JACKSON:  -- HTC --

6              "MR. HOVAN:  -- I worked for AT&T.

7              "AGENT JACKSON:  Yeah, went straight

8    old school.  All right.

9              "MR. HOVAN:  I used to have an HTC,

10   it's very good phones.

11             "AGENT JACKSON:  Yeah.  All right, so

12   the Samsung doesn't have -- no password on it?

13             "MR. HOVAN:  No password.

14             "AGENT JACKSON:  Okay.

15             "MR. HOVAN:  And do you want me -- I

16   can show you -- I can point you to all the WhatsApp

17   conversations that are prevalent (sic) to you --

18             "AGENT FEAR:  Sure, that would help

19   out.

20             "MR. HOVAN:  -- I can save you time.

21   And you can look -- feel free to look through

22   everything, but I'll show you the more important ones.

23             "AGENT FEAR:  Okay."

24   BY MR. MURRAY:

25        Q    Right there from lines 18 to lines 24, what

1   is Mr. Hovan offering?

2        A    Again, he's offering to point out the

3   specific conversations that he feels like might be

4   most relevant to us and at the same time he's offering

5   for us to look through everything.

6        Q    Is he expressing any reticence here?

7        A    He is not.

8        Q    At this point in time, have you made any

9   threats or promises to him?

10       A    No, not at all.

11       Q    And is this consistent with many of his

12  other offers throughout the beginning and later on in

13  this meeting?

14       A    Yes, it is.

15              MR. MURRAY:  Please proceed.

16       (Begin playing audio clip G-1-10:)

17              "AGENT JACKSON:  So this one is the

18  password for the iPhone X.  Can you get to it through

19  -- if you can't use your face, can you just put the

20  passcode and you still --

21              "MR. HOVAN:  It should work, I think.

22  I mean, let me -- I think if you just do it a couple

23  times, it should, but let me just turn off the

24  password.  I think this probably will work.  And, like

25  I said, there's nothing on there -- oh, shit.

1                    "AGENT JACKSON:  What's that?

2                    "MR. HOVAN:  The password didn't work.

3                    "AGENT FEAR:  I think it's just not

4      taking the zero.

5                    "MR. HOVAN:  Yeah.  Okay."

6                    MR. MURRAY:  So can you stop it just --

7      there's a lot of pauses here, Agent Fear, I'll let you

8      --

9                    THE WITNESS:  I apologize.

10                   MR. MURRAY:  I'll do it at the moment

11     that you get your water.

12                   THE WITNESS:  I'm sorry.

13                   MR. MURRAY:  No, not at all.  Please do

14     that.

15     BY MR. MURRAY:

16         Q    There's a lot of pauses here, what's going

17     on in the transcript at this time?

18         A    So what's happening is, Agent Jackson is

19     trying to write down the passcodes on the consent-to-

20     search form and Mr. Hovan is trying to confirm that he

21     has the right passcode and then tried to turn it off,

22     and he's just having trouble, as he mentioned earlier

23     -- or it might have been -- it might be later, I think

24     he's about to mention that he's not great with

25     iPhones.  So he's just struggling to figure out how to

1    turn it off.

2         Q    And why is it important to turn off the

3    passcodes here?

4         A    In order for him to be able to show us the

5    different communications and for us to look through

6    the phone.

7         Q    And if the passcodes remain on the phone,

8    might that also be problematic for the FBI in the

9    future to get back in the phone?

10        A    Yes.

11        Q    So if the passwords are turned off, the FBI

12   then can proceed with searches in the future?

13        A    Yes, that's right.

14        Q    And was that being contemplated at the time

15   as this consent-to-search form was being prepared?  In

16   the sense of, was Mr. Hovan -- was a form being filled

17   out to allow the FBI to search the phone both at this

18   meeting, but into the future?

19        A    Yes, it was.  Yes, that's correct.

20        Q    And removing the passwords from the phone

21   would facilitate that, correct?

22        A    That's correct.

23             MR. MURRAY:  Please proceed.

24             THE COURT:  On page 25, is that where

25   you're going?

```
 1                    MR. MURRAY:  Yes.  I'm trying to find

 2      it myself, Your Honor, so thank you.  We're on page

 3      25, line 1.

 4                    THE COURT:  Where he says he's not good

 5      with iPhones?

 6                    MR. MURRAY:  I think it's going to be

 7      -- yes, exactly.  Thank you.

 8         (Begin playing audio clip G-1-10:)

 9                    "AGENT FEAR:  Yeah, it's confusing,

10      these newer --

11                    "MR. HOVAN:  It's all" --

12                    MR. MURRAY:  So we're going to start at

13      -- how about --

14         (Begin playing audio clip G-1-10:)

15                    "MR. HOVAN:  Do you know how to turn

16      that off?

17                    "AGENT FEAR:  I can turn it off.

18                    "MR. HOVAN:  Yeah."

19                    MR. MURRAY:  Why don't we -- just to

20      make it easier, Your Honor, because I want to make

21      sure -- could we pick up at line 40 on page 24?  So

22      that starts with, "The passwords didn't work."

23      Because I think I might have been talking over the end

24      of it.

25         (Begin playing audio clip G-1-10:)
```

```
1                    "MR. HOVAN:  The password didn't work.
2                    "AGENT FEAR:  I think it's just not
3        taking the zero.
4                    "MR. HOVAN:  Yeah.  Okay.  I'm not good
5        with iPhones.
6                    "AGENT FEAR:  Yeah, it's confusing
7        these newer --
8                    "MR. HOVAN:  Cancel -- do you know how
9        to turn it off?
10                   "AGENT FEAR:  Yeah, I can turn it off.
11                   "MR. HOVAN:  Yeah.
12                   "AGENT FEAR:  Let's see.
13                   "MR. HOVAN:  But, like I said, I never
14       did anything with me work phone, so you can look at
15       it.
16                   "AGENT JACKSON:  Okay.
17                   "AGENT FEAR:  Is that your --
18                   "MR. HOVAN:  I'm not going to get that
19       back for a long -- I'm not getting that back for a
20       while, I know.
21                   "AGENT FEAR:  I think it might be off.
22       Let's try it.
23                   "AGENT JACKSON:  Possibly not -- I
24       mean, I don't know.  It depends on what they find on
25       there, but they don't, you know -- so I couldn't
```

1    really say.  I don't want to give you a date --

2                   "AGENT FEAR:  It's not off.

3                   "AGENT JACKSON:  -- you know

4                   "MR. HOVAN:  Uh --

5                   "AGENT FEAR:  (Indiscernible) say it

6    again.

7                   "MR. HOVAN:  I'm still being recorded,

8    yeah?

9                   "AGENT JACKSON:  Yes.

10                  "MR. HOVAN:  So what are the next

11   steps?  I guess I can answer past that or --

12                  "AGENT JACKSON:  Yeah.  Well, let me

13   get to this real quick.  If -- okay --

14                  "AGENT FEAR:  We're still trying to

15   turn this off, but, I mean, the passcode works.  We

16   should be fine.

17                  "AGENT JACKSON:  Your signature, date.

18                  "MR. HOVAN:  It's the 10th?

19                  "AGENT JACKSON:  Yes, 2/10/20.  Thank

20   you.

21                  "AGENT FEAR:  You're right, it's not

22   letting you -- but you gave us -- so for right now

23   that should be fine."

24   BY MR. MURRAY:

25        Q    So, Agent Fear, on page 26, the top of the

1    page where they're talking about the 10th and February

2    10th, 2020, what is happening there?

3        A    They are finalizing the consent form.  Mr.

4    Hovan is given the opportunity to review it and then

5    he's signing it.

6        Q    And we hear some scratching, is that a

7    signature of the consent form?

8        A    Yes.  So that would be both Mr. Hovan

9    signing it and Agent Jackson signing it.

10                MR. MURRAY:  So then, Your Honor, I

11   have one more clip I'd like to play.  We have not

12   listened to this yet.  This begins on page 26 at line

13   39.

14   BY MR. MURRAY:

15       Q    Do you recall, Agent Fear, after -- about

16   20, 30 seconds after the signature of the form, what

17   happens in this next clip?

18       A    Mr. Hovan starts walking me through and

19   showing me the different WhatsApp communications, the

20   chats and the groups, and identifying the different

21   people and their phone numbers.

22       Q    But at this point he's provided consent to

23   you to search the phones, correct?

24       A    Yes.

25       Q    He's provided oral consent?

```
 1        A    Yes.

 2        Q    And written consent?

 3        A    Yes.

 4             MR. MURRAY:  So, Your Honor, starting

 5   on page 26 at line 40, please.

 6             UNIDENTIFIED SPEAKER:  What page?

 7             MR. MURRAY:  Oh, sorry, 1-11.

 8             THE COURT:  Page what, 40?

 9             MR. MURRAY:  26 at 40 is the last one.

10             THE COURT:  Oh.

11        (Begin playing audio clip G-1-11:)

12             "MR. HOVAN:  Ravi (ph), Nicky Fuchs,

13   Swiss Specialists --

14             "AGENT FEAR:  What is Swiss

15   Specialists?

16             "MR. HOVAN:  This is just -- it's the

17   same people like Nicky.  You can go in here, you'll

18   see everyone that's in the chats.  Ravi

19   (indiscernible) Nick.  That's Rob that's Bill.

20             "AGENT FEAR:  407" --

21             THE COURT:  Are you sure that's the

22   right number?

23             MR. MURRAY:  Let me make sure, I'm not

24   -- page 26 at line 40.

25             THE COURT:  All right, one second.
```

1                    THE WITNESS:  I think it starts at the

2    -- at --

3                    THE COURT:  Okay, that's a film, that's

4    a fun photo, is that the one that --

5                    MR. MURRAY:  I think it -- oh, so this

6    might be the person that was helping me cut off the

7    first few lines of this.  So it starts later down on

8    line 40 where -- or actually it starts on line 41.  So

9    I gave you the wrong thing.  On line 41 on page 26.

10                   THE COURT:  "I know we have so much

11   fun"?

12                   MR. MURRAY:  Right below that, 41.

13   There's a transition in topics.  So before that Mr.

14   Hovan is talking about his wife, yeah.  I'm not asking

15   about that, as it's not relevant to consent.  On the

16   line below it says, "Ravi, Nicky Fuchs, Swiss

17   Specialists."

18                   THE COURT:  I don't see it.  On page

19   26?

20                   MR. MURRAY:  26 at line 41.

21                   THE COURT:  It says, "I know, so I'm

22   going to break her heart, it's so sad."  And, "Ravi,

23   Nicky Fuchs" --

24                   MR. MURRAY:  Yeah.

25                   THE COURT:  -- "Swiss" -- that's the

1    line?

2              MR. MURRAY:  It's the "Ravi" there.  So

3    there's a break in the conversation.

4    BY MR. MURRAY:

5         Q    So, Agent Fear, Swiss Specialists, what is

6    that?  When you're looking at the phone, what --

7    that's not an individual, right?

8         A    I believe that was the name of a group chat.

9    So then when you go into that chat, there's different

10   contacts within it.

11        Q    So for example, if you want to chat about a

12   particular topic, you can name that chat, is that

13   right?

14        A    Yes, that's right.

15        Q    And then different people can participate,

16   is that right?

17        A    That's right.

18        Q    So is Mr. Hovan going through different

19   named chats and listing to you the relevant ones and

20   the people who participated in them?

21        A    Yes.  Some of the chats that he pointed out

22   were just -- I believe were just between him and

23   another individual and at other times it was chats

24   where it had a specific name, like what you're

25   mentioning, and there were multiple participants in

 1   those chats.

 2       Q    So he was identifying to you not just the

 3   names of individuals that you'd be interested in, but

 4   particular chats that had been named so that you could

 5   know to go in those?

 6       A    Yes, that's right.

 7                 MR. MURRAY:  If you could proceed

 8   again?  We're starting at line 41 on page 26, Your

 9   Honor.

10       (Begin playing audio clip G-1-11:)

11                 "MR. HOVAN:  Ravi, Nicky Fuchs, Swiss

12   Specialists.

13                 "AGENT FEAR:  What's Swiss Specialists?

14                 "MR. HOVAN:  This is just -- it's the

15   same people like Nicky.  You can go in here, you'll

16   see everyone that's in the chats.  Ravi, Al, Nick --

17   that's Rob, that's Bill.

18                 "AGENT FEAR:  407 is Rob?

19                 "MR. HOVAN:  Uh-huh.  917 is Bill.

20                 "AGENT FEAR:  917 is Bill.  Is that --

21                 "MR. HOVAN:  347 is Anthony.  I met him

22   for the first time today.  He was -- I never really

23   talked to him directly, I know Nick was.  He was the

24   one that was helping everyone set up like passwords,

25   things like that, I think.

1                    "AGENT JACKSON:  Okay.

2                    "MR. HOVAN:  I know that Rob set up

3    like an Antigua password, I think.  I didn't do any of

4    that stuff.  That's Rob.  'Has anyone ever seen my

5    phone?'

6                    "AGENT FEAR:  That's Rob, it's 407" --

7                    MR. MURRAY:  Can you stop there,

8    please?

9    BY MR. MURRAY:

10       Q    So, just for the record, you mentioned

11   earlier that there was one portion of this transcript

12   that you thought was inaccurate, is that right?

13       A    Yes.

14       Q    Is that in page 27, line 22?

15       A    Yes.  The part where he says "Has anyone

16   ever seen" -- it's hard to make out.  He might be

17   saying something like "that's the only one I see in my

18   phone."  I'm not entirely sure.  That's the only part

19   that I believe I hear differently than what's

20   transcribed.

21       Q    So the words "Has anyone ever seen" you

22   think are not accurate, right?

23       A    Yes.

24       Q    You don't hear that and it doesn't make

25   sense in the context, right?

1        A     Right.

2        Q     Because you're all looking at his phone, so

3   Mr. Hovan wouldn't be asking has anyone ever seen my

4   phone?

5        A     Right.

6        Q     So, with that correction, you believe the

7   rest of the transcript is accurate, is that right?

8        A     Yes.

9              MR. MURRAY:  If we could proceed,

10  please.

11         (Begin playing audio clip G-1-11:)

12              "AGENT FEAR:  222-8267 --

13              "MR. HOVAN:  Yeah.

14              "AGENT FEAR:  -- is also him?

15              "MR. HOVAN:  Yeah.

16              "AGENT FEAR:  Okay.

17              "MR. HOVAN:  This is Management Company

18  and this is -- who's in there?  They're all pretty

19  much the same people, it's just the same, because this

20  is Ravi, Hal, Nick, Rob, and Bill.  And 347 is -- I

21  think this is the -- I think that's the guy that's --

22              "AGENT FEAR:  347-534-73 --

23              "MR. HOVAN:  I think he's the guy --

24              "AGENT FEAR:  -- 52.

25              "MR. HOVAN:  -- the specialist guy, I

1   just met him today, I think his name is Anthony.  He

2   was like the financial accountant or something.

3            "AGENT FEAR:  Okay.

4            "MR. HOVAN:  And that's -- oh, yeah,

5   and then there's this one.  This hasn't been on in a

6   while, Philly Investors.  And this is Nicky, me, Ravi,

7   Hal, and Jason was on there."

8   BY MR. MURRAY:

9      Q    So on page 27, line 34, it mentions

10  Management Company, is that the name of another one of

11  these group chats that Mr. Hovan has directed you to?

12     A    Yes.

13     Q    And then on page 28, line 6 to 7, Philly

14  Investors, is that yet another one of these group

15  chats to which he's directed you to?

16     A    Yes.

17     Q    Now, after this, did Mr. Hovan -- after he

18  provided this consent orally and in writing, did he

19  ever withdraw it?

20     A    No, he did not.

21     Q    Did he ever express concerns about the

22  consent or your searching through the phones before or

23  after this?

24     A    No.  In fact, one of the last things he said

25  or towards the end he again reiterated, if there was

1    anything he could do to help us, he would be a

2    witness; he wanted to help.

3        Q    And were you ever concerned or given any

4    reason to think that his consent wasn't voluntary and

5    free during this interview?

6        A    No, I was not.

7                 MR. MURRAY:  No further questions, Your

8    Honor.

9                 THE COURT:  Okay.  Any cross-

10   examination?  Is it going to be the same length?  I

11   just am trying to --

12                MR. FAYHEE:  I'm going to be very

13   swift, Your Honor.

14                THE COURT:  Oh, are you?  Go ahead.

15                MR. FAYHEE:  I'm going to show you that

16   I can be long-winded and short too, I hope.  We'll

17   see.

18                THE COURT:  Okay.

19                CROSS-EXAMINATION

20   BY MR. FAYHEE:

21       Q    Good afternoon, Special Agent Fear.  My name

22   is Ryan Fayhee, I represent Mr. Hovan.

23       A    Good afternoon.

24       Q    So, as I just mentioned to the Judge, I'm

25   going to try to move through a little bit swiftly here

1    and try to just focus on a couple of points.  And you

2    have a binder in front of you still there that I may

3    refer to from time to time.

4         A    Okay.

5         Q    So just to make sure I heard correctly.  So

6    are you or were you, February 10, 2020, the day of the

7    arrest, were you assigned to this investigation or

8    were you just helping out on the day of the arrest and

9    the interview of Mr. Hovan?

10        A    I was just helping out on the day of the

11   arrest.

12        Q    And are you assigned to the same squad that

13   was managing this investigation?

14        A    One of the squads, yes.

15        Q    One of the squads, but not -- you weren't

16   assigned to the investigation other than for the

17   purposes of this arrest and the interview?

18        A    That's correct.

19        Q    Got it, okay.  And so on the day of the

20   arrest, I'm talking about the arrest itself, which we

21   understand took place at the Hotel Monaco, how would

22   you describe your role at that arrest?  What was your

23   job at that time?

24        A    My job at that time was to be one of the

25   agents who went into the room to ensure that everyone

1    was arrested safely.  So I was tasked with filing in

2    and making sure that, you know, as we came up to two

3    people, that we would make sure that they were in a

4    safe position, that they were taken into custody, and

5    that they did not have any weapons on them.

6         Q    Okay.  And so were you assigned to place

7    under arrest a specific person or just there generally

8    to ensure safety, just to make sure I understand?

9         A    So when we execute an arrest like that, it's

10   too big.  So I was assigned that day to interview and

11   transport and process and book Mr. Hovan.

12        Q    Okay.

13        A    But going into a room, there's too many

14   people.  So my task was not you are to find Mr. Hovan

15   and arrest him specifically, it was to assist on

16   executing the arrest on everyone in that room.  So I

17   did not specifically go to Mr. Hovan, I went to the

18   most logical person in that room at the time.

19        Q    And who was that?

20        A    I don't know, honestly.

21        Q    Oh, you don't remember?  Okay, fair enough.

22   That's all right.

23        In terms of how you prepared for the day of the

24   arrest -- now, I understand it's typical to have sort

25   of a safety briefing the day of and I'm a little less

1    interested in the safety briefing itself, I was more

2    interested in what steps you would have taken to

3    prepare, say, for the interview of Mr. Hovan or to

4    prepare for the arrest more substantively?

5         A    Sure.  I mean, we were giving a brief

6    overview of the case and provided with a sense of the

7    types of questions and a piece of paper that had some

8    general questions and some names on it to go over with

9    Mr. Hovan.

10        Q    Okay.  So, if I understand correctly, there

11   was an oral briefing that was provided, was that -- is

12   that correct?

13        A    Yes, that's right.

14        Q    And was that the day of the arrest or

15   earlier, if you can recall?

16        A    I believe it was the day of the arrest.

17        Q    Okay.  And you had been provided some

18   packet, a set of papers that was intended to help you

19   prepare for the interview of Mr. Hovan or at least to

20   make use of in the course of the interview with Mr.

21   Hovan?

22        A    Yes, that's right.

23        Q    Okay.  And who provided you that

24   information?

25        A    One of the case agents.

1    Q    Okay.  And one of the case agents assigned

2    specifically to the case or somebody else?

3    A    One of the case agents assigned to the case,

4    yes.

5    Q    But you don't remember who specifically that

6    was?

7    A    I mean, I don't know who handed us the

8    packet, but both agents involved conducted the

9    briefing.

10   Q    Do you know who drafted the packet?

11   A    I do not, no.

12   Q    Okay.  So it's assigned to your squad, your

13   squad is preparing and participating in the arrest,

14   but you don't know who drafted the packet that's being

15   handed off to you?

16   A    Not specifically.  They could have worked on

17   it together.  You know, typically, they're working

18   together.  They might assign different tasks to

19   different people, but they likely both reviewed it.

20   Q    Okay.  And do you remember who performed the

21   oral briefing the day of?

22   A    I don't remember specifically if both agents

23   spoke, I don't know.

24   Q    Is it typical to have two case agents sort

25   of assigned as their case as being the lead case

1    agents?

2        A    A lot of times there's multiple, but there's

3    a lot of -- but not always, it depends.

4        Q    In this case, who were the two lead case

5    agents?

6        A    The two lead case agents were Agent Andrew

7    Torno and Agent John Chris Vacanti.

8        Q    Okay, okay.  And who is it -- well, I'll

9    just move along.  That's helpful.

10        And so for the purposes of the arrest, when you

11    arrived, you made the statement, I think -- I heard

12    two statements earlier.  One was, in your direct

13    examination you said, "We interrupted a meeting," do

14    you remember that --

15        A    Uh-huh.

16        Q    -- when you said that?  And the second one I

17    heard, it was on cross here, that you filed in the

18    room, do you remember that one?

19        A    I don't know if I said filed, but I may

20    have.  That's what we did --

21        Q    Okay.

22        A    -- that's how I would describe it.

23        Q    That's all right.  Yeah, no, I won't focus

24    on it.  So in terms of interrupted a meeting, I wanted

25    to talk a little bit more about that.

1        Now, you understand, don't you, that this was an

2    FBI undercover operation, correct?

3        A    Yes, I knew that.

4        Q    Right.  And so, in other words, it had been

5    the FBI that had arranged this meeting at the hotel,

6    is that correct?

7                  MR. MURRAY:  Objection, that's a fact

8    not in evidence.

9                  THE COURT:  What's -- what are you

10   trying to --

11                 MR. FAYHEE:  I'm simply cross-

12   examining.  She said she interrupted a meeting.  I

13   think it's a very highly relevant fact that the FBI

14   had absolute control over the meeting that she's

15   interrupted.  It was set up for the purposes of this

16   arrest and I'm interested in the circumstances in

17   which Mr. Hovan was placed under arrest, and taken and

18   interviewed by Special Agent Fear.

19                 THE COURT:  All right, I'll allow that.

20                 MR. MURRAY:  Well, and I guess, Your

21   Honor, then I don't see its relevance as to why or who

22   set up this meeting, you know.  The facts of the --

23   you know, the facts of the agents coming in seems

24   relevant, but how it all came about and getting into

25   what was going on in the investigation behind it --

1              THE COURT:  Well, I don't think he's

2    going to do that.

3              MR. FAYHEE:  No, I had no interest in

4    it --

5              THE COURT:  I'm not going to allow you

6    do it, so --

7              MR. FAYHEE:  Fair enough, Your Honor.

8    I think it will sound familiar to you because it is

9    the same line of questioning I asked Special Agent

10   Jackson without objection.

11   BY MR. FAYHEE:

12      Q    So the question was, you had an

13   understanding at the time that you, quote,

14   "interrupted a meeting," that this was a meeting that

15   the FBI undercover platform had set up involving Mr.

16   Hovan?

17      A    No, I did not know that.

18      Q    Okay.

19      A    I was not a lead case agent, I don't know

20   the facts, but I do know that there were several

21   people there that we were going to arrest that day.

22      Q    Okay.  You knew the people were going to be

23   there for the purposes of the arrest?

24      A    I knew that was -- I knew that people were

25   going to be at that meeting and that that was where we

1   were going to execute the arrest.

2       Q   Okay.  Were there FBI agents in the room

3   acting in an undercover capacity at the time of the

4   arrest?

5       A   As I mentioned, I know this was an

6   undercover operation.

7       Q   Right, we've established that.  My question

8   is, were there FBI agents in the room acting in an

9   undercover capacity at the time of the arrest?

10      A   Yes, there were.

11      Q   Okay.  And then there were also defendants

12  or would be defendants who were charged in the case,

13  including Mr. Hovan?

14      A   Yes, that's correct.

15      Q   How many, if you can recall, persons were

16  arrested that day?  We can count Mr. Hovan, if you

17  like, as part of them, but how many were arrested?

18      A   I honestly don't remember.  It wasn't my

19  case.  I was given my -- you know, my task.  I don't

20  remember, I don't know.

21      Q   So you were briefed on that morning for the

22  purposes of ensuring the safety of the room, but you

23  don't know how many people would be arrested?

24      A   We were supposed to go in and make sure that

25  we maintained the security and safety of everyone.

1    Everyone was to be placed in handcuffs and then at

2    that point, for transport, my task was to transport

3    Mr. Hovan.

4         Q    Okay.  But you don't know how many people

5    were arrested that day?

6         A    I don't recall the specific number, I'm

7    sorry.

8         Q    Okay.  Do you know whether it was more than

9    five or less than five?

10        A    It might have been about four or five.  I

11   don't know, I'm sorry.

12        Q    And do you remember how many other people in

13   the room who were not arrested, how many other people?

14   So I can get a sense of how many people totally are in

15   the room?

16        A    I don't know, I don't remember.

17        Q    More than five, less than five?

18        A    I don't know.  I wasn't involved in the

19   specifics of their undercover operation.

20        Q    Okay.

21        A    I was helping out that day.

22        Q    Did you get a briefing -- given that we've

23   established it's an FBI undercover operation, did you

24   get a briefing of where people would be positioned

25   within the room prior to coming to effectuate the

1    arrest?

2         A    No, not that I recall.  I don't think we had

3    any of those specifics.

4         Q    Did you know whether the FBI agents who were

5    running the undercover would be in the room before the

6    defendants?

7         A    I'm not sure.  I don't remember how -- I

8    don't really know the specifics of how the meeting was

9    supposed to be set up.

10        Q    Okay.  And so when you ultimately came

11   through the door -- do you remember how many agents

12   effectuated the arrest?

13        A    I don't.

14        Q    Okay.  So you don't remember how many

15   defendants were there, you don't remember how many FBI

16   agents were in the room, correct?

17        A    Correct.

18        Q    Do you know whether there were any

19   confidential human sources in the room at the time of

20   the arrest?

21        A    I believe there was.

22        Q    Okay.  How many?

23        A    I don't know that I'm at liberty to speak

24   about that.

25        Q    I'm not asking you what the identity of the

1    confidential human source is, I'm asking whether there

2    were any in there and how many.

3              MR. MURRAY:  Objection, Your Honor.  I

4    don't see how any of this is relevant.  We're trying

5    not to get in the way of Mr. Fayhee's cross-

6    examination here, but this is --

7              THE COURT:  What are you trying to

8    show?

9              MR. FAYHEE:  Well, Your Honor, the

10   Agent has displayed a near-photographic memory of the

11   transcript of the interview, I'm simply asking her

12   questions about the arrest that she witnessed, that

13   she was there to provide security for --

14             THE COURT:  And she said she doesn't

15   remember.

16             MR. FAYHEE:  -- and she can't seem to

17   recall anything regarding it.  So I'm asking

18   additional questions to try to jog her memory.  And

19   now she's claiming that she can't answer whether there

20   was a confidential human source in the room, even

21   though she asked about him during the course of the

22   interview, because she says she's not at liberty to

23   testify whether one or wasn't.

24             THE COURT:  She knows --

25             MR. MURRAY:  This is a hearing --

1                     THE COURT:  Yes?

2                     MR. MURRAY:  -- Your Honor, this is a

3      hearing about the consent of -- at this interview.

4      The Agent has listened to the recording, has reviewed

5      the transcript, she's testified about those facts.

6      We've been -- not objected to Mr. Fayhee going into

7      this irrelevant area, but she does not recall at this

8      point these issues, you know, and now it's becoming

9      argumentative.

10                     THE COURT:  Well, it's all right for

11     him to -- I'll allow it, but make it short.

12                     MR. FAYHEE:  Thank you.

13     BY MR. FAYHEE:

14        Q    The question was whether or not there was a

15     confidential human source in the room at the time of

16     the arrest?

17                     THE COURT:  If you know.

18                     THE WITNESS:  I believe there was.

19     But, again, I was not the lead agent on the case, and

20     my task that day was to go in and help safely execute

21     the arrest of every individual in the room and then to

22     transport Mr. Hovan, which is what I did and I

23     remember doing that very well.

24     BY MR. FAYHEE:

25        Q    Was the confidential human source arrested

1    then?  If everyone in the room was being arrested, was

2    the confidential human source arrested at that time?

3         A    I believe everyone in the room was put into

4    handcuffs and in the room.

5         Q    Okay.  Now, at the time that you came in to

6    effectuate the arrest --

7         A    Uh-huh.

8         Q    -- I know pursuant to FBI policy and,

9    obviously, it makes sense you were armed, correct?

10        A    Yes.

11        Q    And every FBI agent there to effectuate the

12   arrest was armed?

13        A    That's correct.

14        Q    Do you remember whether you, you personally,

15   had your firearm drawn when coming in the room?

16        A    No, I did not have it out.

17        Q    Okay.  Do you remember if any other FBI

18   agent had their firearm drawn when they came in the

19   room?

20        A    I can't speak to everyone else.  I believe

21   the plan was not to.  So, you know, once we're in the

22   room, my focus is elsewhere, it's on making sure that

23   we secure every individual that's in the room safely.

24   So I can tell you that I did not have my weapon out.

25        Q    Okay, you can tell me that you didn't have

1    your weapon out and you said, as I hear it, your

2    understanding of the plan is that firearms would not

3    be drawn, correct?

4         A    That's -- I believe that was what the plan

5    was.

6         Q    Got it.

7         A    It may have been to have your hand on it in

8    case you need it, but, yes, in this circumstance and

9    going into an environment like this, the plan was to

10   go in and safely kind of secure everyone away from

11   each other.

12        Q    Okay, fair enough.  And had you -- because

13   you were assigned at least to transport Mr. Hovan and

14   to interview him, had you researched Mr. Hovan's past,

15   meaning his arrest history, background, education,

16   those sorts of things?

17        A    We were given some general information about

18   him.

19        Q    Okay.  And what was that general

20   information?

21        A    Information on criminal history, information

22   on what the investigation had shown was his

23   involvement at that point.

24        Q    Okay.  And do you have -- can you recall

25   sitting here today what his criminal history was?

1     A     I believe he didn't have any.

2     Q     That he had never been arrested?

3     A     I don't think so.

4     Q     Okay.  And you referenced, you can flip back

5  to it, if you'd like, I think it's already in

6  evidence, the LinkedIn page that was put up on the

7  screen here.  My recollection, it might be Exhibit

8  Number -- I'm losing numbers here --

9                THE COURT:  Well --

10               THE WITNESS:  4?

11               THE COURT:  -- we don't have any

12  objection to that.

13               MR. MURRAY:  It's Exhibit Number --

14               THE COURT:  Come on, move on.

15               MR. MURRAY:  -- it's Exhibit Number 4.

16               MR. FAYHEE:  Exhibit Number 4.

17  BY MR. FAYHEE:

18     Q     That document that was referenced, the

19  LinkedIn page at tab 4 -- excuse me, I shouldn't rely

20  on my memory -- was this a document that you had

21  reviewed prior to the arrest?

22     A     No, it was a document I've reviewed more

23  recently.

24     Q     Okay.  In preparation for your testimony

25  today?

1        A    That's correct.

2        Q    Okay.  And the facts that you reviewed in

3    preparation for your testimony today here, were those

4    generally known to you at that time?  For example,

5    that he was a college graduate and that he worked at

6    AT&T?

7        A    His employment was known to me.  I don't

8    think I specifically asked if he was a college

9    graduate, but it was very apparent in the interview

10   that he was well educated.

11       Q    Sure.  No, that's right.  And -- okay.

12       So Mr. Hovan is placed under arrest, we're moving

13   from the hotel, we're putting him in a car, as I

14   understand correctly, just to move things along, and

15   we're taking him over to the FBI for the purposes of

16   the interview, correct?

17       A    Yes.

18       Q    Now, at the time that Mr. Hovan is placed

19   under arrest, I understand handcuffs were placed on

20   him, is that correct?

21       A    Yes, that's right.

22       Q    Standard protocol?

23       A    Yes.

24       Q    He's then transported over to the FBI

25   building a couple of blocks away, correct?

1      A     Yes.

2      Q     And then brought into the FBI building, up

3  an elevator, and up into the interview room, correct?

4      A     Yes.

5      Q     From there, I understand there's an

6  interview room, two Special Agents and one analyst are

7  present, yourself --

8      A     Forensic accountant.

9      Q     Forensics accountant -- excuse me, forensic

10 accountant, Ms. Weber?

11     A     Uh-huh.

12     Q     Yourself and Special Agent Jackson, correct?

13     A     Yes, that's right.

14     Q     Now, I was hoping you might be able to just

15 give me a better understanding of the room.  You did a

16 good job on direct.  I didn't know it was pink inside,

17 but I understand there's some pink veneer in the room

18 or something?

19     A     No, it was just a neutral color --

20     Q     A neutral color.

21     A     -- I believe is what I said.

22     Q     Okay, okay.

23     A     It's not pink.

24     Q     Okay, good, that's good to hear.  A neutral

25 color, all right.  And then is the table square?

```
 1        A    The table is round.

 2        Q    It's round, okay.  And where are you sitting

 3   in comparison to Mr. Hovan?

 4        A    I'm sitting to Mr. Hovan's left.

 5        Q    Okay.

 6             THE COURT:  On his lap?

 7             THE WITNESS:  To his left.

 8             THE COURT:  Oh, okay.

 9             THE WITNESS:  I'm sorry.

10             THE COURT:  Okay.

11             MR. FAYHEE:  I'm glad you heard that

12   incorrectly, Your Honor.

13             THE COURT:  I just want to make sure I

14   heard her correctly.

15        (Laughter)

16             MR. MURRAY:  Thank you for clarifying.

17   BY MR. FAYHEE:

18        Q    You're sitting to Mr. Hovan's left --

19        A    Yes.

20        Q    -- and where is Special Agent Jackson

21   sitting?

22        A    He's sitting to Mr. Hovan's right.

23        Q    Okay.  And I suppose -- I don't know how

24   many chairs fit around this table.  Are there chairs

25   around the table?
```

1      A     Yes.

2      Q     How many?

3      A     Four.

4      Q     Okay, so four chairs.  You're sitting to his

5  -- Mr. Hovan's left, Special Agent Jackson is sitting

6  to his right, and is anyone sitting in the fourth

7  chair?

8      A     Yes, Forensic Accountant Megan Weber.

9      Q     All right, so all the chairs are full.  And

10 she's sitting then, I take it, across from him?

11     A     Yes, she's sitting to my left, to Agent

12 Jackson's right.

13     Q     Okay.  And is Mr. Hovan, once in the room,

14 is he restrained?

15     A     Yes, he had leg shackles on, but his hands

16 were free, he was un-handcuffed.

17     Q     Okay.  So do you recall when you took his

18 handcuffs off, was it -- it would have been in the

19 room or --

20     A     It was prior to the interview, once he was

21 in the room --

22     Q     Okay.

23     A     -- and it was very quick to get him up,

24 between the time that we got him up into the room and

25 started the interview.  So I imagine it was very

1    quickly.

2         Q    Okay.  And is the door open or locked?

3         A    So, typically, when we make an arrest, we

4    take someone to the main federal building in our

5    office over there where we have a true booking room

6    and that is a much more secure location.  This

7    location is just an interview room.  So Mr. Hovan, had

8    he not been restrained, if he had gotten past us, he

9    could have gone out that interview door, turned right,

10   gone down the elevators, and gone free.  There was no

11   security, there's no front desk, there's nothing to

12   ensure that he doesn't leave.

13        Q    And that's why you had leg irons on?

14        A    Yes, that's right.

15        Q    And are leg irons required in every instance

16   for persons taken in those rooms for the purposes of

17   doing an interview?

18        A    So we just take all factors into account and

19   always make sure that safety first, and whatever makes

20   sense.  For other people, handcuffs may have stayed

21   on.  In the actual booking rooms, there's an oval

22   where you can connect a handcuff.  So in those cases

23   we might leave one handcuff on and take the leg

24   shackles off.  We just do something to try and ensure

25   he's as comfortable as he can be while still

1    maintaining our safety and restricting his movement.

2        Q    And so you mentioned there's an oval, that's

3    like a device to connect one hand with a handcuff to

4    that device so the hand can't move freely --

5        A    But that's not in this room.

6        Q    There wasn't one in this room, but -- okay,

7    gotcha, understood.  And it wasn't made use of in this

8    interview?

9        A    Correct.

10       Q    In other words, with Mr. Hovan, his hands

11   were free?

12       A    There was not one in this room.

13       Q    Got it.

14       A    This room was just a normal round table.

15       Q    And I was just curious, you know, having now

16   seen the LinkedIn page, as you see it, and the

17   research you did and the fact that he had no criminal

18   history, no arrests or otherwise, I was wondering what

19   set of circumstances were relied upon to place him in

20   leg irons?

21       A    Just, again, we were ensuring agent safety

22   and that we needed to ensure that we could restrict

23   his movements.  Obviously, Mr. Hovan is a larger guy,

24   he is larger than me.  You know, we always need to

25   take various factors into account and the biggest one

1    is that we were in an interview room that was

2    unsecured, that he could leave the room and get out

3    and get down the elevators.  So we made sure that the

4    leg shackles were comfortable and weren't bothering

5    him.

6        Q    So it was a concern -- I just wanted to get

7    this straight, is there a flight risk concern, a

8    safety concern, both?

9        A    Both, just --

10       Q    Okay.

11       A    -- yes.

12       Q    Okay.  And he could run out the FBI and have

13   time to get in an elevator, push the button, wait for

14   the elevators to open, get in and then go downstairs,

15   and that's why leg irons were required?  I'm having

16   trouble following here.

17       A    I mean, again, we always have to ensure the

18   safety of everyone.  Mr. Hovan is under arrest, he is

19   not free to leave at that point, we do need to make

20   sure that he's restricted in a way that he's still

21   comfortable, but he is under arrest at that point.

22   So, to ensure agent safety, to ensure that he does not

23   flee, yes, the decision was made to leave his hands

24   free and make him more comfortable in that way, but

25   leave the leg shackles on to restrict his movement and

1    ensure safety.

2        Q    Okay.  And who made that decision to wear

3    the leg irons?

4        A    Agent Jackson and I sort of made it

5    together.

6        Q    Okay.  Was that prior to his arrest or after

7    his arrest?

8        A    It was sort of as we got in the room, saw

9    the circumstances, saw his demeanor.  You know, if he

10   had not been so calm and cooperative, if he had been

11   more elevated, upset, irate, then we would have had to

12   take that into account as well, but his demeanor

13   played a large role in the fact that we did un-

14   handcuff him.

15       Q    And so his calm demeanor led to the choice

16   to put leg irons on him during the course of the

17   interview?

18       A    No, he had the leg irons on during

19   transport.

20       Q    Okay.

21       A    The choice to un-handcuff him was because of

22   his calm, cooperative demeanor.

23       Q    Got it.  Okay, very well.

24            THE COURT:  How much longer are you

25   going to be?

```
 1                    MR. FAYHEE:  Just I'm going to go to

 2      the transcript and talk through a couple of points.  I

 3      anticipate --

 4                    THE COURT:  Because we -- I mean, we've

 5      been going on about two and a half hours.  Nobody -- I

 6      took some lunch, but I don't know about anybody else.

 7      Are you starved?  Okay, why don't we take 15 minutes,

 8      you have to have -- because I would like to be able to

 9      finish up today, I don't want to have to go further.

10                    MR. MURRAY:  Yes, Your Honor.  And I'm

11      just wondering, I'm trying to look at our team and to

12      see whether or not -- if the Court would like to take

13      a break, we'd be fine.  I'm not sure 15 minutes will

14      give anybody an opportunity to eat --

15                    THE COURT:  Twenty minutes?

16                    MR. MURRAY:  Or we could go straight

17      through, if --

18                    THE COURT:  Well, that's up to you.

19                    MR. FAYHEE:  And I'm absolutely happy

20      to go straight through, I don't want to speak -- but

21      my guess is that they're okay too.

22                    THE COURT:  All right, go on.

23                    MR. FAYHEE:  Okay.

24                    MR. MURRAY:  We appreciate the

25      indulgence, but thank you, Your Honor.
```

1            MR. FAYHEE:  And, again, I'll keep my

2    promise to be swift here as best I can.

3    BY MR. FAYHEE:

4        Q    All right, so moving on to the course of the

5    interview.  So you're going to have that set of

6    documents before you there and if you wouldn't mind

7    flipping to Exhibit 1, you'll see there and you might

8    recognize a transcript of the audio recording of Mr.

9    Hovan's interview.  Do you see that?

10       A    Yes, I do.

11       Q    Okay.  Now, in particular, Special Agent

12   Fear, I want to draw your attention for the Judge's

13   benefit here, I'm looking at -- and for everybody's

14   benefit -- I'm looking at page 2, all right?

15           THE COURT:   This is 1-B?

16   BY MR. FAYHEE:

17       Q    This is 1-B, page 2 of the transcript, and

18   in particular I'm referencing line 29.  Do you see

19   that?

20       A    Yes.

21       Q    Now, at this point, the initial next to it,

22   you recognize that as Special Agent Jackson's

23   initials, correct?

24       A    Yes, that's right.

25       Q    And he says, as recorded in the transcript,

1    "This down 12:20" -- I take it he's referring to the

2    time --

3        A    Uh-huh.

4        Q    -- that he's sitting here, and it says, "All

5    right, all right.  Let me scoot here and read these to

6    you, okay?  So this is your advice-of-rights form.

7    Okay."  Do you remember that?

8        A    Yes, I do

9        Q    Okay.  And what's he describing there, what

10   did you witness at that time?

11       A    At that point, Agent Jackson has the FD-395

12   advice-of-rights form out and he is scooting a little

13   bit closer to Mr. Hovan, so that he can see it and

14   they can go through the form together to ensure that

15   Mr. Hovan understood his rights.

16       Q    And he didn't have to scoot very far because

17   he was sitting just beside him, right?

18       A    It's a small table, so --

19       Q    It's a small table.

20       A    -- he didn't have to scoot very far.

21       Q    Okay, okay.  And so he scoots next to him

22   and that way they can read the form together?

23       A    Yes, that's right.

24       Q    Because on this particular form, it's FBI

25   policy, it's required to read each and every one of

1    the Miranda rights from the form, correct?

2         A    All that's required is to go over the form

3    and ensure that the person that you have under arrest

4    or that you're reading the rights to understands the

5    form.  Whether you choose to read it or not, that's

6    not a requirement.

7         Q    So it's not a requirement for the agent to

8    orally recite the Miranda warnings that are depicted

9    here in the transcript?

10        A    No, I believe Agent Jackson just did that to

11   ensure that Mr. Hovan was following along and

12   understood his rights.

13        Q    Okay, okay.  And if you flip to what's tab

14   2, I believe -- yep, exactly -- tab 2 in that same

15   binder, you're going to find in fact that the FD-395

16   you reference is there before you, correct?

17        A    Yes.

18        Q    And in this instance, consistent with what

19   we see in the transcript, we see this advice of

20   rights, that's correct, depicted here in the form,

21   correct?

22        A    This is the advice of rights, yes.

23        Q    Yep.  And it's the same advice of rights

24   that was read to him, to Mr. Hovan, and captured in

25   this transcript?

1    A    Yes.

2    Q    And in each instance Mr. Hovan has initialed

3   each of these rights that are being orally presented

4   to him?

5    A    Yes.

6    Q    And the purpose of that is to demonstrate

7   that in fact they were provided to Mr. Hovan, correct?

8    A    Well, I believe, if you listen to the

9   recording or look at the transcript, Agent Jackson

10   read these to him and then asked him to initial next

11   to each one to ensure he understood it.

12    Q    Correct and that makes sense.  And then it's

13   signed, of course, in this instance by Agent Jackson

14   and then also by Mr. Hovan?

15    A    And by myself as well.

16    Q    And by yourself as a witness.  You're on the

17   second witness line, if I understand it correctly --

18    A    Yes.

19    Q    -- yes?  Okay, very well.

20        And this happens, as is set out in the

21   transcript, before any questions at all, correct?

22    A    Yes, any substantive questions about the

23   case, absolutely.

24    Q    And that's because it's important for the

25   witness who's being interviewed to fully and

1    completely understand their rights?

2         A    Yes.

3         Q    And to voluntarily -- knowingly and

4    voluntarily waive them if they wish to speak, correct?

5         A    Yes.  They need to understand their rights

6    and they can choose whether to speak with us now or to

7    wait and have a lawyer present.

8         Q    Exactly, exactly.  And that way they

9    understand their rights and then, if they choose to

10   waive them, you can start asking questions of them?

11        A    Yes, that's right.

12        Q    Got it, understood.  All right.  So I want

13   to fast forward a little bit in the course of the

14   interview and I want to get all the way to page 21

15   that's depicted there in the transcript.  Now, we have

16   the audio recording here, if it would be helpful, but

17   I'm just focused on time, I'd like to just use the

18   transcript, if I could.

19            Now, you testified earlier that Mr. Hovan

20   provided his verbal consent, that is verbal consent to

21   the search of his electronic devices -- we're speaking

22   of two phones, right, an iPhone and a Samsung phone --

23   you testified that he offered his verbal consent prior

24   to getting his written consent, correct?

25        A    Correct.

1      Q    Okay.  Now, I'm interested in particular,

2   Special Agent Fear -- and I know if we need to go back

3   or you need some time and context, I don't want to --

4   no surprises here -- I'm looking at line 23.  I think

5   you testified about this on direct examination.  You

6   say, "Is there anything else we haven't asked you

7   about that would be helpful for us to know about the

8   deal or these people," correct?

9      A    Uh-huh.

10     Q    Okay.  Mr. Hovan provides a response and

11  then comes down a little bit further.  Now we're all

12  the way to the bottom of page 21, okay?  There's --

13     A    Yes.

14     Q    -- there's a paragraph that starts at line

15  40 where Mr. Hovan starts out.  He says, "I'm not

16  going to lie and try," did you hear that?

17     A    Yes.

18     Q    Okay.  So same paragraph, down to the very

19  bottom of the page, Mr. Hovan makes a reference, it

20  says, "Like having a look at WhatsApp conversations

21  and things like that" --

22              MR. MURRAY:  Objection again.  I'm

23  sorry to do this, but I think it is relevant, the

24  transcript says, "Like have at looking at WhatsApp

25  messages" --

1                MR. FAYHEE:  No problem, Your Honor,

2    I'll read the whole thing.  I was just trying to move

3    things along.  I'll start over.

4    BY MR. FAYHEE:

5        Q    "And, like I said, like have at looking at

6    WhatsApp conversations and things like that, they're

7    fair game to you."  Okay?  And then he says, I mean,

8    you're going to look at them anyway probably, but I'll

9    point you to the ones, I'll point you to every single

10   conversation I've ever had."  Do you see that?

11       A    I do.  There's a couple points where you

12   didn't read it verbatim, but yes.

13       Q    I tried my best.  It's been a long day.

14       A    Sure.

15       Q    My question is, before that -- before that

16   recorded conversation, we'll rely on the recording, to

17   your mind, had Mr. Hovan consented, verbally consented

18   to the search of his phones before, after, or does

19   this reflect his consent?

20       A    As you can see even in his words, he said,

21   "And, like I said, like have at looking at WhatsApp

22   conversations."  So, multiple times earlier in the

23   interview, he had already referenced that we could

24   read through the WhatsApp conversations.  And so he's

25   referring back to that, sort of I already said you

1    could have at looking through WhatsApp conversations

2    and things like that.  I know WhatsApp is a free

3    messenger that you download to your phone that allows

4    you to send and receive things like text messages.

5         So at that point he is offering verbal

6    consent for us to look at the WhatsApp conversations

7    "and things like that," meaning other communications

8    similar.

9    Q    I see.  And so I'm just looking for a time

10   frame here.  So do you believe, sitting here today,

11   that Mr. Hovan had verbally consented before this

12   paragraph depicted at the bottom of the page after,

13   during, or all three?

14   A    So I think it's one of the situations where

15   he had from the start been very eager to cooperate and

16   had offered repeatedly to help us in any way that he

17   could.  There were other earlier references to you can

18   look through my WhatsApp, which was a form of consent.

19   I would have followed up on that more clearly, but it

20   was verbal consent.  He was offering for us to look

21   through his WhatsApp conversations.  At this point,

22   unprompted, I had just asked an open-ended, rather

23   generic question that he then led to "have at looking

24   at WhatsApp conversations and things like that."  To

25   me, at that point he is then saying, yes, you can look

1   at WhatsApp conversations and things like that.

2        Q    And so -- now, you think he has consent at

3   least in the course of this, if I understand your

4   testimony correctly, because he says, "I mean, you're

5   going to look at them anyway probably, but I'll point

6   you to the ones, I'll point you to every single

7   conversation I ever had."  You don't respond, but Mr.

8   -- excuse me, Special Agent Jackson does, "Right."

9             So notwithstanding the statement, "I mean,

10  you're going to look at them anyway probably, but I'll

11  point you to the ones," by that point you have verbal

12  consent to search the phone?

13       A    With the continuation of that sentence, but,

14  you know, in doing our due diligence, we of course

15  followed up with written consent.

16       Q    Yep, we're going to get to that, but I'm

17  really interested because it's -- I heard it quite a

18  few times that you had verbal consent, so I was just

19  confused by the statement Mr. Hovan made, "I mean,

20  you're going to look at them anyway probably," if you

21  had verbal consent.

22       A    So, if you look at that entire statement,

23  Mr. Hovan is giving us verbal consent to look through

24  the WhatsApp communication -- conversations and things

25  like that on his phone.  He is clearly saying "have

1    at," meaning go ahead and look at these

2    communications.  And then not only that, but he goes

3    to the next level and says I'll point you to every

4    single conversation that I've ever had.  So, yes, he's

5    consenting verbally.

6        Q    So -- just to make sure I have it crystal

7    clear -- so Mr. Hovan, in offering to voluntarily in

8    the course of the interview walk you through WhatsApp

9    conversations -- and then I see the focus on this word

10    -- "And, like I said, like looking at" -- "and things

11    like that" -- that you had verbal consent not just to

12    look at the WhatsApp messages in the course of the

13    interview, but to search the phones?

14        A    I mean, in general, this entire interview I

15    feel like needs to be looked at in totality, because

16    he then later does go on to verbally say feel free to

17    look through everything.  So it's all kind of taken

18    together, but at that point I know that we have verbal

19    consent to look through his phones at these specific

20    types of communications.

21        Q    Sure, okay.  So page 21, we're here.  Take

22    as much time as you need with these pages because I'm

23    interested in knowing at this time, if you can recall,

24    that is, this paragraph we're focused on at the bottom

25    of page 29 --

1        A    29?

2        Q    Excuse me, I'm sorry, 21.

3        A    Okay.

4        Q    Whether at that time Mr. Hovan had reviewed

5    the consent form that's located at your tab there at

6    tab 3.

7        A    No.  So we were following logically the

8    course of the interview.  So, again, this unprompted,

9    unsolicited offering by Mr. Hovan to look at his

10   WhatsApp chats came from my generic, open-ended

11   question.  So at that point we then follow up and

12   follow through the process to start confirming his

13   consent, which involved asking whether or not his

14   phones had passcodes, and then pulling out a consent-

15   to-search form and getting written consent, if he

16   chose to agree to it.

17       Q    Sure.  And you've just provided a very

18   decent summary.  If we look at page 22 here, if we're

19   at line 14, you say, "Yeah, uh, do your phones, do

20   they have passcodes?"

21       A    Uh-huh.

22       Q    Now, at that point, is the consent-of-search

23   form in front of Mr. Hovan or --

24       A    No, it's not --

25       Q    -- has he not --

1      A    -- yet.

2      Q    -- been provided -- okay, okay.

3      A    It's not yet.

4      Q    So, unlike in the Miranda context where you

5    hold back, where you give them their advice first,

6    here you ask the questions first and then give him the

7    form later?

8              MR. MURRAY:  Objection --

9              THE WITNESS:  No, I'm sorry --

10             MR. MURRAY:  -- it's a

11   mischaracterization.  That's -- at that point, ask

12   what questions?  The question was an open-ended

13   question and Mr. Hovan ended up volunteering it.

14             THE COURT:  You can argue that in your

15   final submission to me.  You can answer the question.

16   Overruled.

17             THE WITNESS:  Can you --

18   BY MR. FAYHEE:

19     Q    Sure.  The question is -- the question is,

20   in contrast to the Miranda warnings where you give the

21   warnings, you read them, they initial them, then you

22   ask questions, here the questions come first,

23   specifically do your phones, do they have passcodes,

24   and then you give him the form, isn't that correct?

25     A    No, that's not correct.  That's --

1        Q    Okay.

2        A    -- not how I would put it at all.  So what's

3    happening here is, again, we're following the course

4    of the logical interview.  So he has verbally offered

5    for us to look through the WhatsApp chats and things

6    like that and at this point, you know, we're talking

7    about phones.  And I didn't ask him for his passcodes

8    to get into it right there, I was just curious if his

9    phones had passcodes, sort of a -- just a continuation

10   of the conversation.  And then following that point,

11   before we got into the phones and were looking through

12   them, Agent Jackson does go through the consent-to-

13   search form, fill it out, and Mr. Hovan signs it,

14   confirming his verbal consent through the written

15   consent.

16       Q    Got it, okay.  So -- but it's true, isn't

17   it, that you were asking for the passcodes for the

18   purposes of allowing the FBI to search the phones?

19       A    At that point I wasn't asking for the

20   passcodes, I just asked if the phones had passcodes.

21       Q    So when you say "do they have passcodes,"

22   you were only interested in him saying yes and not

23   what the passcodes were?

24       A    Well, we were talking generally about

25   passcodes, I was just pointing out that at that point

1    I hadn't specifically asked him for them.

2         Q    I see.  And so in line 19 when you say, "Oh,

3    yeah, I mean, we're going to look at the phones

4    regardless and it's usually just easier," are you

5    still at that point, you know, moments later

6    interested only whether they have passcodes?

7         A    No, at that point we are starting to talk

8    about what the passcodes would be and starting to

9    understand, because he's indicated that his work phone

10   does have a passcode, so --

11        Q    And this is before, once again, there's an

12   advice of rights on the consent form in front of Mr.

13   Hovan?

14        A    It's not an advice of rights, it's a consent

15   to search, and we had not searched through the phones

16   or looked through the phones, we were just having a

17   general discussion about it.

18        Q    Sure.  Why don't I -- maybe it would be

19   easier just to make sure we're on the same page here,

20   why don't you take a look at the specific form that

21   Mr. Hovan was provided, which is at 3.  And in

22   particular, as you just said, it's not an advice of

23   rights form and, it's true, it's called a consent to

24   search, but I see this part, number 2, "I have been

25   advised of my right to refuse consent," do you see

1    that?

2          A    I do.

3          Q    Okay.  So when you're making the statement

4    that you're, quote, "going to look at the phones

5    regardless," is that the point at which he's advised

6    of his right to refuse consent?

7          A     No, not at all.  So when I say we're going

8    to look at both phones regardless, it's in the context

9    of just the general passcode conversation.  He's

10   indicated that his work phone does have a passcode,

11   but then follows up to say but there's nothing on it,

12   but you can still look at it.  So I'm trying to say,

13   yes, we would still want to look at that phone

14   regardless, meaning to check it out and just make sure

15   that there's nothing on it.  So that happens before

16   the -- we're still just explaining this to him, that

17   happens before the consent-to-search form is pulled

18   out.

19         Q    I see, I see.  Okay.  Going down here to

20   line 29, Special Agent Jackson --

21                    THE COURT:  What page?

22   BY MR. FAYHEE:

23         Q    -- here we see a first reference to a

24   consent form.  He says, "Okay, so what we're" --

25                    THE COURT:  What page are you on?

```
 1                    MR. FAYHEE:  Excuse me, Your Honor,
 2    still 22, same page, line 29.
 3                    THE COURT:  All right.
 4    BY MR. FAYHEE:
 5         Q    Once again, Special Agent Jackson states,
 6    "Okay, so what we're going to do is I'm going to have
 7    you, if you're good with this, with us looking through
 8    your phones, I'm going to have you sign a consent
 9    form."  Do you see that?
10         A    Yes.
11         Q    Okay.  Now, at this point, who is the form
12    in front of, Special Agent Jackson or Mr. Hovan?
13         A    Special Agent Jackson has it out.
14         Q    Right.  So it's still not in front of Mr.
15    Hovan, we're on the same page?
16         A    Agent Jackson is right next to Mr. Hovan.
17         Q    Because they're sitting right next to each
18    other, not across the table, but right next to one
19    another?
20         A    It's a small, round table, I mean, it's --
21         Q    Your sense, as best as you know, Mr. Hovan
22    can read it from where he's sitting?
23         A    Well, I know he can read it because, as
24    Agent Jackson started to fill it out, Mr. Hovan
25    corrected him because he saw that he was writing in
```

1   all capital letters for the "hova," and he said

2   lowercase and corrected Agent Jackson.  So I know he

3   could read it.

4        Q    Okay, okay.  And so in the course of filling

5   it out, as you've testified, Special Agent Jackson is

6   filling out the passcode, there's this back and forth

7   in the course of 23, but on this full page, to the

8   best of your knowledge as you review it today, the

9   form is still in front of Special Agent Jackson?

10       A    Agent Jackson is filling out the form.  But,

11  again, this is where I know Mr. Hovan is tracking and

12  following what Agent Jackson is doing because, as you

13  can see in lines 5 through I guess 11, Mr. Hovan says,

14  "Yeah, it's 0510 H-O-H," Agent Jackson says, "Hold on,

15  I'm sorry.  There's 1510."

16            Mr. Hovan says, "That's my birthday and then

17  H-O-V-A."  And then there's a pause and he says,

18  "Lowercase."  And if you were to look at the form,

19  that's the point at which Agent Jackson is writing

20  down, so he's writing 0510HOVA, in all capitals, and

21  Mr. Hovan is watching him and is clarifying it's

22  lowercase.

23       Q    Okay.  It's not a verbal clarification, it's

24  because they're sitting so close to one another he can

25  see the form itself and following along as he's

1    writing it?

2         A    Correct.

3         Q    I see.

4         A    You can hear that Agent Jackson isn't saying

5    is it uppercase or lowercase, Mr. Hovan sees it and

6    corrects him.

7         Q    Okay.  Okay, understood.  Now, if we go on

8    to page 24 -- again, I tried to move through, but --

9    without reciting it, but take as much time as you need

10   to get through it -- there's continued discussion

11   about passwords and the like.  Do you see that there?

12        A    Yes, I do.

13        Q    Okay.  But still in the course of this

14   conversation, as it continues on to page 25 and then

15   even on to page 26, only there, page 26 at -- to be

16   very specific, we're at line 12 -- well, really, line

17   -- just to be fair, line 6, we're sort of capturing

18   between lines 6 and 16.  Do you see that there?  Why

19   don't you take a minute?

20        (Pause)

21        A    Okay.

22        Q    Now, at that point, very clearly the form is

23   now in front of Mr. Hovan, correct?

24        A    Correct.

25        Q    Because he's applying his actual signature

1    to the form?

2         A    Yes.

3         Q    Yep.  And dating it as well, he's asking for

4    clarification about the date?

5         A    Yes.

6         Q    Okay.  And so Agent Jackson just slides the

7    form in front of him and for Mr. Hovan to finish

8    signing it?

9         A    So these pages that you just skipped over is

10   where Agent Jackson, this discussion of passwords is

11   so that he can write it down on here --

12        Q    Yep.

13        A    -- and then Mr. Hovan is so eager to help,

14   he's trying to take off the passcodes on his phone.

15        Q    Uh-huh.

16        A    And then Agent Jackson does show him the

17   form and Mr. Hovan signs the form.

18        Q    Correct, correct.  We're on the same page.

19   And so I don't see here on page 26 prior to the

20   signature that Special Agent Jackson read the form to

21   him.

22        A    That's correct, he didn't read this one to

23   him.

24        Q    He didn't read this one to him, nor did --

25   if you look back to Exhibit Number 3 -- nor did Mr.

1    Hovan initial the 2, 3, and 4 under the descriptions

2    of the phone?

3         A    That's right.

4         Q    Even though it says, "I have been advised of

5    my right to refuse consent"?

6         A    That's right.

7         Q    He wasn't verbally advised of his right to

8    refuse consent?

9         A    He was advised of that right on this form,

10   which he was reading and following along as Agent

11   Jackson was filling out.

12        Q    Well, he's confirming that he's been advised

13   of the -- if he's given the opportunity to read it,

14   that is -- confirming that he's been advised of his

15   right to refuse consent, but it wasn't read to him,

16   correct?

17                  MR. MURRAY:  Objection, argumentative.

18                  MR. FAYHEE:  Your Honor, I'll withdraw

19   it.  I think I made the point.

20                  THE COURT:  Okay.

21   BY MR. FAYHEE:

22        Q    Let me -- final series of questions.  On

23   direct examination, you discussed much later in the

24   transcript, after the written consent was signed,

25   there were references to a number of chats that Mr.

1    Hovan was showing you names and sharing phone numbers,

2    do you recall that?

3        A    Yes, I do.

4        Q    All right.  Now, there's a reference, I

5    believe that Mr. Murray in particular referenced the

6    bottom of page 26, 41, line 41, that begins with,

7    "Ravi, Nicky Fuchs, Swiss Specialists," et cetera.  Do

8    you see that?

9        A    Uh-huh.

10        Q    All right.  Now, do you recognize these

11   names that are offered here; Ravi, Nicky Fuchs, Swiss

12   Specialists?

13        A    From reviewing the transcript, it's

14   refreshed my memory that Ravi and Nicky Fuchs were

15   people that were allegedly involved in the conspiracy.

16        Q    Okay.  So you don't know that Ravi is in

17   fact the name, not the actual name, but the name of an

18   FBI undercover agent?

19        A    I don't know anything about the undercover

20   operatives.

21        Q    And you don't know that Ravi as the FBI

22   undercover agent actually set up these WhatsApp groups

23   on Mr. Hovan's phone?

24        A    Again, as I said, I don't know anything

25   about the undercover operatives or any aspects of the

1    investigation to that extent.

2         Q    Okay.  But you were interested in asking

3    questions about these WhatsApp -- these WhatsApp

4    conversations?

5         A    Oh, no, he had just mentioned multiple times

6    that he would point out all the relevant conversations

7    and the relevant people for us.  So at this point

8    we're just going through his phone together and he's

9    doing exactly what he had offered to do throughout,

10   which was pointing out this is this person, this group

11   is one that was related to this, that's all he's doing

12   at that point.

13        Q    And so he's doing at that point when you see

14   the reference to the, quote, "Swish -- Swiss

15   Specialist" at line 43?  You don't know, sitting here

16   today, that the Swiss Specialist was introduced to Mr.

17   Hovan by the FBI undercover?

18        A    I don't know anything about Swiss Specialist

19   other than what's captured on this recording.

20        Q    Got it.  Okay.

21             MR. FAYHEE:  One moment, Your Honor.

22        (Pause)

23             MR. FAYHEE:  All right, Your Honor, I

24   have no further questions.

25             THE COURT:  So is there any -- any --

1              MR. MURRAY:  No, Your Honor.  Thank

2     you.

3              THE COURT:  Okay, all right.  Healthy

4     appetite.

5        (Witness excused)

6              THE COURT:  I'm going to ask -- how

7     much time do you need to file a follow-up what you

8     think you've proven?

9              MR. MURRAY:  I think if we get to have

10    two weeks, Your Honor.

11             THE COURT:  Okay, that's fine --

12             MR. MURRAY:  And actually --

13             THE COURT:  -- because the trial is not

14    going to happen when we think it's going to happen.

15             MR. MURRAY:  And I'm checking.  I think

16    we need two weeks, Your Honor, but if the -- assuming

17    the trial is not happening, there's a family vacation

18    that I was hoping to take next week.  So if --

19             THE COURT:  Oh, no, no, no, no --

20             MR. MURRAY:  -- we could make it three

21    weeks.

22             THE COURT:  -- wait a second.  Lawyers

23    work too hard, you are going to -- look, I'm taking

24    judicial notice of that --

25        (Laughter)

1                    THE COURT:  -- you have a vacation,

2      that has to take precedence at this particular moment,

3      if it doesn't interfere with the rights of the

4      Defendant.  So when do you -- three weeks?

5                    MR. MURRAY:  Three weeks.

6                    THE COURT:  Is that all right with you?

7                    MR. FAYHEE:  It is, Your Honor -- it

8      probably is.  Can I just raise one quick question,

9      what's pending here on the trial date?  Obviously, I

10     absolutely understand there's not going to be a trial

11     on July 12th, which is when it's currently scheduled,

12     no problem at all.  There is, though, you might know,

13     a current pending motion to move the trial date from

14     July 6th to six months total.

15                    THE COURT:  Well, I will certainly

16     consider that, but that seems pretty far off.  I can't

17     tell -- but I will consider it.  I think that --

18     what's your position on that?

19                    MR. MURRAY:  The other defendants, I

20     know -- I don't believe that Mr. Hovan has agreed to

21     that motion yet and I'm not sure he's taken a position

22     on it -- perhaps I'm, you know, wrong about that, but

23     obviously Mr. Fayhee will do it -- the Government

24     doesn't object to the Defendant's request for that

25     time.

```
 1                    MR. FAYHEE:  And, Your Honor, the only

 2      point is this.  There was one party that did not

 3      consent to it and it was us.  We do think six months

 4      is too long and in particular, as stated in the motion

 5      -- again, the other defense counsel have to reflect

 6      exactly -- it's because they claim voluminous

 7      discovery and the like.  Obviously, the COVID issue

 8      has pushed the trial date out.  I'm sensible and

 9      reasonable about that, I get it.  Six months is way

10      too long.  As you've heard today, Mr. Hovan had a job,

11      he wants to get one again, he wants to rebuild his

12      career, his reputation, the sooner we can have this

13      trial, as soon as possible, within reason, is what we

14      want --

15                    THE COURT:  Well, why don't we have --

16                    MR. FAYHEE:  -- and we don't believe

17      that's 60 days -- we believe it's 60 to 90 days.

18                    THE COURT:  Does 90 days work for you?

19                    MR. MURRAY:  We can be ready either

20      way, Your Honor.

21                    THE COURT:  All right.

22                    MR. FAYHEE:  And so the only reason I

23      offer that, Your Honor, is if we're -- I'm just

24      building back time.  If we could get 90 days, that

25      would be great, and I just want to make sure we're
```

1    making the best use of that time.

2              THE COURT:  This is from -- 90 days

3    from July?

4              MR. FAYHEE:  That would be fine.

5              THE COURT:  So it's August, September,

6    October.  I don't know what my calendar looks like

7    now.

8              MR. FAYHEE:  Fair enough.

9              THE COURT:  Well, look, we'll call you.

10             MR. FAYHEE:  Okay.  I just wanted to

11   make that -- I just wanted to make that point and to

12   build that in.

13             THE COURT:  All right.  Well, we'll

14   call you if I have any question about it.

15             MR. MURRAY:  And my only concern is,

16   Your Honor, I just know that I'm attached by some of

17   your colleagues for trials in the second half of

18   October and the beginning of November, so --

19             THE COURT:  How long do you think this

20   trial is going to take?

21             MR. FAYHEE:  Ask the Government first.

22             MR. MURRAY:  Your Honor, I anticipate,

23   you know, there's a lot of transcripts in this case,

24   so I expect it will --

25             THE COURT:  I've already seen that.

1          (Laughter)

2                    MR. MURRAY:  Exactly, Your Honor.  I

3     thought today would go quicker and it didn't.  So I'm

4     trying to readjust my estimates.  I think it would

5     take at least a week and a half for the Government's

6     case.

7                    THE COURT:  All right, okay.  And then

8     --

9                    MR. FAYHEE:  And, Your Honor, we

10    anticipate a significant number of defense witnesses,

11    fact witnesses in this case, and we're going to come

12    back to you probably with some motions on this

13    because, as you know and as we've talked about in the

14    past, there's some confidential human sources --

15                   THE COURT:  And you have trials --

16                   MR. FAYHEE:  -- that are essential --

17                   THE COURT:  -- and you have trials --

18    you do?

19                   MR. MURRAY:  I do.

20                   THE COURT:  In October?

21                   MR. MURRAY:  I have trials in October

22    and November.

23                   THE COURT:  Well, you know what's

24    happening, I mean, we're all of a sudden --

25                   MR. MURRAY:  Yes.

1                    THE COURT:  -- we're all of a sudden,

2       you know, have two and a half years -- a year and a

3       half's trials all at once.  I'm going to have to call

4       you when I have my -- let's try and figure out when

5       we're going to get this thing decided.

6                    MR. MURRAY:  Yes.

7                    THE COURT:  And you can -- you want

8       three weeks, this is the -- so say it's -- July 1st,

9       7th, the 14th -- about the 21st of July.

10                   MR. MURRAY:  Okay.  Very good, Your

11      Honor.

12                   THE COURT:  And you need two weeks to

13      respond?

14                   MR. FAYHEE:  If you'd like to set it up

15      that way.  I'm sorry, I had understood them to be

16      joint submissions, but if you prefer that we do it in

17      that --

18                   THE COURT:  Well, he has to tell you

19      what he's going to do and you have to criticize it.

20                   MR. FAYHEE:  I prefer it that way

21      strongly.

22          (Laughter)

23                   MR. FAYHEE:  Yeah, that'd be fine, two

24      weeks would be fine.

25                   THE COURT:  Okay.  All right, that's

1    fine.  And we'll see what we can do, we'll see what we

2    can do and, if I have any questions, I'll just get you

3    on the phone.

4                    MR. MURRAY:  Great.

5                    MR. FAYHEE:  That would be just fine.

6                    THE COURT:  I think I did that once

7    before.

8                    MR. MURRAY:  Thank you, Your Honor.

9                    THE COURT:  Okay?

10                   MR. FAYHEE:  Thank you very much.

11                   THE COURT:  You're very welcome.  Thank

12   you.

13                   (Proceeding is adjourned)

14                        * * * * *

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3              We, Lisa Beck and Tracey Williams, certify

4       that the foregoing is a correct transcript from the

5       official electronic sound recording of the proceedings

6       in the above-entitled matter.

7

8       _____

9       Lisa Beck

10

11

12      _____

13      Tracey Williams

14

15

16      Dated:  July 7, 2021

17

18

19

20

21

22

23

24

25