IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | No. 2020-254-1 |
| NICHOLAS HOVAN | : | |

**August 24th, 2021**                                                                 **Anita B. Brody, J.**

### MEMORANDUM

This prosecution arises out of an alleged scheme by Nicholas Hovan ("Hovan") and his co-conspirators to purchase and sell Iranian oil in violation of U.S. sanctions against Iran under the International Emergency Economic Powers Act ("IEEPA"). Hovan is charged with conspiracy under 18 U.S.C. § 371; engaging and attempting to engage in transactions prohibited by IEEPA under 50 U.S.C. §§ 1701-1707; money laundering conspiracy under 18 U.S.C. § 1956(h); and aiding and abetting under 18 U.S.C. § 2.

Before me is Hovan's motion to suppress the evidence obtained from his personal and work phones.[1] Def. Hovan's Mot. to Suppress Search Warrant & for *Franks* Hr'g, ECF No. 141. Hovan argues that he did not voluntarily consent to the search of his personal and work phones.

The Government bears the burden of proving, by a preponderance of the evidence, that Hovan's consent was voluntary. *United States v. Sebetich*, 776 F.2d 412, 424 (3d Cir. 1985) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

---

[1] Hovan's motion also seeks to suppress evidence obtained from his tablet and laptop. The Government represents that, at this time, it does not intend to introduce evidence from the tablet or laptop. Hr'g Tr. 182:21-183:2. As such, I will only address suppression of the evidence obtained from Hovan's personal and work phones.

On Tuesday, June 29, 2021, I conducted a suppression hearing on whether Hovan voluntarily consented to the search of his phones. Based on the following factual findings and legal conclusions, I will deny Hovan's motion to suppress the evidence found on his personal and work phones.

## I.     Findings of Fact[2]

At the hearing on June 29, 2021, the Government presented two witnesses: FBI Special Agent Jessica Fear ("SA Fear") and FBI Special Agent Christopher Jackson ("SA Jackson"). I considered the quality of each witness's knowledge, understanding, and memory of the events in question; observed each witness's appearance, behavior, and demeanor while testifying; contemplated the interests of each witness in the outcome of this motion; and evaluated each witness's testimony for consistency with the other evidence in this case. After considering all the factors that bear on a witness's credibility, I find that SA Fear and SA Jackson provided credible testimony.[3]

Upon consideration of the testimony and other evidence presented at the hearing,[4] I make the following findings:

Hovan is a college-educated adult who has over a decade of work experience and has held multiple senior positions throughout his career. Ex. 4.

---

[2] I use ECF page numbers throughout to avoid confusion.

[3] I note minor differences between SA Fear and SA Jackson's testimony, but these differences are immaterial and do not alter the ultimate conclusions in this case. For example, SA Fear testified that she and SA Jackson sat to each side of Hovan at the round table while interviewing Hovan, while SA Jackson testified that he and SA Fear sat across the round table from Hovan.

[4] Consistent with the agreement of parties at the June 23, 2021, telephone conference, I reviewed the audio recording and transcript of Hovan's post-arrest interview prior to the suppression hearing. June 23, 2021, Telephone Conference 5:27-8:58.

Around 11:55 A.M. on February 10, 2020, SA Fear, SA Jackson, and other FBI agents interrupted a meeting at the Hotel Monaco in Philadelphia. Hr'g Tr. 26:15-27:11, 209:4-209:15. SA Jackson arrested Hovan, placed him in handcuffs, and retrieved two phones from his person: a Samsung Galaxy Note 9 personal phone and an Apple iPhone X work phone. *Id.* at 27:9-27, 116:4-116:6; Ex. 1B, at 23:38-24:39 ("Interview Tr.").

Around 12:05 A.M., SA Fear and SA Jackson transported Hovan in an FBI vehicle to an interview room in the Philadelphia FBI Field Office that was about five to ten minutes away. Hr'g Tr. 27:23-28:8, 210:21-211:6. The interview room was approximately 12 feet by 10 feet in size, well-lit, painted in neutral colors, and kept at a comfortable temperature. *Id.* at 29:25-30:8, 212:20-212:25. There was a round table in the room. *Id.* at 30:9-30:12, 212:20-212:23. Hovan was seated at the round table with SA Fear, SA Jackson, and Forensic Accountant Megan Weber. *Id.* at 30:13-30:19, 213:4-213:15. SA Fear and SA Jackson removed Hovan's handcuffs but restrained his legs with leg shackles for safety reasons. *Id.* at 31:3-31:22, 268:13-272:1. Hovan was provided with the opportunity to drink some water. *Id.* at 30:25-31:2.

At approximately 12:19 P.M., SA Fear, SA Jackson, and Forensic Accountant Weber began to interview Hovan in the FBI interview room. Hr'g Tr. 29:19-29:24, 212:11-212:13; Interview Tr. 3:3-3:6.

At 12:20 P.M., SA Jackson read Hovan his *Miranda* rights. Hr'g Tr. 34:7-34:12, 214:18-214:25; Interview Tr. 3:29-3:40. After being read his *Miranda* rights Hovan stated,

> Um I'm honestly like, I'd rather do this faster, I don't really need a lawyer cause I don't really. . . I'll tell you everything I know . . . .Yeah I know, no, I know I'm just saying- . . . -like I have the right to a lawyer, but I'm just saying, I know what I know and I can tell you everything I don't, and I'm confident with telling the truth on this.

3

Interview Tr. 3:4-3:14. Hovan then initialed and signed an advice of rights form stating that he understood his *Miranda* rights. Hr'g Tr. 35:11-36:5; Ex. 2.

Five minutes into the interview, in response to SA Jackson's request that Hovan "walk [them] through why he [thought he was]" at the FBI office, Hovan stated: "I've been on WhatsApp chats to catch up, but my whole role in this was just connecting th[e] two parties." Interview Tr. 4:16-4:18, 5:24-5:25; Ex. 1A 2:34-2:45, 5:35-5:54 ("Interview Recording"). WhatsApp is "like a text messenger service that [people] utilize primarily through [their] phone and it's encrypted on both ends." Hr'g Tr. 51:15-19, 281:2-281:4. As such, WhatsApp chats are normally located on phones. *Id.* at 54:12-54:16.

Seven minutes into the interview, SA Jackson asked Hovan whether he knew "who [another individual] may have worked for." Interview Tr. 6:19; Interview Recording 7:41-7:49. Hovan stated:

> Oh, I have no idea, but when we were in that meeting she was, it was, it was a meeting where we were like, we don't want to be involved in this cause this is-, doesn't-, and then I don't know, maybe I just didn't feel like it was as dangerous as it was and I just, I wasn't really doing much. I mean, you can read through the WhatsApp chats and you can see my involvement. Like, I wasn't doing much. So like, I was like, let me just see it through, and I should've just cut it off . . . .

Interview Tr. 6:21-6:26; Interview Recording 7:49-8:12.

In response, eight minutes into the interview, SA Fear asked Hovan: "What was your understanding of what was happening? What were you connecting the parties to? Like explain it to us as if we didn't know." Interview Tr. 6:28-6:29; Interview Recording 8:14-8:19. While explaining his relationship to the other alleged participants in the deal, Hovan stated:

> Um, and I didn't, I, before I sent them down to visit them, I never really known them or had a conversation, and [an alleged co-conspirator] wasn't my friend or anything; I never really talked to him before then. I mean you can look through my history, you could see that, that is exactly when conversation started between any of them.

4

Interview Tr. 6:40-6:43; Interview Recording 8:49-9:04.

Ten minutes into the interview, SA Jackson asked whether Hovan knew the last name of another alleged participant in the deal, leading to the following exchange:

> Hovan: I don't.
>
> SA Jackson: Okay.
>
> Hovan: He's in my WhatsApp. I think it's [first name], maybe his last name is in there.
>
> SA Jackson: Okay.
>
> Hovan: I can show it to you.

Interview Tr. 8:3-8:13; Interview Recording 10:14-10:21.

Sixteen minutes into the interview, Hovan stated: "So, but I'll help you as much as I can in trying to find them [the other participants in the deal] . . . . Really like I'll be 100% cooperative for whatever you need." Interview Tr. 12:37-12:43; Interview Recording 16:12-16:20.

Eighteen minutes into the interview, SA Fear asked Hovan how he knew one of the other alleged participants in the deal, leading to the following exchange:

> Hovan: . . . . So I was like, I told him and I said there might be an opportunity for, um, for like, for oil, and then he was like, and then I was like, this is the guy's number, and they called and they talked. But like I never, I wasn't part of that conversation, it was a call that I wasn't on, um, and then they were just talking directly the whole time. It was never, I was just kind of like-, I made the introduction and then they started-, the two sides started talking directly about it and I'm on these like group chats
>
> SA Jackson/SA Fear: Mhm.
>
> Hovan: but like I, you can see, I don't contribute anything to them. Like I'm just-
>
> SA Jackson: That's the, that's the WhatsApp?

5

Hovan: Yeah and you can, you can take them, you can look at them. I don't really care cause, like, you can see the involvement. There's like three chats.

Interview Tr. 14:34-15:15; Interview Recording 18:05-18:59.

Twenty-seven minutes into the interview, the following exchange occurred:

SA Fear: Is there anything else that we haven't asked you about that would be helpful for us to know about this deal or these people?

Hovan: There like is-, like I've-, the I, I knew everybody, like I've kind of met everyone in that room by name, except for the one person next to the other investor. I never met him, um, before, but other than that, like I don't, I don't really know how much more I know that's-, like like I said I don't really know that much. You'll probably get a lot more information from other people in the room, but like I'll answer any question that I can answer or anything like that I that I can try and answer.

SA Jackson: Mhm.

Hovan: Like I said I gotta tell the truth, and I'm not gonna-

SA Fear: Yeah

Hovan: I'm not gonna lie to try and help my case out any, um but I- all I can do is tell you the truth and my involvement, and and what I know from involvement of other people. And like I said, like, have at looking at WhatsApp conversations and things like that because I-, they're, they're fair game for you, I mean you're gonna look at them anyway probably, but I'll point you to the ones-, I'll point you to every single conversation I've ever had.

SA Jackson: Right.

Hovan: Um, because I personally, like I don't think anything really hurts my case cause like I-, it's-, like I said, it's, I pointed two parties together.

SA Fear: Okay.

Hovan: And uh I just, I should've just backed out when I first got the call to be involved in something like this.

SA Fear: Yeah, um, do your phones, do they have passcodes?

Hovan: Um, my iPhone does, but that's my work phone. There is nothing on there. I mean you can look at it, but there is nothing on there.

> SA Fear: Okay, yeah, I mean were gonna look at both phones regardless and its usually just easier—
>
> Hovan: Yeah I, I don-, I actually don't know how to use iPhones well, like if I can just open it with my face and you can, you can turn off the passcode if you want.
>
> SA Jackson: Yeah, so-
>
> Hovan: There's no passcode on this one.
>
> SA Jackson: Okay, so what we're gonna do is I'm gonna have you, if your [sic] good with this, with us looking through your phones, I'm gonna have you sign a consent form.
>
> Hovan: Okay.
>
> SA Jackson: Okay?
>
> Hovan: Yeah.

Interview Tr. 22:23-23:36; Interview Recording 27:50-29:32.

Around twenty-nine minutes into the interview, SA Jackson began filling out the portion of FBI consent to search form that described the items to be searched. Hr'g Tr. 85:15-86:21, 232:15-232:25; Interview Tr. 23:38-24:39; Interview Recording 29:32-30:20. Hovan watched SA Jackson fill out the form and corrected SA Jackson when SA Jackson incorrectly wrote the password to one of Hovan's phones. Hr'g Tr. 85:15-86:21, 221:18-22123, 232:15-233:7; Interview Tr. 25:38-25:37; Interview Recording 29:32-30:20.

After assisting the special agents with the passwords to his phones, Hovan stated: "And do you want me to-, I can show you, I can point you to all the WhatsApp conversations that are prevalent to you. I can save you time." Interview Tr. 23:38-25:19; Interview Recording 29:33-30:44. SA Fear responded: "Sure that'd be helpful." Interview Tr. 25:21. Hovan replied: "And

you can look. Feel free, feel free to look through everything, but I'll show you the more important ones." *Id.* at 25:23-25:24.

Around thirty-two minutes into the interview, Hovan reviewed and signed an FBI consent to search form. Hr'g Tr. 39:3-39:24, 203:15-204:20, 221:10-221:17, 240:25-241:9; Interview Tr. 27:6-27:16; Interview Recording 32:35-32:55. The form stated:

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:
   (Describe the person(s), place(s), or thing(s) to be searched.)

       Iphone X    [password] (work)
       Samsung    no password

2. I have been advised of my right to refuse consent.
3. I give this permission voluntarily.
4. I authorize these agents to take any items which they determine may be related to their investigation.

Ex. 3.

After he signed the consent form, Hovan showed SA Fear specific WhatsApp chats in his phone. Hr'g Tr. 241:15-241:21, 244:18-245:6; Interview Tr. 27:31-29:7.

The entire interview lasted approximately fifty minutes. Hr'g Tr. 96:8-96:10, 214:16-214:17; *see* Interview Tr. 3:3-3:4, 36:31 (interview starting at 12:19 PM and ending at 1:10 PM). The tone throughout the interview was polite and conversational, and the agents did not yell, brandish their weapons, or use force. Hr'g Tr. 41:6-41:22, 96:11-97:3; *see generally* Interview Recording. Hovan appeared cooperative, calm, lucid, and responsive throughout the interview. *E.g.*, Hr'g Tr. 33:20-34:6, 37:1-37:8, 47:10-47:14, 61:1-61:19, 73:8-73:11, 76:22-77:1, 216:22-217:18; *see generally* Interview Recording. At points during the interview, Hovan joked with the agents and laughed. Hr'g Tr. 41:6-41:11, 67:11-67:18; Interview Tr. 14:14-14:21, 24:41-25:4.

    **II.**    **Conclusions of Law**

Hovan contends that he did not voluntarily consent to the search of his phones because he was not verbally informed that he could refuse consent, he was in custody and restrained, and he believed the FBI agents would search his phones regardless of whether he consented.

"It is well settled that the government may undertake a search . . . if an individual consents to the search, and any evidence discovered during such a search may be seized and admitted at trial." *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994). Whether consent was voluntarily given is determined from the totality of the circumstances. *Id.* Factors that bear on consent include, but are not limited to: (1) "the age, education, and intelligence of the subject"; (2) "whether the subject was advised of his or her constitutional rights"; (3) "the length of the encounter [and] the repetition or duration of the questioning"; (4) "the use of physical punishment"; (5) "the setting in which the consent was obtained"; and (6) "the parties' verbal and non-verbal actions." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009).

I will discuss each factor in turn.

### 1. *Hovan's age, education, and intelligence*

The first factor—the "age, education, and intelligence of the subject"—weighs in favor of voluntariness. Hovan is a college-educated adult who has a decade of work experience and has held multiple senior positions throughout his career. Ex. 4; *see, e.g.*, *United States v. Vaghari*, 653 F. Supp. 2d 537, 545 (E.D. Pa. 2009) (first factor weighed in favor of voluntariness when defendant was adult, attended some college, and ran his own company), *aff'd*, 500 F. App'x 139 (3d Cir. 2012). As such, the first factor weighs in favor of voluntariness.

### 2. *Whether Hovan was advised of his constitutional rights*

The second factor—"whether the subject was advised of his or her constitutional rights"—weighs in favor of voluntariness. Hovan was advised of his *Miranda* rights at the outset of the interview. Hr'g Tr. 34:7-34:12, 214:18-214:25; Interview Tr. 3:29-3:40.

Hovan contends, however, that his consent was involuntary because the special agents did not sufficiently advise him of his right to refuse consent. This argument is unavailing. Though Hovan was not verbally advised of his right to refuse consent, he reviewed and signed a written consent form that stated, "I have been advised of my right to refuse consent."[5] Hr'g Tr. 39:3-39:24, 203:15-204:20, 221:10-221:17, 240:25-241:9; Interview Tr. 27:6-27:16; Interview Recording 32:35-32:55; Ex. 3. This statement on the consent form sufficiently advised Hovan of his right to refuse consent. *See, e.g.*, *United States v. Hynson*, 451 F. App'x 91, 95 (3d Cir. 2011) (second factor weighed in favor of voluntariness when defendant "signed the consent form which expressly notified her of the right to refuse consent"); *United States v. Ramirez*, 115 F. Supp. 2d 401, 410 (S.D.N.Y. Sept. 21, 2000) (consent was valid where "the officers failed to articulate to [the defendant] her right to refuse consent," but "this right was clearly presented to her on the consent form that she read and signed"); *United States v. Ramsey*, No. 19-268, 2020 WL 2220312, at *3 (E.D. Pa. May 6, 2020) (defendant was "on notice of his right to refuse" consent

---

[5] Even if Hovan had not been advised of his right to refuse consent, this fact alone would not vitiate Hovan's consent. The Third Circuit has made clear that

> "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." Nor is the government required to advise the defendant of his right to refuse consent before eliciting his consent.

*Kim*, 27 F.3d at 955 (quoting *Schneckloth*, 412 U.S. at 227); *accord United States v. Brown*, 563 F.3d 410, 416 (9th Cir. 2009) ("Although Agent Watson admittedly did not notify Rishel that she had a right not to consent to search, this factor is not an absolute requirement for a finding of voluntariness and also seems inapposite given that Rishel volunteered consent without any prompting whatsoever." (internal citation omitted)).

10

because the "consent to search forms included the following straightforward statement: 'I have been advised of my right to refuse to consent to this search. . . .'").

Thus, Hovan was advised of his rights—including his right to refuse consent—and the second factor weighs in favor of voluntariness.

### 3. *The length of the encounter and repetition or duration of the questioning*

The third factor—"the length of the encounter [and] the repetition or duration of the questioning"—weighs in favor of voluntariness. The special agents asked to search Hovan's phones twenty-nine minutes into the interview, and Hovan signed the consent form approximately thirty-two minutes into the interview. Interview Tr. 22:29-22:36:16, 27:12-27:16; Interview Recording 29:25-29:32, 32:45-32:54. The entire interview lasted approximately fifty minutes. Hr'g Tr. 96:8-96:10, 214:16-214:17; *see* Interview Tr. 3:3-3:4, 36:31 (interview starting at 12:19 PM and ending at 1:10 PM); *see, e.g.*, *Vaghari*, 653 F. Supp. 2d at 545 (third factor weighed in favor of voluntariness when the encounter lasted "approximately thirty minutes, a relatively short period of time"); *United States v. Mendoza*, 334 F. App'x 515, 518 (3d Cir. 2009) (affirming that the consent was voluntary when defendant had been "detained for approximately an hour and fifteen minutes by the time he signed the written consent"). Furthermore, the FBI agents did not repeatedly ask Hovan about his phones before Hovan provided his consent. As such, the third factor weighs in favor of voluntariness.

### 4. *The use of physical punishment*

The fourth factor—"the use of physical punishment"—weighs in favor of voluntariness. Hovan does not allege—and record does not suggest—that the special agents used force or physical intimidation.

### 5. *The setting in which the consent was obtained*

11

The fifth factor—"the setting in which the consent was obtained"—is neutral. Hovan argues that his consent was involuntary because he was in custody and restrained with leg shackles at the time of his consent. As an initial matter, "the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976). Furthermore, there is "no indication in this record that [Hovan] was . . . unable in the face of a custodial arrest to exercise a free choice." *Id.* at 424-25. Though Hovan was under arrest and restrained, there were only two agents and a forensic accountant present during the interview, the agents did not brandish their weapons or otherwise use force, and the tone of the interview was conversational. Hr'g Tr. 29:19-29:24, 41:6-41:22, 96:11-97:3, 212:11-212:13; Interview Tr. 3:3-3:6; *see, e.g.*, *United States v. Navedo-Colon*, 996 F.2d 1337, 1338 (1st Cir. 1993) (consent was voluntary when "appellant was simply questioned by one agent for less than an hour, after *Miranda* warnings, in an approximately eighty square foot room with an open door—albeit while appellant was sitting with one hand handcuffed to a chair"); *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) ("That [defendant] was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion."); *Mendoza*, 334 F. App'x at 518 (consent was voluntary though the defendant was handcuffed because the defendant "was not subjected to prolonged or repeated questioning and was treated in a professional and courteous manner by the officers involved in the stop"). As such, this factor is neutral.

### 6.  *The parties' verbal and non-verbal actions*

The sixth factor—"the parties' verbal and non-verbal actions"—weighs in favor of voluntariness. Hovan argues that his consent was involuntary because the agents made two allegedly misleading statements that caused Hovan to believe the agents would search his phones

regardless of his consent. "When evidence exists to show . . . —that a defendant believed he must consent—such evidence weighs heavily against a finding that consent was voluntarily given. And when that belief stems directly from misrepresentations by government agents, however innocently made, we deem the consent even more questionable." *Sebetich*, 776 F.2d at 424. Hovan's argument, however, fails for several reasons.

First, before the allegedly misleading statements, Hovan made several unprompted offers to show the agent the contents of his phones:

- Seven minutes into the interview, in response to a question regarding the names of people involved in the deal, Hovan stated: "I mean, *you can read through the WhatsApp chats* and you can see my involvement. Like, I wasn't doing much." Interview Tr. 6:24-6:25 (emphasis added); Interview Recording 7:49-8:12.

- Eight minutes into the interview, in response to a question regarding Hovan's "understanding of what was happening" in the oil deal, Hovan responded: "I never really talked to him before then. *I mean you can look through my history, you could see that, that is exactly when the conversation started between any of them.*" Interview Tr. 6:28-6:29, 6:41-6:43 (emphasis added); Interview Recording 8:49-9:04.

- Ten minutes into the interview, in response to a question about the last name of an individual Hovan mentioned, Hovan responded: "He's in my WhatsApp. I think it's [first name], maybe his last name is in there." Interview Tr. 8:3-8:9; Interview Recording 10:14-10:21. SA Jackson responded, "Okay." Interview Tr. 8:11. Hovan then replied, "*I can show it to you.*" *Id.* 8:13 (emphasis added).

- Eighteen minutes into the interview, in response to Hovan describing conversations between the participants in the deal, SA Jackson asked, "That's the, that's the

13

> WhatsApp?" Interview Tr. 15:10-15:12; Interview Recording 18:20-18:59. Hovan responded, "*Yeah and you can, you can take them, you can look at them.* I don't really care cause, like, *you can see the involvement*. There's like three chats." Interview Tr. 15:14-15:15 (emphasis added).

Hovan's unprompted offers to show the agents the contents of his phones before the allegedly misleading statements weighs in favor of voluntariness. *See, e.g.*, *United States v. Dion*, 859 F.3d 114, 129-30 (1st Cir. 2017) (consent voluntary when defendant made "multiple unsolicited offers" to let police search his vehicle, and the "repeated offer to search . . . , eventually, was accepted"); *United States v. Perez*, No. 09-233, 2010 WL 157501, at *4 (E.D. Pa. Jan. 15, 2010) (consent was voluntary when, defendant "volunteered, apparently on his own initiative, to offer his car up for a police search," "even if it was a perplexing or unwise act on his part").

Next, after the allegedly misleading statements, the agents' conduct clarified that Hovan could still refuse consent. The agents confirmed that Hovan was "good" with allowing the agents to search his phones, signaling that Hovan had a choice regarding consenting to the search. Interview Tr. 23:29-23:36; *see, e.g.*, *United States v. Peterson*, No. 3:18-CR-00049 (JCH), 2018 WL 6061571, at *12 (D. Conn. Nov. 20, 2018) (though a law enforcement official's "earlier statements suggested that [defendant] had no choice but to consent to a search," the consent was still voluntary because the official later "asked whether [defendant] was 'on board' to cooperate, signaling that the decision to consent or not still rested with [defendant]"). The agents also provided Hovan with a written consent form that informed him that he could refuse consent. Ex. 3; *see, e.g.*, *United States v. Warwick*, No. 16-CR-4572 MCA, 2017 WL 3822076, at *13 (D.N.M. Aug. 30, 2017) ("[T]he advisements on the consent-to-search form were sufficient to overcome any perceived coercive atmosphere or effect of the circumstances during the

encounter."), *aff'd*, 928 F.3d 939 (10th Cir. 2019); *United States v. Delano*, No. 3:07CR-00073, 2007 WL 3025089, at *4 (W.D. Ky. Oct. 15, 2007) ("The Consent Form clearly dispelled any belief by [defendant] that he had no choice but to permit the search of his computers. The form specifically notified [defendant] that he had the right to refuse to consent to the search.").

Finally, Hovan and the FBI agents' conduct throughout the entire interview confirms that Hovan's consent was a voluntary and informed choice. The agents were polite and conversational throughout the interview, and Hovan even joked with the agents. Hr'g Tr. 41:6-41:22, 67:11-67:18, 96:11-97:3; Interview Tr. 14:14-14:21, 24:41-25:4; *see Kim*, 27 F.3d at 955 (officer's "polite," "courteous and conversational" tone weighed in favor of voluntariness). Hovan repeatedly indicated his willingness to cooperate throughout the interview.[6] *Kim*, 27 F.3d at 955 (defendant's "cooperative[ness]" and lack of reluctance to allow the search weighed in favor of voluntariness). When the agents finally asked to search his phones, Hovan did not object the agents' request. Instead, he offered to help the agents access the phones, offered to show the agents the "more important" conversations, and walked SA Fear though the WhatsApp conversations. Hr'g Tr. 241:15-241:21, 244:18-245:6; Interview Tr. 23:38-25:24, 27:31-29:7; *see United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011) (factor weighed in favor of consent when defendant "assisted the officers in their search"); *Kim*, 27 F.3d at 955 (consent was

---

[6] For example, one minute into the interview, Hovan stated:

> Um I'm honestly like, I'd rather do this faster, I don't really need a lawyer cause I don't really. . . I'll tell you everything I know. . . . -like I have the right to a lawyer, but I'm just saying, I know what I know and I can tell you everything I don't, and I'm confident with telling the truth on this.

Interview Tr. 3:4-3:14; Interview Recording 1:45-2:06. Later, sixteen minutes into the interview, Hovan reiterated: "So, but I'll help you as much as I can in trying to find them [the other participants in the deal] . . . . Really like I'll be 100% cooperative for whatever you need." Interview Tr. 12:37-12:43; Interview Recording 16:12-16:20.

voluntary when defendant "readily" replied to officer's request to search). As such, this factor weights in favor of voluntariness

Thus, under the totality of the circumstances, Hovan voluntarily consented to the search of his personal and work phones.

### III. Conclusion

For the reasons discussed above, I will deny Hovan's motions to suppress the evidence obtained from his phones because he consented to the search.[7]

                                     *S/Anita B. Brody*
                                     ANITA B. BRODY, J.

XC: Speedy Trial

COPIES VIA ECF                        Copies mailed 08-25-2021 to:
                                                     Nicholas Hovan, defendant #1

---

[7] Because I find that Hovan voluntarily consented to the search of his phones, I will not address his argument that the evidence on the phones should be suppressed based on *Franks v. Delaware*, 438 U.S. 154 (1978), and I will deny his request for a *Franks* hearing.